**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT A. LEVY, D.M.D., LLC, on behalf of | ) | |
| himself and all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: |
| v. | ) | |
| | ) | |
| HARTFORD CASUALTY | ) | |
| INSURANCE COMPANY, | ) | |
| an Indiana Corporation | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

**PLAINTIFF'S CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ........................................................................... 1

II.    THE PARTIES............................................................................................... 3

III.   JURISDICTION AND VENUE ..................................................................... 3

IV.    FACTUAL ALLEGATIONS ......................................................................... 4

   A.   The Global COVID-19 Pandemic ............................................................ 4

   B.   Steps Taken by Authorities in Missouri to Control the Pandemic .................................. 6

   C.   Standards and Recommendations Related to the Pandemic for Dental Practices............ 8

   D.   The Devastating Impact of the COVID-19 Pandemic on Dental Practices .................. 10

   E.   Hartford's Spectrum Business Owner's Insurance Policy ............................................ 11

V.     CLASS ALLEGATIONS ............................................................................... 16

VI.    JURY DEMAND ........................................................................................... 18

VII.   COUNT I: Business Income Breach Of Contract............................................................ 19

VIII.  COUNT II: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable
       to Business Income ........................................................................................ 20

IX.    COUNT III: Declaratory Relief Applicable to Business Income ..................................... 21

X.     COUNT IV: Extra Expense Breach of Contract............................................................ 22

XI.    COUNT V: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable
       to Extra Expense ........................................................................................... 24

XII.   COUNT VI: Declaratory Relief Applicable to Extra Expense ......................................... 25

XIII.  PRAYER FOR RELIEF ................................................................................. 26

PLAINTIFF ROBERT A. LEVY, D.M.D., LLC individually and on behalf of other similarly situated persons and entities operating dental practices in Missouri, makes the following allegations based upon information and belief, except as to those allegations specifically pertaining to Plaintiff, which are based on personal knowledge. Plaintiff brings this action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory and injunctive relief against DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY ("Hartford" or "Defendant"), demanding a trial by jury.

## I.   NATURE OF THE ACTION

1.   ROBERT A. LEVY, D.M.D. ("Dr. Levy") has been practicing dentistry in St. Louis County through Plaintiff Robert A. Levy, D.M.D., LLC ("Plaintiff") for over 30 years. To make sure that Plaintiff would be protected if it was forced to temporarily cease its practice by unanticipated events beyond its control, Plaintiff purchased a commercial insurance policy from Hartford. That policy is attached hereto as Exhibit A.

2.   Such an event, namely the worst health crisis to hit the State of Missouri, the United States, and indeed the world in over a century, arrived in early 2020 in the form of a worldwide pandemic of a disease called COVID-19, causing a massive number of illnesses and numerous deaths.

3.   Like Plaintiff, many other dental practices have purchased insurance from Hartford to protect against losses from catastrophic events like the current unforeseen COVID-19 pandemic. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed because of direct physical loss or damage to the property. This coverage, commonly known as "business interruption" or "business income" coverage, is standard in most all-risk commercial property insurance policies.

1

4.    As a result of the pandemic, on March 23, 2020, the Centers for Disease Control ("CDC"), and American Dental Association ("ADA") recommended to all dentists in the United States that elective, or non-urgent dental procedures be postponed to help reduce the risk of spreading COVID-19.[1]

5.    On the same date, the Missouri Dental Board urged Missouri dentists to adhere to those recommendations.

6.    That same date, in response to these recommendations and because of the risk of continuing its dental practice during the COVID-19 pandemic, Plaintiff shut down its practice. Since then, it has seen only a handful of patients and only for urgent problems.

7.    According to surveys conducted by the American Dental Association, all other dental practices in Missouri also completely ceased seeing patients for elective or non-urgent visits for the same reasons.

8.    However, despite the provision of business income coverage in its policies, Defendant is refusing to comply with its obligation to pay for business income losses and covered expenses incurred by policyholders as a result of the physical loss and damage to their insured property arising from the COVID-19 pandemic.

9.    Defendant seeks to justify its decision to unilaterally and preemptively deny coverage owed to its insureds on grounds that are patently specious. It states that there is no coverage because a virus cannot cause physical loss or damage to property as required by the policy. However, beginning in 2006, Defendant's policy specifically *excluded* certain types of property loss or damage caused by viruses (though not the type of losses sustained by Plaintiff). If viruses could not cause property loss or damage, there would have been no reason to exclude them from

---

[1] https://content.govdelivery.com/accounts/MODIFP/bulletins/282c1ac (accessed 5/8/2010).

the policy because they wouldn't have been covered to begin with. Defendant is grasping at straws and knows that there is coverage for Plaintiff's losses, as well as those of other dental practices.

10. Plaintiff brings this action on behalf of a class of Missouri dental practices (as defined below) that purchased standard Hartford commercial property insurance policies that provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered business income and extra expense losses.

11. This action also seeks a declaratory judgment that Hartford is contractually obligated to pay these losses. In addition, plaintiff seeks damages, attorneys' fees and costs, and any other relief that this Court deems equitable and just, arising out of Hartford's breach of contract and wrongful conduct alleged herein.

## II. THE PARTIES

12. Plaintiff Robert A. Levy, D.M.D., LLC, is a dental practice located at 777 South New Ballas Road, Suite 322 East, in St. Louis County, Missouri. Dr. Levy has practiced dentistry through that entity for over 30 years. Aside from giving his patients regular checkups and teeth cleaning, the treatments he provides include dental fillings, dental sealants, dentures, dental bridges, dental implants, dental crowns and tooth extractions, as well as dental bonding, porcelain veneers, inlays, onlays and teeth whitening.

13. Hartford is an insurance company incorporated in Indiana with its principal place of business at One Hartford Plaza, Hartford, CT 06155.

## III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between Defendant and at least one member of the class; there are more than one hundred members of the class; and the amount in controversy exceeds $5,000,000.00,

3

exclusive of interest and costs. This Court also has subject matter jurisdiction pursuant to 28

U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial

part, if not all, of the acts and omissions complained of in this action took place in this district.

## IV. FACTUAL ALLEGATIONS

### A.  The Global COVID-19 Pandemic

16. According to the World Health Organization ("WHO") COVID-19 is an infectious

disease for which there is no vaccine or treatment.[2] It spreads easily from person-to-person.[3]

17. When an infected person coughs, sneezes, or even just talks, droplets with the infectious

agent fly into the air from the person's nose or mouth and can thereby infect others. This can

occur even if the person is asymptomatic.[4] As WebMD states, "Some people who don't know

they've been infected can give it to others. This is called asymptomatic spread. You can also pass

it on before you notice any signs of infection, called presymptomatic spread."[5]

18.  Thus, absent testing, there is no way to know whether a person with whom one comes

into contact might be spreading the disease.

19. The coronavirus can live in the air for up to three hours, be breathed in by others, and get

into their lungs, where it can infect them.[6]

---

[2]  https://www.who.int/health-topics/coronavirus#tab=tab_1 (accessed 5/10/2020).
[3] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html#:~:text=On%20March%2011%2C%20the,of%20new%20influenza%20viruses. (accessed 5/10/2020).
[4] https://www.webmd.com/lung/coronavirus-transmission-overview#1 (accessed 5/10/2020).
[5] *Id.*
[6] *Id.*

20. The coronavirus can also infect people who touch surfaces, such as countertops, doorknobs – and, of course, dental equipment – that contain the virus. It can live on plastic and stainless steel for up to three days.[7]

21. COVID-19 is a new disease. The first known outbreak was a cluster of cases of pneumonia in Wuhan, Hubei Province in China in December 2019.[8] The disease did not even have an official name when WHO declared a "Public Health Emergency of International Concern" on January 30, 2020.[9] The disease was given its name by WHO on February 11, 2020, short for "coronavirus disease 2019."[10]

22. After it was first discovered, COVID-19 spread rapidly. On March 11, 2020, "[d]eeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction, WHO made the assessment that COVID-19 can be characterized as a pandemic."[11]

23. A pandemic is "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[12] To be classified as a pandemic, WHO requires "the worldwide spread of a new disease."[13]

24. At the point that WHO labeled COVID-19 a pandemic, the number of cases outside China in just the past two weeks had increased by 13-fold to 118,000 in 114 countries; more than 4,000 people had lost their lives, and as the Director-General of WHO stated, "[t]housands more [were] fighting for their lives in hospitals."[14]

---

[7] *Id.*
[8] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).
[9] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (accessed 5/10/2020).
[10] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200211-sitrep-22-ncov.pdf?sfvrsn=fb6d49b1_2 (accessed 5/10/2020).
[11] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).
[12] https://www.merriam-webster.com/dictionary/pandemic (accessed 5/11/2020) (accessed 5/10/2020).
[13] https://www.who.int/csr/disease/swineflu/frequently_asked_questions/pandemic/en/ (accessed 5/10/2020).
[14] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed 5/10/2020).

25. According to the COVID Tracking Project, 1,672 patients at that point had tested positive in the United States, and 43 patients had died.[15] From that date on, the number of cases and deaths increased rapidly. By March 23, 2020, the number of cases in the this country had increased more than 28 times to 47,013 and deaths had increased by 12 times to 521.

26. As of May 1f, 2020, according to the *New York Times*, 1.4 million Americans had tested positive for COVID-19, and 85,000 had died from the disease.[16] That was more than any other country in the world and the 11th and 13th highest on a per capita basis, respectively.[17]

27. Missouri was hit by COVID-19 later than other states, but once it arrived it spread just as rapidly. As of March 11, 2020, when COVID-19 was first declared a worldwide pandemic, there was only one reported case in Missouri, an individual who had died. By March 23, those numbers had grown to 183 cases and three deaths. By May 13, there were more than 10,000 Missouri cases, and 542 Missourians had died of the disease.[18]

28. The rate of infection in St. Louis City and County quickly caught up with the rest of the country. As of May 13, per 100,000 residents in the City and County respectively, there were 498 and 387 cases and 29 and 28 deaths;[19] that compares to 422 cases and 25 deaths per 100,000 in the United States as a whole. [20]

**B. Steps Taken by Authorities in Missouri to Control the Pandemic**

29. On March 13, 2020, a state of emergency presented by COVID-19 was declared in both St. Louis City and St. Louis County.[21]

---

[15] https://covidtracking.com/data/us-daily (accessed 5/13/2020).
[16] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 5/14/2020).
[17] *Id.*
[18] https://covidtracking.com/data/state/missouri#historical (accessed 5/14/2020).
[19] https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html(accessed 5/13/2020).
[20] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 5/13/2020).
[21] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/covid-19-public-health-emergency-order-and-proclamation.cfm; and https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (both accessed 5/11/2020).

30. After COVID-19 continued to spread, the City and County of St. Louis both issued Stay at Home Orders.

31. On March 21, 2020, County Executive Dr. Sam Page issued an Executive Order, commanding the Director of the St. Louis County Department of Public Health to issue an order directing that "people stay home when possible" other than, *inter alia*, to "perform tasks *essential* to the health and safety of individuals, their families, their household members, and their pets, such as … visiting a health care professional or hospital …."[22]

32. On March 23, 2020, the St. Louis County Director of Public Health issued a Stay at Home Order and, subsequently an Amended Stay at Home Order, that allowed residents to leave home to engage in "Essential Activities," including "Healthcare Operations," defined to include dentists. The Order was scheduled to remain in place until 11:59 April 22, 2020.[23]

33. That Order was amended on April 23, 2020, and again on May 4, 2020, extending the Stay at Home Order indefinitely.[24] On May 8, 2020, the St. Louis County Director of Public Health eased the restrictions somewhat as of May 8, 2020, but still noted: "All Gatherings pose an increased risk of transmission and should be voluntarily avoided whenever possible."[25]

34. Meanwhile, the City of St. Louis issued a Stay at Home Order that, as in St. Louis County, went into effect March 23. It ordered all individuals living in the City to remain at home with certain exceptions including "[t]o perform tasks essential to the health and safety of

---

[22] https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (accessed 5/11/2020) (emphasis added).

[23] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-amended-stay-at-home-order/; https://stlouisco.com/portals/8/docs/document%20library/CountyExecutive/Executive%20Orders/Stay%20at%20Home%20Order.pdf (both accessed 5/11/2020).

[24] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-extension-and-amendment-of-stay-at-home-order/; https://stlcorona.com/news/dph-covid-19-update-542020/ (both accessed 5/11/2020.

[25] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-business-and-individual-guidelines-for-social-distancing-and-re-opening/ (accessed 5/13/2020).

individuals, their family [and] household members … such as … visiting a health care professional."[26] That order was extended on April 16, 2020, with no definite ending date.[27] On May 11, 2020, the City Health Commissioner entered an order similar to that in St. Louis County, allowing limited re-opening as of May 18.[28]

35. Because the Stay at Home Orders limited out-of-home activities to essential activities, they allowed only visits to a dentist for essential treatments.

### C.  Standards and Recommendations Related to the Pandemic for Dental Practices

36. As of March 23, 2020, the same date that the Stay at Home Orders went into effect in St. Louis City and County, the CDC and the ADA were recommending that elective, or non-urgent dental procedures be postponed to reduce the risk of spreading COVID-19. [29]

37. The CDC explained that these recommendations were based on the risk of infection in dental offices, especially because of the spatter of bodily fluids and microorganisms:

> The practice of dentistry involves the use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes. These instruments create a visible spray that contains large particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, dental health care personnel (DHCP), or the patient. The spray also might contain certain aerosols.[30]

38. CDC went on to explain that the precautions it recommended in other healthcare settings were not possible for dental practices because dental settings "are not designed for or equipped

---

[26] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commission-s-Order-5-03-21-2020.pdf (accessed 5/11/2020).

[27] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commissioner-s-Order-No-7.pdf (accessed 5/11/2020).

[28] https://www.stlouis-mo.gov/government/departments/mayor/news/city-of-st-louis-to-begin-gradually-reopening-on-may-18.cfm (accessed 5/13/2020).

[29] https://content.govdelivery.com/accounts/MODIFP/bulletins/282c1ac (accessed 5/11/2020). They made those recommendations on March 18. https://aonaffinity-blob-cdn.azureedge.net/affinitytemplate-dev/media/dentistsadvantagedev/media/risk/alerts/rmalert_coronavirus_march2020.pdf (accessed 5/11/2020).

[30] https://web.archive.org/web/20200327164143/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/11/2020) (footnote omitted).

to provide this standard of care. For example, most dental settings do not have airborne infection isolation rooms or single-patient rooms, do not have a respiratory protection program, and do not routinely stock N95 respirators."[31]

39. Accordingly, CDC recommended that "[s]ervices should be limited to urgent and emergency visits only during this period of the pandemic. These actions help staff and patients stay safe, preserve personal protective equipment and patient care supplies, and expand available health system capacity."[32]

40. As of May 13, 2020, those recommendations were still in effect.[33] When the CDC reiterated them on April 7, 2020, it noted that the United States Occupational Safety and Health Administration had said that dental healthcare professionals were at very high risk of COVID-19 "as their jobs are those with high potential for exposure to known or suspected sources of the virus that causes COVID-19 during specific procedures."[34]

41. On March 23, 2020, the Missouri Dental Board, the body that regulates Missouri dentists, issued a bulletin stating that it supports the CDC and ADA recommendations described above, and it "urged Missouri dentists to adhere to them."  The Board also "strongly encouraged" dentists "to take the necessary steps to insure the safety of their patients, staff and themselves by limiting opportunities for this virus to continue to spread."[35]

---

[31] https://web.archive.org/web/20200327164143/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/11/2020).
[32] *Id.*
[33] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/13/2020).
[34] https://web.archive.org/web/20200414014847/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/1/11/2020).
[35] https://content.govdelivery.com/accounts/MODIFP/bulletins/282c1ac (accessed 5/11/2020).

**D.  The Devastating Impact of the COVID-19 Pandemic on Dental Practices**

42. In the face of the Covid-19 pandemic, Plaintiff and other Missouri dentists had no choice but to shut down their practices except to see patients for non-elective and urgent care. Any reasonable dentist would have shut down except for such emergencies.

43. And that is what happened.

44. On April 15, 2020, Marko Vujicic, Ph. D., chief economist and vice president of the ADA's Health Policy Institute ("HPI"), was quoted as saying that "the coming two to three months represent a critical juncture for the economic sustainability of many dental practices."[36]

45. And in fact, April was devastating to dentists' practices. A good example is what happened during the week of April 20. According to an ADA national survey, that week 79.4 % of dental practices were closed except for emergency patients, and another 17.2% were closed completely, meaning that 96.6% of dentists in the United States were completely shut down except possibly for emergencies; the other few were open but had lower volume than usual.[37]

46. In Missouri that week, 71.6% of dentists were seeing only emergency patients, and 17.9% were completely closed. Not one dentist reported to the survey that his or her practice was open with business as usual.[38]

47. Nationwide, dentists reported that their patient volume had plummeted. In the week of April 20, 86.0% reported that their volume was less than 5% of what was typical in their practice; for another 7.7% it was between 5 and 10%.[39]

---

[36] https://us.dental-tribune.com/news/dentists-report-financial-impact-of-covid-19-on-their-practices/ (accessed 5/12/2020)
[37] Health Policy Institute, COVID-19: Economic Impact on Dental Practices (Week of April 20 Results) ("Economic Impact") at 1.
[38] Economic Impact at 4.
[39] Economic Impact at 6.

48. Missouri was typical. Fully 75.5% of dentists that week saw less than 5% of their usual patient volume, and another 9.1% saw between 5 and 10%.[40]

49. Not surprisingly, the financial impact on dentists has also been devastating. That same week of April 20, 76.9% of dentists collected less than 5% in fees compared to what was typical in their practice, and another 13.0% collected between 5 and 10%.[41]

50. Again, Missouri was typical, with 65.7% collecting less than 5% of the typical amount, and another 14.8% collecting between 5-10% during the week of April 20. Only 4.6% collected even 76% or more of what was typical.[42]

**E. Hartford's Spectrum Business Owner's Insurance Policy**

51. In exchange for premiums paid by Plaintiff to Defendant, Plaintiff obtained a Spectrum Business Owner's Policy, Policy Number 84 SBA RV5801 SA, covering a Policy Period from 10/21/2019 to 10/21/2020 (Exhibit A) ("the policy").

52. The policy's Special Property Coverage Form states that the coverage is "for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called 'scheduled premises' in this policy) caused by or resulting from a Covered Cause of Loss." Ex. A at 30 (page numbers refer to the page of the pdf file).

53. The scheduled premises are 777 S. New Ballas Rd., Ste 322 East, Saint Louis, MO 63141, which is where Plaintiff maintains and conducts its dental practice. Ex, A at 16.

54. "Covered Property" means the buildings and structures at that address, including fixtures, machinery, and certain other property. In other words, the Covered Property is the office suite where Plaintiff conducts its business. Ex. A at 30.

---

[40] Economic Impact at 12.
[41] Economic Impact at 6.
[42] Economic Impact at 14.

55. The COVID-19 pandemic caused a direct physical loss to Plaintiff's Covered Property at the scheduled premises by denying Plaintiff the ability to physically access and use the property in the normal fashion in its business; it is therefore a covered loss.

56. The coverage provided by the policy includes loss of Business Income:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'. The suspension must be caused by direct physical loss of or physical damage to property at the 'scheduled premises', including personal property in the open (or in a vehicle) within 1,000 feet of the 'scheduled premises,' caused by or resulting from a Covered Cause of Loss.

Ex. A at 39.

57. "Operations" means "your business activities occurring at the 'scheduled premises ….'" Ex.A at 53. In other words, that is Plaintiff's practice of dentistry.

58. "Period of restoration" means the period "begin[ning] with the date of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the 'scheduled premises'" and ending when the property is restored. Ex. A at 53. Thus, it is the period when the property cannot be used for Plaintiff's business because of the COVID-19 pandemic.

59. The policy provides that, for purposes of the above provision, "suspension" includes "[t]he partial slowdown or complete cessation of your business activities." Ex. A at 39. Because Plaintiff's business activities suffered a partial slowdown or complete cessation, Plaintiff experienced a suspension.

60. COVID-19 is a "covered cause of loss" under the policy. Covered Causes of Loss are defined as follows:

> RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
>
> **a.** Excluded in Section **B., EXCLUSIONS;** or
>
> **b.** Limited in Paragraph **A.4.** Limitations ….

12

Ex. A at 31. Because the COVID-19 pandemic created a risk of direct physical loss, it is a "covered cause of loss" unless excluded or limited. None of the Exclusions in Section B or the Limitations in Paragraph A.4 apply to COVID-19. *See* Ex. A at 31, 45-47. Therefore, COVID-19 is a covered cause of loss.

61. Plaintiff's policy also covers Plaintiff's "Extra Expense" for expenditures made necessary by the COVID-19 pandemic. Ex. A at 39-40. Specifically, the policy states:

> (1) We will pay reasonable and necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled premises'… caused by or resulting from a Covered Cause of Loss.
>
> ***
>
> (3) Extra Expense means expense incurred:
>
> > (a) To avoid or minimize the suspension of business and to continue 'operations':
> >
> > > (i) At the 'scheduled premises'; …
> >
> > (b) To minimize the suspension of business if you cannot continue "operations".
> >
> > (c) (i) To repair or replace any property; or
> >
> > > (ii) … to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage o., Business Income.
> > >
> > > We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or physical damage. This Additional Coverage is not subject to the Limits of Insurance.

62. The policy also covers Plaintiff's Extended Business Income for losses that occur after the property is restored, as follows:

> (1) If the necessary suspension of your 'operations' produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

13

(a) Begins on the date property is actually repaired, rebuilt or replaced and 'operations' are resumed; and

(b) Ends on the earlier of:

(i) The date you could restore your 'operations' with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred; or

(ii) 30 consecutive days after the date determined in (1)(a) above.

Loss of Business Income must be caused by direct physical loss or physical damage at the 'scheduled premises' caused by or resulting from a Covered Cause of Loss.

(2) With respect to the coverage provided in this Additional Coverage, suspension means:

(a) The partial slowdown or complete cessation of your business activities; and

(b) That a part or all of the 'scheduled premises' is rendered untenantable as a result of a Covered Cause of Loss.

Ex. A at 40.

63. Plaintiff and Class Members are entitled to coverage under the above provisions.

64. However, Defendant denies that the COVID-19 pandemic is a covered cause of loss and refuses to provide any coverage whatsoever.

65. Dr. Levy called Defendant in March 2020 to ask if his losses were covered and was told that they were not.

66. Plaintiff has sent Defendant a formal written claim. Defendant has not yet responded, but Plaintiff expects that Defendant will reiterate its denial of coverage.

67. Defendant states the purported basis of its denial of coverage on its web site:

**COVID-19 Business Interruption Claims**

We're closely monitoring COVID-19, and we know it's affecting businesses across the country. Although most property insurance includes business interruption coverage, coverage may be unavailable or limited *because viruses*

14

*generally do not cause physical loss or damage to property as required by the policy*. If you want to submit a claim for your business, click below.

https://www.thehartford.com/commercial-property-insurance/claims (accessed 5/13/2020)

(emphasis added).

68. This explanation is illogical and a sham because Defendant knows that viruses can cause physical loss or damage to property under the policy. For that reason, the policy includes a *virus exclusion*, which excludes some coverages resulting from viruses. That exclusion, which was added to the policy in or about 2006, appears on a page headed with this statement: "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." Ex. A at 135.

69. The virus exclusion states:

**i. "Fungi", Wet Rot, Dry Rot, Bacteria And Virus**

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

(1) Presence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or *virus*.

Ex. A at 135.

70. If a virus, even one that was present or active in the property, does not cause physical loss or damage to the property, there would have been absolutely no reason for Defendant to change the policy by excluding viruses under certain conditions or to state in the policy that the provision changes the policy. The fact that Defendant felt the need to include an exclusion for viruses shows that Defendant knows that viruses most certainly *can* cause loss or damage to the property.

71. However, the virus exclusion does not apply to Plaintiff's loss (as Defendant knows because it did not offer it on its website as a reason for refusing coverage for losses due to the

15

COVID-19 pandemic). Plaintiff's loss was not caused by the presence of viruses in its premises. There is no evidence that the virus has ever been in his premises. Plaintiff's loss was caused by the worldwide pandemic and, as recommended by the CDC and dental organizations, the need to prevent it from spreading to his employees, his patients and others.

## V. CLASS ALLEGATIONS

72. Plaintiff brings this action on behalf of itself and as a representative of all others who are similarly situated. Pursuant to Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of the following classes:

> a. All persons and entities operating dental practices in Missouri with Business Income (including Extended Business Income) coverage issued by Defendant that suffered suspension of business related to COVID-19, and for which Defendant has denied a claim for the losses or has otherwise failed to acknowledge or accept as a covered loss, or pay for the covered losses (the "Business Income Coverage Class").

> b. All persons and entities operating dental practices in Missouri with Extra Expense coverage issued by Defendant that sought to avoid or minimize the suspension of business related to COVID-19 and for which Defendant has denied a claim for the expenses or has otherwise failed to acknowledge or accept as a covered expense, or pay for the covered expenses (the "Extra Expense Coverage Class").

73. Excluded from each of the above Classes are Defendant, including any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendant. Also excluded are the judges and court personnel in this case and any members of their immediate families.

74. Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

75. This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Rule 23 of the Federal Rules of Civil Procedure.

76. **Numerosity.** Fed. R. Civ. P. 23(a)(1). The members of each Class is so numerous that joinder of all members is impractical. The precise number of Class members can be ascertained from Defendant's records.

77. **Commonality and Predominance.** Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to each Class, which predominate over any questions affecting individual members of each respective Class. These common questions of law and fact include, without limitation:

   a. Whether Plaintiff and the Class members suffered a covered loss under the common policies issued to members of the Class;

   b. Whether Defendant wrongfully denied all claims based on COVID-19;

   c. Whether Defendant's Business Income coverage applies to a suspension of business caused by COVID-19 and/or in response to the presence or threat of COVID-19;

   d. Whether Defendant's Extra Expense coverage applies to efforts to avoid or minimize a loss caused by COVID-19;

   e. Whether Defendant has breached its contracts of insurance through a uniform and blanket denial of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19;

   f. Whether Plaintiff and the Class members suffered damages as a result of Defendant's actions.

78. **Typicality.** Fed. R. Civ. P. 23 (a)(3). Plaintiff's claims are typical of the claims of the Class it seeks to represent. Plaintiff and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendant's unlawful conduct.

79. **Adequacy.** Fed. R. Civ. P. 23(a)(4). Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

17

80. **Superiority.** Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer losses and Defendant's misconduct will proceed without remedy. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Finally, Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

81. **Injunctive and Declaratory Relief.** Fed. R. Civ. P. 23(b)(2). Defendant's unlawful and unfair conduct is uniform as to all members of each Class. Defendant has acted or refused to act on grounds that apply generally to each Class, so that final injunctive relief or declaratory relief is appropriate with respect to each Class as a whole.

## VI. JURY DEMAND

82. Plaintiff demands trial by jury on all claims so triable.

## VII.    COUNT I: Business Income Breach Of Contract
### (By Plaintiff and the Business Income Coverage Class)

83. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

84. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendant under Missouri law.

85. Plaintiff's Policy and the policies of other Business Income Coverage Class members are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Plaintiff for its covered losses under the Policy and for Class members' covered losses.

86. In Plaintiff's policy, Defendant expressly agrees to pay for losses of Business Income incurred as a result of causes not excluded, including losses caused by the COVID-19 pandemic. Specifically, Defendant promises to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

87. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members lost Business Income and Extended Business Income.

88. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under Plaintiff's policy and other Class members' policies.

89. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

90. Defendant, without justification, has refused performance under Plaintiff's policy and other Class members' policies by denying coverage for these losses. Accordingly, Defendant is in breach of the policy and other Class members' policies.

91. Due to Defendant's breach of the policy and other Class members' policies, Plaintiff and other members of the Business Income Coverage Class have suffered actual and substantial damages for which Defendant is liable, in an amount to be proved at trial.

## VIII.   COUNT II: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable to Business Income
(By Plaintiff and the Business Income Coverage Class)

92. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

93. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendant under Missouri law.

94. Defendant has breached the duty of good faith and fair dealing owed to Plaintiff and the Business Income Coverage Class in the following respects:

    a.  Unreasonably acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

    b.  Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

    c.  Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff and the Class' claims;

    d.  Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff and the Class' policies;

    e.  Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

    f.  Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

    g.  Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

20

h.  Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i.  Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class;

j.  Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;

k.  Unreasonably placing its own financial interests above the interests of Plaintiff and the Class; and

l.  Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

95. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing.

96. As a result of this breach, Plaintiff and the Business Income Coverage Class have been damaged in an amount to be proven at trial.

## IX. COUNT III: Declaratory Relief Applicable to Business Income
## (By Plaintiff and the Business Income Coverage Class)

97. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

98. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendant under Missouri law.

99. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

100. Plaintiff's Policy and the policies of other Business Income Coverage Class members are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by the policy.

101. In the Policy, Defendant expressly agreed to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the policy. Specifically, Defendant promised to pay for losses of business income sustained as a result of a business suspension.

102. A covered loss has resulted in business suspensions, which have caused Plaintiff's and Class members losses.

103. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the policy and other Class members' policies.

104. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

105. Defendant, without justification, has refused performance under the policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of the policy and other Class members' policies.

106. Plaintiff and the Class members seek a judicial determination of whether the policies provide coverage for Plaintiff's and Class members' losses.

107. A case or controversy exists regarding Class members' rights and Defendant's obligations under the terms of the Class members' policies.

## X.  COUNT IV: Extra Expense Breach of Contract
### (By Plaintiff and the Extra Expense Coverage Class)

108. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

109. Plaintiff brings this claim individually and on behalf of the Extra Expense Coverage Class against Defendant under Missouri law.

110. Plaintiff's policy and the policies of other Extra Expense Coverage Class members are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

111. In Plaintiff's policy and the policies of other Extra Expense Coverage Class members, Defendant expressly agrees to pay for extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendant promises to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

112. A covered loss has resulted in a business suspension. These suspensions have caused Plaintiff and Class members to incur extra expenses.

113. The extra expenses triggered the extra expense coverage under Plaintiff's policy and other Class members' policies.

114. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

115. Defendant, without justification, has refused performance under the policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of the policy and other Class members' policies.

116. Due to Defendant's breach of the policy and other Class member policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendant is liable, in an amount to be proved at trial.

## XI. COUNT V: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable to Extra Expense
### (By Plaintiff and the Extra Expense Coverage Class)

117. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

118. Plaintiff brings this claim individually and on behalf of the Extra Expense Class against Defendant under Missouri law.

119. Defendant has breached the duty of good faith and fair dealing owed to Plaintiff and the Extra Expense Class with respect to the Extra Expense provisions in the following respects:

    a. Unreasonably acting or failing to act in a manner that deprives Plaintiff and the Class the benefits of their policies;

    b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

    c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff and the Class' claims;

    d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff and the Class' policies;

    e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

    f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

    g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

    h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

    i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class;

24

     j.   Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;

     k.   Unreasonably placing its own financial interests above the interests of Plaintiff and the Class; and

     l.   Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

120. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of the policies.

121. As a result of this breach, Plaintiff and the Extra Expense Class have been damaged in an amount to be proven at trial.

### XII.   COUNT VI: Declaratory Relief Applicable to Extra Expense (By Plaintiff and the Extra Expense Class)

122. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

123. Plaintiff brings this claim individually and on behalf of the Extra Expense Class against Defendant under Missouri law.

124. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

125. Plaintiff's policy and the policies of other Extra Expense Class members are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

126. In Plaintiff's policy and the policies of other Extra Expense Class members, Defendant expressly agrees to pay extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendant promises to pay amounts to avoid or minimize the losses from

suspension of business and to continue "operations" at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

127. The COVID-19 pandemic has caused Plaintiff and the Extra Expense Class covered losses.

128. These covered losses have resulted, and will result, in extra expenses, which have caused Plaintiff's and Class members losses.

129. The extra expenses triggered the Extra Expense coverage under Plaintiff's policy and other Class members' policies.

130. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

131. Defendant, without justification, has refused performance under Plaintiff's policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of Plaintiff's policy and other Class members' policies.

132. Plaintiff and the Class members seek a judicial determination of whether the Extra Expense provisions of the policies provide coverage for Plaintiff's and Class members' losses.

133. An actual case or controversy exists regarding Extra Expense Class members' rights and Defendant's obligations under the terms of the Extra Expense provisions of Plaintiff's policy and other Class members' policies.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment against Defendant, as follows:

1.   An order certifying appropriate classes and/or subclasses, designating Plaintiff as the class representative and its counsel as class counsel;

2.   A judicial declaration declaring the meaning of the provisions concerning the business income coverage and extra expense coverage;

3.   An award of damages to Plaintiff and the Class in an amount to be determined at trial;

4.   An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded, as allowed by law;

5.   An award of costs and attorneys' fees, as allowed by law; and

6. Such other or further relief as may be appropriate.

Dated: May 14, 2020                    Respectfully submitted,

**LAW OFFICE OF RICHARD S. CORNFELD, LLC**

By:   _/s/ Richard S. Cornfeld_
Richard S. Cornfeld, #31046MO
Daniel S. Levy, #66039MO
1010 Market Street, Suite 1645
St. Louis, Missouri 63101
P. 314-241-5799
F. 314-241-5788
rcornfeld@cornfeldlegal.com
dlevy@cornfeldlegal.com

And

Anthony S. Bruning, #30906MO
Anthony S. Bruning, Jr., #60200MO
Ryan L. Bruning, #62773MO
THE BRUNING LAW FIRM, LLC
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
P. 314-735-8100 / F. 314-898-3078
tony@bruninglegal.com
aj@bruninglegal.com
ryan@bruninglegal.com

And

Alfredo Torrijos (*Pro Hac Vice* to be submitted)

ARIAS SANGUINETTI WANG & TORRIJOS, LLP
6701 Center Drive West, 14th Floor
Los Angeles, CA
T: (310) 844-9696
F: (310) 861-0168
alfredo@aswtlawyers.com

***Attorneys for Plaintiffs***