# Exhibit B



CALIFORNIA COURT OF APPEAL

FOR THE FIRST APPELLATE DISTRICT - DIVISION FIVE

No. A114289

| | |
|---|---|
| Linda Demery, | Solano County Superior Court No. FCS 024698 |
| Plaintiff and Respondent, | |
| v. | |
| Hartford Underwriters Insurance Company, | |
| Defendant and Appellant. | |

Appeal From the Superior Court
of California, County of Solano
Honorable Judge Scott L. Kays

## APPELLANT'S OPENING BRIEF

BINGHAM McCUTCHEN LLP
John R. Reese (SBN 37653)
Robert A. Lewis (SBN 83630)
Karen Kennard (SBN 141925)
Three Embarcadero Center
San Francisco, California 94111-4067
Telephone: (415) 393-2000

Attorneys for Defendant and Appellant
Hartford Underwriters Insurance Company

# CALIFORNIA COURT OF APPEAL

## FOR THE FIRST APPELLATE DISTRICT - DIVISION FIVE

No. A114289

Linda Demery,

    Plaintiff and Respondent,

v.

Hartford Underwriters Insurance Company,

    Defendant and Appellant.

Solano County Superior Court No. FCS 024698

Appeal From the Superior Court
of California, County of Solano
Honorable Judge Scott L. Kays

---

## APPELLANT'S OPENING BRIEF

---

BINGHAM McCUTCHEN LLP
John R. Reese (SBN 37653)
Robert A. Lewis (SBN 83630)
Karen Kennard (SBN 141925)
Three Embarcadero Center
San Francisco, California 94111-4067
Telephone: (415) 393-2000

Attorneys for Defendant and Appellant
Hartford Underwriters Insurance Company

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS
## (CALIFORNIA RULE OF COURT 14.5)

Pursuant to California Rule of Court 14.5(d), Appellant and Defendant Hartford Underwriters Insurance Company ("Hartford Underwriters") certifies as follows:

1. Hartford Underwriters is a wholly-owned subsidiary of Hartford Fire Insurance Company. Hartford Fire Insurance Company is a wholly-owned subsidiary of The Hartford Financial Services Group, Inc. California Rule of Court 14.5(d)(1).

2. The following entities have an interest in the outcome of the proceeding pursuant to California Rule of Court 14.5(d)(2) and Canon 3E of the Code of Judicial Ethics because they are involved in the facts that give rise to this proceeding: (1) First State Management Group, Inc.; (2) Pacific Insurance Company, Ltd.; (3) Twin City Fire Insurance Company; and (4) Hartford Casualty Insurance Company. California Rule of Court 14.(d)(2); Code of Judicial Ethics, Canon 3E.

I declare under penalty of perjury that the foregoing is true and correct and that this certification was executed in San Francisco, California, on December 14, 2006.

Robert A. Lewis

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................ 1

II. STATEMENT OF THE CASE ............................................ 3

    A.  Facts ........................................................................ 3

        1.  The Demery Case ............................................. 3

        2.  M&F's Prior Representations of Hartford Entities ............................................................. 4

        3.  M&F's Concurrent Representations of Hartford Entities ................................................ 7

        4.  M&F Was Aware of the Unity of Interest Between The Hartford Entities .......................... 8

    B.  Proceedings Below ................................................. 14

        1.  The Conflict is Discovered ............................. 14

        2.  Hartford Underwriters Immediately Seeks Disqualification of M&F ............................... 15

        3.  The Trial Court's Ruling ................................ 17

        4.  Initial Appellate Proceedings ........................ 18

III. STATEMENT OF APPEALABILITY ............................. 19

IV. STANDARD OF REVIEW .............................................. 20

V.  ARGUMENT .................................................................... 21

    A.  The Trial Court Erred in Failing to Disqualify M&F On Grounds of Simultaneous Adverse Representation ....... 21

        1.  The Material Facts Are Not Disputed And Compel Disqualification ................................ 22

            a.  The Facts Regarding Simultaneous Adverse Representation ............................. 23

            b.  The Facts Regarding "Unity of Interest" ....... 23

            c.  The Facts Regarding Delay and Prejudice ...................................................... 25

        2.  The Trial Court Correctly Applied The "Unity of Interest" Test ........................................... 25

SF/21676441.8

# TABLE OF CONTENTS
## (continued)

3.    Disqualification of M&F Should Have Been Mandatory And Automatic As A Matter Of Law ........................................................................ 31

    a.    The Obligation To Identify And Resolve Conflicts Rests With The Attorney, Not The Client ..................................................... 33

    b.    Hartford Underwriters Did Not Delay In Seeking Disqualification ................................ 35

    c.    The Order Purports to Make Factual Determinations of Delay and Prejudice Which Were Not Asserted by Demery And For Which There Is No Evidence .......... 37

B.    The Trial Court Erred in Failing to Disqualify M&F On Grounds of Successive Representation .......................... 40

    1.    The Material Facts Are Not Disputed ....................... 40

    2.    M&F Must Be Disqualified Because It Formerly Represented Other Hartford Entities In Substantially Related Matters ............................... 42

    a.    M&F's Prior Representation Of Hartford Companies In Insurance Coverage Matters Is "Substantially Related" To Its Current Representation of Demery In A Bad Faith and Breach of Contract Matter ...... 43

    b.    The Evidence Establishes The Requisite "Substantial Relationship" Between Demery And The Matters Previously Handled By M&F .......................................... 45

VI.    CONCLUSION ............................................................................ 48

CERTIFICATE OF COMPLIANCE ........................................................ 49

# TABLE OF AUTHORITIES

Page

## CASES

*Adams v. Aerojet-General Corp.*, 86 Cal. App. 4th 1324
(2001) .................................................................................. 20

*American Mut. Liab. Ins. Co. v. Superior Court*, 38 Cal. App.
3d 579 (1974) ....................................................................... 23

*Baxter Diagnostics Inc. v. AVL Scientific Corp.*, 798 F.Supp.
612 (C.D. Cal. 1992) ............................................................ 28

*Blecher & Collins, P.C. v. Northwest Airlines, Inc.*, 858
F.Supp. 1442 (C.D. Cal. 1994) ....................................... 34, 36

*Brooklyn Navy Yard Cogeneration Partners, L.P. v. Superior
Court*, 60 Cal. App. 4th 248 (1997) ..................................... 26

*Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*,
264 F.Supp.2d 914 (N.D. Cal. 2003) ........................ 26, 28, 30

*Comden v. Superior Court*, 20 Cal. 3d 906 (1978) ..................... 40

*Farris v. Fireman's Fund Ins. Co.*, 119 Cal.App.4th 671
(2004) ......................................................................... 43, 44, 45

*Flatt v. Superior Court*, 9 Cal. 4th 275 (1994) ................... 22, 31

*Fremont Indemnity Company v. Fremont General
Corporation*, 143 Cal. App. 4th 50 (2006) ........................... 20

*H.F. Ahmanson & Co. v. Salomon Brothers, Inc.*, 229
Cal.App.3d 1445 (1991) .................................................. 43, 47

*Hartford Acc. and Indem. Co. v. RJR Nabisco, Inc.*, 721
F.Supp. 534 (S.D.N.Y. 1989) ............................................... 28

*Jeffry v. Pounds*, 67 Cal. App. 3d 6 (1977) ............................... 21

*Lysick v. Walcom*, 258 Cal. App. 2d 136 (1968) ....................... 23

*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69
Cal.App.4th 223 (1999) .................... 25, 26, 27, 28, 30, 42, 43

SF/21676441.8

*People v. SpeeDee Oil Change Systems, Inc.*, 20 Cal. 4th 1135 (1999)........................................................................... 20

*Purdy v. Pacific Automobile Ins. Co.*, 157 Cal. App. 3d 59 (1984)................................................................................... 23

*Ramada Franchise System, Inc. v. Hotel of Gainesville Assocs.*, 988 F. Supp. 1460 (N.D. Ga. 1997)................................... 28, 30

*Reed v. Superior Court*, 92 Cal. App. 4th 448 (2001) ................................. 20

*River West, Inc. v. Nickel*, 188 Cal. App. 3d 1297 (1987) .......................... 35

*State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*, 72 Cal. App. 4th 1422 (1999)......................................... 21, 22, 32, 34, 35, 36, 39

*Teradyne, Inc. v. Hewlett-Packard Co.*, 1991 WL 239940 (N.D. Cal. 1991) ................................................................... 28

*Truck Ins. Exchange v. Fireman's Fund Ins. Co.*, 6 Cal. App. 4th 1050 (1992) ...................................................... 20, 21, 32

**STATUTES AND RULES**

Rule 3-310(C) of the California Rules of Professional Conduct............................................................................. 21, 33, 34

Rule 3-310(E) of the California Rules of Professional Conduct............................................................................. 42, 44

SF/21676441.8

## I.    INTRODUCTION

The trial court correctly determined that the law firm of Michel & Fackler ("M&F"), representing Plaintiff and Respondent Linda Demery ("Demery") in this case, had a conflict of interest because of its extensive current and past representation of several companies related to Defendant and Appellant Hartford Underwriters Insurance Company ("Hartford Underwriters"). Despite that determination, the trial court incorrectly ruled that M&F should not be disqualified and could continue to pursue Demery's claim against Hartford Underwriters. This appeal seeks reversal of the trial court's April 24, 2006 order denying Hartford Underwriters' motion to disqualify M&F, so that Hartford Underwriters will not have to face a lengthy trial with its own attorneys as adversaries.

The appeal presents the following question: Who has the obligation to identify and resolve conflicts of interest -- the attorney who is seeking to undertake a new representation, or the client being sued by that attorney? California has always placed the obligation to identify and resolve conflicts of interest squarely -- and solely -- on the attorney bringing the lawsuit, not the client being sued. The trial court deviated from this well-established law, and imposed a new and unprecedented legal obligation on the client, Hartford Underwriters, to uncover the conflict of interest that was never disclosed by M&F. This is reversible error.

Moreover, under settled California law, simultaneous adverse

SF/21676441.8

representation of the type the trial court found M&F engaged in here has routinely led to automatic or "*per se*" disqualification when the conflict of interest is discovered. Here, however, the trial court again parted with precedent and refused to disqualify M&F, even though Demery offered no evidence that she would actually be prejudiced by M&F's disqualification, because, in the court's view, "someone" at Hartford Underwriters should have uncovered the undisclosed conflict sooner. This, too, is reversible error.

The trial court did not cite any legal authority to impose on the client the obligation to uncover conflicts of interest. Indeed, the only legal authority on this subject puts that obligation squarely on the *attorney*, not the *client*. The obligation is not onerous for the attorney, and particularly not in this case. M&F is not a sizable firm with large numbers of lawyers where this kind of obvious conflict might not immediately be detected. M&F has just three lawyers. All of them represented Demery in suing Hartford Underwriters, and all of them also represented Hartford companies in the several matters that were the basis for the trial court's determination that there was a conflict of interest.

By contrast, it is uncontested that Hartford Underwriters and its counsel in this case were completely unaware of M&F's ongoing and past work for other Hartford companies until shortly before the Demery trial was scheduled to begin, and they moved for disqualification

2

immediately upon discovering the conflict. There is no legal support for the proposition that it is the client's burden to somehow discover conflicts or that its own lawyers can prosecute claims against it if the client fails to uncover an undisclosed conflict quickly enough. Yet if the trial court's decision is allowed to stand, that will be the result here. The trial court's ruling is erroneous and must be reversed.

## II.     STATEMENT OF THE CASE

### A.     Facts

#### 1.     The Demery Case

This dispute arose in November 2001, when the kitchen of Demery's Vallejo home was damaged by a fire caused by food left cooking unattended on the stove. Demery's home was insured by Hartford Underwriters, and after the fire, Demery made a claim against Hartford Underwriters under her California homeowners' insurance policy. A dispute arose between Demery and Hartford Underwriters regarding the amount of loss caused by the fire, which was resolved by an appraisal award issued in September 2003. The appraisal award was fully paid by Hartford Underwriters.

Demery then retained M&F to represent her in litigation against Hartford Underwriters. In August 2004, M&F filed a complaint against Hartford Underwriters for its alleged delay in payment of Demery's policy benefits. The Demery complaint asserts causes of action against

Hartford Underwriters for breach of contract, breach of the implied covenant of good faith and fair dealing, and race discrimination. AA Vol. I, Tab 1, at 1-19 (Complaint).

## 2. M&F's Prior Representations of Hartford Entities

For many years before the Demery complaint was filed, M&F's business consisted largely of representing various insurance companies. AA Vol. I, Tab 4, at 99 (Kennard Decl., Ex. 4).[1] As part of this practice, dating back to at least the mid-1990's, M&F represented several subsidiaries of Hartford Underwriters' parent company, Hartford Fire Insurance Company ("Hartford Fire"), in various insurance-related matters.[2] In fact, over the years, M&F represented various Hartford Fire

---

[1]     "AA" refers to Appellant's Appendix. "RT" refers to the Reporter's Transcript. Appellant's Appendix includes twelve documents that were marked as trial exhibits and lodged with the trial court by the parties in advance of trial. During oral argument of the disqualification motion, these exhibits were referred to by their trial exhibit numbers. RT at 239:17-240:23; AA Vol. I, Tab 2, at 20-60 (Def. Tr. Exs. 3, 58, 76, 79, 102, 105, 108, 113, 122, 125, 175, 201). However, because the trial was subsequently stayed pending resolution of this appeal, these exhibits have not yet been admitted into evidence by the trial court. They are referred to herein and in the Appellant's Appendix as "Def. Tr. Ex. __."

[2]     Hartford Underwriters is a wholly-owned subsidiary of Hartford Fire. Hartford Fire, in turn, is a wholly-owned subsidiary of The Hartford Financial Services Group, Inc. ("HFSG") (together with its subsidiaries, "The Hartford"). HFSG is a holding company and has no significant business operations of its own. The brand name "The Hartford" is registered to Hartford Fire, and all of the employees of Hartford

(Footnote Continued on Next Page.)

SF/21676441.8

subsidiaries in at least 97 matters, for which it was paid over $1.3 million in legal fees. AA Vol. II, Tab 20, at 351 (April 24 Order); AA Vol. I, Tab 8, at 176, 178-190 (Blum Decl. ¶ 3 and Ex. A thereto); AA Vol. I, Tab 9, at 206-207 (Carlson Decl. ¶¶ 2-4).

M&F's work for these Hartford Fire subsidiaries included preparing coverage opinions relating to California homeowners' insurance policies of the same type issued to Demery. AA Vol. I, Tab 8, at 176, 191-201 (Blum Decl. ¶¶ 4-6 and Exs. B and C thereto). Moreover, M&F handled at least one case for a Hartford company involving allegations of bad faith handling of a claim which, like Demery's claim, involved issues of asbestos remediation and the payment of "actual cash value" for damaged property. AA Vol. I, Tab 12, at 213-250 (Pawloski Decl. ¶¶ 1-8 and Ex. 1 thereto). In that case, like the Demery case, the appraisal process was invoked, and M&F assisted its Hartford client in preparing for the appraisal, including informing the insured that disputed issues would have to await the outcome of the appraisal, the very position Demery has attacked Hartford Underwriters for taking in this case. *Id.* at 215 (Pawloski Decl. ¶ 7).

---

(Footnote Continued from Previous Page.)

Underwriters are employed by and paid by Hartford Fire. AA Vol. II, Tab 20, at 347-348 (April 24 Order); AA Vol. I, Tab 7, at 173-174 (Costello Decl. ¶¶ 1-8).

Among the claims M&F handled were at least 27 matters for a Hartford Fire subsidiary called First State Management Group, Inc. ("First State"). AA Vol. I, Tab 5, at 106, 109-113 (Jordan Decl. ¶ 4 and Ex. 1 thereto). Like Hartford Underwriters, First State is a wholly-owned subsidiary of Hartford Fire. AA Vol. I, Tab 7, at 173 (Costello Decl. ¶ 3). And like Hartford Underwriters, all of the employees of First State are employed by and paid by Hartford Fire. *Id.* (Costello Decl. ¶ 5).

First State acts as the underwriting manager for several of the Hartford insurance companies, including Pacific Insurance Company, Ltd. ("Pacific").[3] AA Vol. I, Tab 5, at 106 (Jordan Decl. ¶ 2). In addition to underwriting, First State is responsible for handling the claims that are made on policies underwritten by First State, including those issued by Pacific. *Id.* Since at least 1995, M&F was on the list of panel counsel approved to represent First State and Pacific. *Id.* (Jordan Decl. ¶ 4). Between 1999 and 2006, First State's Vice President and Claims Manager retained M&F as coverage counsel to represent Pacific's and First State's interests in several matters. *Id.* at 106, 109-113 (Jordan Decl. ¶¶ 3-4 and Ex. 1 thereto). As discussed more fully below, nine of these cases were

---

[3]    First State does the insurance underwriting for insurance policies issued by Pacific and other Hartford entities. Like Hartford Fire, Pacific is a wholly-owned subsidiary of HFSG. AA Vol. I, Tab 7, at 173 (Costello Decl. ¶ 4); AA Vol. II, Tab 20, at 348 (April 24 Order).

still pending when M&F filed the Demery complaint. *Id.* at 106-108, 123-134 (Jordan Decl. ¶¶ 5-7 and Ex. 3).

### 3. M&F's Concurrent Representations of Hartford Entities

Eventually, after years *representing* insurance companies, M&F decided to begin representing clients *suing* those same companies. So it happened that on August 31, 2004, M&F filed this action on behalf of Demery against Hartford Underwriters.

On the day it filed the Demery complaint against Hartford Underwriters, M&F was still actively *representing* two Hartford companies, First State and Pacific, in *nine open cases. Id.; see also* AA Vol. II, Tab 20, at 350 (April 24 Order). Two of these cases, *Pacific Insurance Company, Ltd. v. Travelers Casualty and Surety Company, et al.* and *Gateway v. Danco,* were still open and active in April 2006, when Hartford Underwriters filed its motion to disqualify M&F. *Id.* at 349-350 (April 24 Order); AA Vol. I, Tab 5, at 106-108, 123-134 (Jordan Decl. ¶¶ 5-8 and Ex. 3 thereto); AA Vol. I, Tab 6, at 136, 137-166 (Scott Decl. ¶¶ 2-4 and Ex. A thereto).

It is undisputed that M&F never disclosed to anyone at First State, Pacific, or any other Hartford entity, that it was planning to file, or had filed, a lawsuit against Hartford Underwriters. AA Vol. I, Tab 5, at 108 (Jordan Decl. ¶ 9); AA Vol. I, Tab 6, at 136 (Scott Decl. ¶ 5); AA Vol.

7

I, Tab 9, at 207 (Carlson Decl. ¶ 5); AA Vol. I, Tab 8, at 177 (Blum Decl. ¶ 7). Nor did M&F ever request a conflict waiver for the Demery litigation from anyone at First State, Pacific, or any other Hartford entity.[4] *Id.* In fact, despite the legal obligation that it do so, there is no evidence in the record that M&F even performed a conflicts check before it filed suit against Hartford Underwriters in the Demery case.

### 4. M&F Was Aware of the Unity of Interest Between The Hartford Entities

M&F does not deny that it knew there was a relationship between Hartford Underwriters, First State, Pacific and the other Hartford entities M&F has represented and continues to represent. Nor, on this record, could M&F credibly make such a claim. Although the various

---

[4] Indeed, it appears that M&F may have taken steps to prevent Hartford Underwriters from discovering its conflicts of interest. On April 5, 2006, M&F filed a motion *in limine* in the Demery case to preclude Hartford Underwriters from mentioning at trial that "years ago, the practice of plaintiff's counsel included work for insurance companies in various matters as defense counsel." AA Vol. I, Tab 4, at 79, 99 (Kennard Decl. ¶ 5 and Ex. 4 thereto at page 99). This generic statement, which does not identify M&F's insurance company clients, contrasts sharply with a far more specific disclosure M&F made in another case a year before. In a July 2005 trial against Safeco Insurance Company, M&F filed an identical *in limine* motion, but specifically disclosed in its brief that Safeco was one of M&F's former insurance clients. *Id.* at 79, 103 (Kennard Decl. ¶ 6 and Ex. 4 thereto at page 103). If M&F believed its current and past work for Hartford companies presented no cause for concern, there would have been no reason not to make the same specific disclosure in this case.

Hartford subsidiaries are legally separate and distinct entities for most purposes, the undisputed facts establish that M&F knew that Hartford Underwriters and the other Hartford entities currently and previously represented by M&F meet the "unity of interest" test applied under California law for purposes of resolving issues regarding conflicts of interest and disqualification.

The brand name "The Hartford" is registered to Hartford Fire, and the Hartford Stag logo is one of the most recognized symbols in the financial services industry. AA Vol. II, Tab 20, at 347-348 (April 24 Order); AA Vol. I, Tab 7, at 172-173 (Costello Decl. ¶ 1). The Hartford representatives who hired and worked with M&F over the years, regardless of their particular corporate affiliation, regularly sent correspondence to M&F on letterhead that said "The Hartford" at the top with the Hartford Stag logo prominently displayed in the upper right corner. AA Vol. I, Tab 4, at 79, 88-89 (Kennard Decl. ¶ 3 and Ex. 2 thereto).

M&F, in return, regularly directed correspondence to "The Hartford" regardless of the particular Hartford entity it was representing. AA Vol. I, Tab 8, at 176, 202-204 (Blum Decl. ¶ 6 and Ex. D thereto). The same was true for electronic correspondence. Although M&F's representation of various Hartford entities was overseen by at least five different Hartford offices over the years (id. at 176, 178-190 (Blum Decl., ¶ 3 and Ex. A)), all of the Hartford representatives with whom M&F

9

corresponded, regardless of their office location or their particular corporate affiliation, had the same e-mail address: "(Name)@thehartford.com." AA Vol. I, Tab 4, at 79, 90-96 (Kennard Decl., ¶ 4 and Ex. 3 thereto).

Not only did M&F direct correspondence to "The Hartford," it also referred to the various entities it was representing as "The Hartford" in legal documents it prepared, including coverage opinions relating to California homeowners' policies like Demery's, regardless of which specific Hartford entity it was representing. AA Vol. I, Tab 8, at 176, 191-204 (Blum Decl., ¶¶ 4-6 and Exs. B, C and D thereto). When M&F attorney Jeff Fackler was asked by the trial court to explain why M&F repeatedly referred to all of its Hartford clients as "The Hartford" regardless of the name of the particular company involved, Mr. Fackler stated that he could not recall. RT at 246:1-15.

Many of the documents M&F received *from Demery herself* regarding her claim against Hartford Underwriters prominently feature the phrase "The Hartford" and display the Hartford Stag logo. RT at 239:17-240:23; AA Vol. I, Tab 2, at 20-60 (Def. Tr. Exs.). Demery's claim was handled by four different claims adjusters on behalf of Hartford Underwriters. Each of these adjusters wrote letters to Demery and her private adjuster, Kevin Dawson. These letters from Hartford Underwriters adjusters all refer to "The Hartford" and display the Hartford Stag logo. RT at 239:17-240:23; AA Vol. I, Tab 2 at 20-46, 50-53 (Def. Tr. Exs. 3, 58, 76,

10

79, 102, 108, 113, 122, 125). Likewise, in a letter prepared for Demery by Mr. Dawson, he referred to Demery as "The Hartford's insured," and referred to the claim "previously submitted to The Hartford" and "tendered and paid by The Hartford." *Id.* at 47-49 (Def. Tr. Ex. 105).

Moreover, every one of the checks Demery received from Hartford Underwriters in payment of her claim displays the phrase "The Hartford" and the Hartford Stag logo. *Id.* at 54-60 (Def. Tr. Exs. 175 and 201). At the bottom of each check is the phrase "Western Personal Lines Claims Service Center, Phoenix, Arizona."[5] Over the years preceding the filing of the Demery Complaint, M&F handled at least 42 cases for various Hartford entities that were administered by Hartford's Western Personal Lines Claims Service Center, and M&F communicated with Hartford employees at that address. AA Vol. I, Tab 8, at 176, 186-190, 202-204 (Blum Decl., ¶ 3 and Exs. A and D thereto).

---

[5]     The Western Personal Lines Claims Service Center was created in 1997 to consolidate the handling of personal lines claims relating to policies issued by various Hartford entities throughout the Western states. AA Vol. I, Tab 4, at 79-87 (Kennard Decl., ¶ 2 and Ex. 1 thereto at pages 82-86). The Demery claim, along with all other California homeowner policy claims, was handled by this regional center. *Id.* M&F attorney Michael Michel has referred to this regional center as "The Hartford Phoenix operation." *Id.* at 82. Letters sent by M&F to this regional claims center are addressed to "The Hartford." AA Vol. I, Tab 8, at 176, 202-204 (Blum Decl., ¶ 6 and Ex. D thereto).

Thus, M&F was clearly on notice that there was a relationship between its adversary in Demery (Hartford Underwriters) and the various Hartford entities it had represented for years -- for some $1.3 million in fees -- and continued to represent through at least April 2006.

The interconnected nature of the Hartford companies extends far beyond the common Hartford name. It is also legal, operational, and financial. As discussed more fully below, California courts typically consider several operational factors to determine whether there is a "unity of interest" between entities for conflict of interest purposes. These factors all lead to the conclusion the trial court reached here -- that there is the requisite unity of interest between Hartford Underwriters and the Hartford entities represented by M&F and therefore they should be treated as one client for purposes of conflicts of interest.

Specifically, all of the employees of Hartford Underwriters, First State and Pacific are employed by and paid by Hartford Fire. AA Vol. II, Tab 20, at 348 (April 24 Order); AA Vol. I, Tab 7, at 173 (Costello Decl. ¶¶ 3-5). A single legal department oversees and manages legal strategy for all of the Hartford entities. AA Vol. II, Tab 20, at 348, 350 (April 24 Order); AA Vol. I, Tab 10, at 209 (Pinkowski Decl. ¶¶ 2-3); AA Vol. I, Tab 11, at 212 (Majewski Decl. ¶¶ 2-3). Because none of the Hartford entities has separate, dedicated in-house counsel, the lawyers to whom M&F

reported regarding the matters it handled also oversaw matters for Hartford Underwriters.[6] *Id.*

This unified oversight extends to corporate management as well. The members of the boards of directors of Pacific, Hartford Underwriters and Hartford Fire are identical. AA Vol. I, Tab 7, at 173-174 (Costello Decl. ¶¶ 6-7). Hartford Underwriters, Hartford Fire, First State and Pacific have the same Treasurer and Corporate Secretary. *Id.* First State claim handlers sit in a Hartford building and are supervised by a Hartford general liability team leader. AA Vol. I, Tab 9, at 206 (Carlson Decl. ¶ 3).

The financial results of the Hartford entities also reflect their interconnected nature. Hartford Fire files consolidated annual financial statements which include the financial results for Pacific, Hartford Underwriters and First State, and the assets of Pacific, Hartford Fire, and Hartford Underwriters are pooled with those of other Hartford companies. AA Vol. I, Tab 7, at 174 (Costello Decl. ¶ 8). Taken together, these factors amply support the trial court's finding that there is a "unity of interest" for

---

[6]     However, it is uncontested that the two individuals overseeing the Demery case on behalf of Hartford Underwriters, Andrew Pinkowski and Kevin Majewski, were not aware prior to April 7, 2006 that M&F had been retained by several Hartford companies in other matters. AA Vol. I, Tab 10, at 209-210 (Pinkowski Decl. ¶ 4); AA Vol. I, Tab 11, at 212 (Majewski Decl. ¶ 4).

conflicts purposes between Hartford Underwriters, Pacific, First State and Hartford Fire.

## B. Proceedings Below

### 1. The Conflict is Discovered

Because M&F ignored its legal and ethical obligation to disclose its current and prior representation of other Hartford entities when it filed the Demery lawsuit in August 2004, its conflicts of interest went undiscovered until shortly before the trial in the Demery case was scheduled to begin. Hartford Underwriters first discovered that M&F had previously represented other Hartford entities on Friday, April 7, 2006, at a mandatory settlement conference in the Demery case. Trial was scheduled to begin the following business day, Monday April 10, 2006.

Dorothy Pawloski, a Hartford representative who had had no previous involvement in the Demery case, attended the settlement conference. When she arrived at court, Ms. Pawloski immediately recognized M&F attorney Michael Michel from her prior involvement with him in a matter in which he had represented Hartford Fire. AA Vol. I, Tab 12, at 214-216 (Pawloski Decl. ¶¶ 2-9); AA Vol. I, Tab 10, at 209-210 (Pinkowski Decl. ¶ 4); AA Vol. I, Tab 11, at 212 (Majewski Decl. ¶ 4). Hartford Underwriters' trial counsel commented on this surprising development to the trial court during the settlement conference. RT at 11:11-12.

14

## 2. Hartford Underwriters Immediately Seeks Disqualification of M&F

Hartford Underwriters immediately commenced an investigation to determine the nature and extent of M&F's prior representations of Hartford companies. Counsel for Hartford Underwriters formally notified the trial court on Monday morning, April 10, 2006, that Hartford Underwriters was investigating whether there were grounds to seek the disqualification of M&F. RT at 11:3-12:4; AA Vol. I, Tab 10, at 209-210 (Pinkowski Decl. ¶ 4).

Hartford Underwriters' investigation was necessarily conducted under extreme time pressure because of the need to promptly move to disqualify M&F if the evidence supported such a motion.[7] By Wednesday, April 12, 2006, the investigation had revealed that, in addition to M&F's prior representations of various Hartford entities, M&F had been representing Hartford companies in several matters when it filed the Demery complaint and was still *currently* representing First State and Pacific in an ongoing matter. AA Vol. I, Tab 10, at 210 (Pinkowski Decl. ¶ 5); AA Vol. I, Tab 11, at 212 (Majewski Decl. ¶ 5); AA Vol. I, Tab 5, at

---

[7]     As a result, it was not possible for Hartford Underwriters to determine the subject matter of all of the 97 cases M&F handled for Hartford companies over the years, particularly given the passage of time and the turnover of personnel. AA Vol. II, Tab 19, at 340 fn. 4 (Disqualification Reply).

106-107 (Jordan Decl. ¶¶ 5-6). That same day, counsel for Hartford Underwriters notified the trial court that it would likely move to disqualify M&F as soon as motion papers could be prepared. RT at 60:16-62:18; AA Vol. I, Tab 10, at 210 (Pinkowski Decl. ¶ 5).

On Friday, April 14, just seven days after the M&F conflicts were first discovered, Hartford Underwriters filed a motion to disqualify M&F.[8] AA Vol. I, Tab 3, at 61-77 (Disqualification Motion). Earlier that same morning, Hartford Underwriters had discovered that M&F was still actively representing First State and Pacific in a second ongoing matter. AA Vol. I, Tab 10, at 210 (Pinkowski Decl. ¶ 6); AA Vol. I, Tab 6, at 135-171 (Scott Decl.).

On Tuesday, April 18, 2006, M&F filed its opposition to Hartford Underwriters' motion for disqualification. AA Vol. II, Tab 13, at 253-270 (Disqualification Opposition). Hartford Underwriters filed a reply memorandum in support of its motion later that same day. AA Vol. II, Tab 19, at 332-345 (Disqualification Reply). The motion for disqualification was heard on April 20, 2006. RT at 205:1-252:25.

---

[8] At the request of the trial court, all of the disqualification briefs were filed by electronic mail. Accordingly, the filing dates referenced here are the dates the briefs were transmitted electronically to the court. However, in some cases, the hard copies of the briefs were endorsed by the court clerk on a later date.

### 3. The Trial Court's Ruling

On April 24, 2006, the trial court ruled on the disqualification motion. AA Vol. II, Tab 20, at 346-355 (April 24 Order). Applying the "unity of interest" test, the court found that "Hartford Underwriters, Hartford Fire, Pacific and First State should be considered a single entity for conflict of interest purposes." *Id.* at 352. Therefore, the court ruled, there was "a conflict in the representation by Michel & Fackler of Linda Demery." *Id.* at 347. However, despite having found a conflict based on M&F's simultaneous representation of First State and Pacific at the same time it was adverse to Hartford Underwriters, the court denied the motion to disqualify. *Id.*

Even though it was uncontested that Hartford Underwriters first discovered the M&F conflict on April 7, 2006 and filed its motion five court days later, the court ruled, with no citation to legal authority or evidence, that "'someone'[9] at HFSG or Hartford Fire (including Hartford Underwriters, Pacific and First State) should have discovered the fact that M&F represented plaintiff in this matter long before Ms. Pawloski raised the issue at the Mandatory Settlement Conference." *Id.* at 353. The court also stated that there would be prejudice to Demery if M&F were

---

[9]    The word "someone" appears in quotation marks in the Order.

disqualified, even though she had not even contended that there would be. *Id.;* AA Vol. II, Tabs 13-18, at 253-331 (Disqualification Opposition).

Based on its view that "someone" at one of the Hartford entities "should have" discovered M&F's conflict before April 7, the trial court concluded that "Hartford Underwriters has unreasonably and inexcusably delayed in asserting these objections to M&F as counsel for plaintiff." AA Vol. II, Tab 20, at 354 (April 24 Order). The court also found, despite the fact that Demery had made no claim of prejudice, that "the prejudice to plaintiff would be dramatic if M&F is removed from the case." *Id.* at 353. The trial court neglected to address or rule on Hartford Underwriters' alternative ground for disqualification on the basis of M&F's prior representation of other Hartford companies in matters that were substantially related to the Demery claim. *Id.* at 346-355.

During a telephonic Trial Management Conference on April 25, 2006, the trial court scheduled the trial to commence on May 3, 2006. AA Vol. II, Tab 32, at 491 (Docket).

### 4.    Initial Appellate Proceedings

On April 27, 2006, Hartford filed a Petition for Writ of Mandate with this Court. AA Vol. II, Tab 21, at 356-379 (Petition). This Court requested briefing from M&F in response to the Petition and temporarily stayed the trial date. AA Vol. II, Tab 22, at 380 (April 28 Order); AA Vol. II, Tab 23, at 381 (May 2 Order). On May 5, 2006, this

18

Court denied the Petition on procedural grounds and suggested that Hartford Underwriters should instead pursue a direct appeal of the trial court's ruling. AA Vol. II, Tab 24, at 382-383 (May 5 Order). This Court's May 5 Order further suggested that Hartford Underwriters "may seek a stay from the trial court, and if unsuccessful in that endeavor, request a stay from this court." *Id.* at 382.

Accordingly, on May 9, 2006, Hartford Underwriters timely filed a Notice of Appeal. AA Vol. II, Tab 25, at 384-387 (Notice of Appeal). The following day, Hartford Underwriters filed a motion to stay the trial pending resolution of the appeal. AA Vol. II, Tab 26, at 388-397 (Stay Motion); *see also* AA Vol. II, Tab 27, at 398-422 (Stay Opposition); AA Vol. II, Tab 28, at 423-433 (Stay Reply). The motion to stay was heard and decided on May 22, 2006. The trial court found that Hartford Underwriters' appeal of the disqualification issue was not "insubstantial or frivolous," and granted the motion to stay pending resolution of this appeal. AA Vol. II, Tab 30, at 439-441 (Stay Order).

## III. STATEMENT OF APPEALABILITY

The April 24, 2006 Order denying Hartford Underwriters' motion to disqualify M&F is immediately appealable. A party who unsuccessfully moves for disqualification may either petition the reviewing court for a writ of mandamus, or file a notice of appeal from the order denying disqualification. *Reed v. Superior Court,* 92 Cal. App. 4th 448, 455

19

(2001). *See also* AA Vol. II, Tab 24, at 382 (May 5 Order) (citing *Reed* and ruling that Hartford Underwriters "has an adequate remedy at law on appeal.").

## IV.    STANDARD OF REVIEW

Generally, an order granting or denying a motion to disqualify is reviewed under an abuse of discretion standard. *Fremont Indemnity Company v. Fremont General Corporation,* 143 Cal. App. 4th 50, 63 (2006); *Truck Ins. Exchange v. Fireman's Fund Ins. Co.,* 6 Cal. App. 4th 1050, 1055 (1992). However, where, as here, there are no material disputed factual issues, the trial court's decision is reviewed *de novo* as a question of law. *People v. SpeeDee Oil Change Systems, Inc.,* 20 Cal. 4th 1135, 1143-44 (1999); *Adams v. Aerojet-General Corp.,* 86 Cal. App. 4th 1324, 1330-31 (2001).

Even if an abuse of discretion standard were applicable here, a disqualification motion implicates important concerns that necessitate careful review of the trial court's exercise of discretion. *People v. SpeeDee Oil Change Systems, Inc.,* 20 Cal. 4th 1135, 1144 (1999). For example, a trial court has discretion when ruling on a motion to disqualify, but "[t]he scope of the trial court's discretion is limited by the applicable principles of law." *Fremont Indemnity Company v. Fremont General Corporation,* 143 Cal. App. 4th 50, 63 (2006). Thus, the reviewing court may reverse the trial court's ruling if it does not conform to applicable legal principles, or if

there is no reasonable basis for the ruling in light of the facts. *Id.* In short, discretion is "deemed abused" when the trial court fails to exercise its discretion in a situation where such exercise is required. *Truck Ins. Exchange v. Fireman's Fund Ins. Co.,* 6 Cal. App. 4th 1050, 1055 (1992).

## V.   ARGUMENT

### A.   The Trial Court Erred in Failing to Disqualify M&F On Grounds of Simultaneous Adverse Representation

The trial court correctly found that M&F's decision to sue Hartford Underwriters at the same time it was representing several Hartford companies violated M&F's duty of loyalty to its Hartford clients. AA Vol. II, Tab 20, at 347, 352 (April 24 Order). An attorney's duty of loyalty absolutely prohibits him or her from undertaking a representation that is directly adverse to a current client, even if it is on a matter that is completely unrelated to the subject matter of the existing representation.[10] *Jeffry v. Pounds,* 67 Cal. App. 3d 6, 10 (1977); *State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.,* 72 Cal. App. 4th 1422, 1431 (1999) ("where an attorney's representation of one client is adverse to the interests of another current client, the primary value at stake is the attorney's duty of *loyalty.*").

---

[10]   Rule 3-310(C) of the California Rules of Professional Conduct provides that "[a] member shall not, without the informed written consent of each client: . . . (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict...."

The duty of loyalty is so fundamental to our adversarial system of justice that disqualification is automatic when an attorney currently represents one client and simultaneously takes on a representation adverse to that client. *Flatt v. Superior Court,* 9 Cal. 4th 275, 284 (1994) (in simultaneous adverse representation cases, the rule of disqualification is *per se* or "automatic" in all but a few instances); *State Farm,* 72 Cal. App. 4th at 1431.[11] Yet here, despite having found that M&F was concurrently representing Hartford companies while suing Hartford Underwriters, the trial court refused to disqualify M&F. This was reversible error.

1.    **The Material Facts Are Not Disputed And Compel Disqualification**

As a matter of law, M&F's concurrent representation of other Hartford companies when it sued Hartford Underwriters is a clear conflict of interest that mandates automatic disqualification under well-established California law. The facts that compel this legal conclusion are undisputed and fall into three distinct categories.

---

[11]    The "few instances" where automatic disqualification can be avoided are clearly inapplicable here. They involve a current conflict that occurred as a result of a merger, or the circumstance where an attorney immediately withdraws from an unseen concurrent adverse representation which occurred by "mere happenstance," thereby implicating the former representation rule rather than the concurrent representation rule. *State Farm,* 72 Cal. App. 4th at 1432.

### a.    The Facts Regarding Simultaneous Adverse Representation

First, the trial court correctly determined that M&F represented Demery in a matter adverse to Hartford Underwriters at the same time it was representing other Hartford companies. This determination was clearly correct, because M&F admitted below that it was still handling two open cases for Pacific Insurance Company (Z-Con and Gateway) when Hartford Underwriters moved for disqualification, and it did not dispute (and therefore conceded) that when it filed the Demery complaint it was handling nine open cases for Pacific and/or First State.[12] AA Vol. II, Tab 13, at 255-256 (Disqualification Opposition).

### b.    The Facts Regarding "Unity of Interest"

Second, the trial court correctly ruled that Hartford Underwriters and the Hartford entities currently and previously represented by M&F must be treated as one client under California's "unity of interest"

---

[12]    M&F suggested below that its real "client" in these cases was Hartford's insured, not a Hartford entity itself. AA Vol. II, Tab 13, at 256 (Disqualification Opposition). The trial court properly rejected this argument. It is well-settled that the attorney represents both the insured and the insurer in insurance defense cases. *See, e.g., Purdy v. Pacific Automobile Ins. Co.,* 157 Cal. App. 3d 59, 76 (1984); *Lysick v. Walcom,* 258 Cal. App. 2d 136, 146 (1968); *American Mut. Liab. Ins. Co. v. Superior Court,* 38 Cal. App. 3d 579, 592 (1974).

test for purposes of a conflict of interest analysis. AA Vol. II, Tab 20, at 352 (April 24 Order). The facts that establish the "unity of interest" for conflicts purposes between Hartford Underwriters and the other Hartford entities M&F represents were set forth in Section II.A.4, above. M&F does not contest any of these facts. It simply claims it was unaware of them, but does not suggest it investigated them.[13] AA Vol. II, Tab 13, at 255-256 (Disqualification Opposition).

M&F's claimed ignorance of the "unity of interest" between Hartford Underwriters and the other Hartford entities it represents is irrelevant.[14] An attorney who fails to properly identify and resolve

---

[13]   M&F also claimed repeatedly below that it never represented Hartford Underwriters. AA Vol. II, Tab 13, at 254 (Disqualification Opposition). Even if true, this is irrelevant. The issue here is whether M&F represented other Hartford entities which shared a "unity of interest" with Hartford Underwriters such that they must be considered to be one client for conflict of interest purposes.

[14]   In any event, M&F's claims of ignorance are not credible in light of the overwhelming evidence, never disputed by M&F, that it acted as if its client was "The Hartford" regardless of which Hartford entity it was representing. M&F did not dispute below that it prepared legal opinions and correspondence which stated that M&F was rendering advice and opinions on behalf of "The Hartford." Nor did M&F dispute that the work it has done over the years and continues to do for Hartford companies is replete with references to "The Hartford," including correspondence on Hartford letterhead and e-mail communications from M&F directed to individuals at "thehartford.com." *See* Section II.A.4, above.

SF/21676441.8

conflicts cannot later avoid disqualification by claiming, when the conflict is discovered, that he or she was "unaware" of it. Otherwise, attorneys would be able to take on representations without any regard for potential conflicts, and later escape responsibility for their actions by claiming ignorance. No case holds that attorneys can be excused from disqualification by failing to determine whether a conflict exists at the outset and claiming ignorance when it is disclosed.

### c. The Facts Regarding Delay and Prejudice

Finally, after correctly applying the "unity of interest" test and finding a conflict of interest based on M&F's concurrent representation, the trial court erred in failing to disqualify M&F. Because it is undisputed that Hartford Underwriters moved for disqualification as soon as the conflict was discovered, and Demery offered no evidence of prejudice that would result from M&F's disqualification, *de novo* review is proper, and the trial court erred as a matter of law.

### 2. The Trial Court Correctly Applied The "Unity of Interest" Test

To determine whether related entities should be considered a single client for conflict of interest purposes, California courts apply the "unity of interest" test set forth by this Court in *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft,* 69 Cal.App.4th 223, 238-53 (1999). The "unity of interest" test applies in both concurrent and successive

representation cases whenever the issue of related entities must be addressed for conflicts purposes. *See, e.g., id.* at 146-47 (applying "unity of interest" test in a successive representation case); *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.,* 264 F.Supp.2d 914, 922-24 (N.D. Cal. 2003) (applying California's "unity of interest" test in a concurrent representation case). Here, the trial court applied the "unity of interest" test to the undisputed facts before it, and correctly found that Hartford Underwriters and the Hartford entities concurrently represented by M&F should be treated as a single client for conflicts purposes.[15] AA Vol. II, Tab 20, at 347, 352 (April 24 Order); *Morrison Knudsen,* 69 Cal.App.4th at 238-53 (1999).

In *Morrison Knudsen,* the Hancock law firm represented the Contra Costa Water District in a dispute with Centennial Engineering,

---

[15]    In so doing, the trial court properly refused to apply the "alter ego" test Demery proposed (which has been widely discredited and, to Hartford Underwriters' knowledge, has never been followed). *Morrison-Knudsen* expressly rejected the alter ego test, which was set forth by the Court of Appeal in the Fourth District in *Brooklyn Navy Yard Cogeneration Partners, L.P. v. Superior Court,* 60 Cal. App. 4th 248, 253 (1997), in favor of the "unity of interest" test because the alter ego test is imported from the general law of corporations to protect creditors against fraud and diversion of assets, and thus incorporates numerous factors (such as undercapitalization and financial misrepresentation) that have little or nothing to do with the ethical concerns that animate conflicts analysis in attorney representation cases. See *Morrison Knudsen,* 69 Cal.App.4th at 250-51.

SF/21676441.8

which was a wholly-owned subsidiary of the Morrison Knudsen Corporation. *Id.* at 226-227. Hancock had never represented Centennial, but until the time of the District's dispute with Centennial, Hancock had been retained by the underwriters of Morrison's insurance policy to monitor the defense attorneys Morrison had retained on errors and omissions claims. *Id.* at 227. Accordingly, the court had to determine whether there was a unity of interest between Morrison and its subsidiary, Centennial, which would disqualify Hancock from any action against Centennial. *Id.* at 238.

The court found that there was a unity of interest between the two corporations based on the following factors: (1) both corporations shared the same legal counsel which controlled their legal affairs; (2) both corporations had overlapping functions and personnel; and (3) the parent and subsidiary were covered by the same insurance policy and claims against both were administered by the parent's personnel. *Id.* at 245-47. The court also noted that Centennial's relationship with Morrison gave the Hancock firm "a significant practical advantage in a case against the affiliate." *Id.* at 253. Therefore, Hancock was disqualified from representing the District against Centennial.[16]

---

[16]     The *Morrison Knudsen* unity of interest test follows a long line of cases in which a similar standard has been applied to find that an affiliate of

(Footnote Continued on Next Page.)

27

The "unity of interest" analysis set forth in *Morrison Knudsen* was later applied in a case involving concurrent representation. *Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*, 264 F.Supp.2d 914 (N.D. Cal. 2003). The dispute in *Argonaut* concerned coverage under certain reinsurance agreements in favor of Argonaut. *Id.* at 917. Argonaut had submitted claims to Lloyd's for legal expenses from an underlying coverage action between Argonaut and one of its insureds. Lloyd's denied coverage and arbitration was initiated. Lloyd's, represented by the Hancock firm, later petitioned to have the umpire removed. *Id.* Argonaut argued that Hancock had a conflict of interest because the firm was representing Argonaut NW, a subsidiary of Argonaut, at the same time in another

---

(Footnote Continued from Previous Page.)

a company represented by an attorney was also a client of that attorney for conflicts purposes. *See, e.g., Baxter Diagnostics Inc. v. AVL Scientific Corp.*, 798 F.Supp. 612, 616 (C.D. Cal. 1992) (finding subsidiary. "inextricably intertwined" with its parent); *Teradyne, Inc. v. Hewlett-Packard Co.*, 1991 WL 239940, *5 (N.D. Cal. 1991) (because of parent's control and supervision of the legal affairs of the subsidiary, there was sufficient "identity of interest" to treat the two as a single client for the limited purpose of determining whether there was a conflict); *Hartford Acc. and Indem. Co. v. RJR Nabisco, Inc.*, 721 F.Supp. 534, 540 (S.D.N.Y. 1989) ("[c]ertain aspects of their separate corporate identities notwithstanding," the parent had also become a client through its supervision of the subsidiary's litigation); *Ramada Franchise System v. Hotel of Gainesville Associates*, 988 F.Supp. 1460, 1465 (N.D. Ga. 1997) (finding "identity of interest" between sister companies). A copy of the *Teradyne* opinion is attached to this brief pursuant to California Rule of Court 977(c).

SF/21676441.8

matter, and had represented Argonaut NW in the past. *Id.*

Hancock argued that Argonaut and Argonaut NW were not the same entity. *Id.* Applying the unity of interest analysis, the district court disagreed. "The question here, where concurrent representation is alleged, is whether there is a sufficient unity of interest between Argonaut and Argonaut NW such that Hancock's representation of Certain Underwriters in the instant case reasonably diminishes the 'level of confidence and trust in counsel' held by Argonaut NW." *Id.* at 922.

The court identified two factors that established the necessary unity of interest: (1) a judgment, whether adverse or favorable, as to one affiliate would affect the other because Argonaut and Argonaut NW pooled resources, shared premiums and liabilities and profits and losses; and (2) both affiliates had common claims departments and claim handling, common officers and directors, a common legal department, a common "corporate masthead" and centralized and overlapping management. *Id.* at 923-924. Based on these factors, the court concluded that Argonaut and Argonaut NW "should be treated as one entity for purposes of analyzing the conflict of interest in the context of concurrent representation of adverse interests." *Id.* at 924. Ultimately, Hancock was disqualified.

Although the majority of cases in which the "unity of interest" test has been applied have involved the parent-subsidiary relationship, the test has also been applied in a case similar to this one,

involving sister corporations. *Ramada Franchise System, Inc. v. Hotel of Gainesville Assocs.*, 988 F. Supp. 1460 (N.D. Ga. 1997). In *Ramada*, plaintiff argued that the defendant's law firm should be disqualified because of its prior representation of plaintiff's sister corporation. *Id.* at 1462. In considering whether there was a sufficient "identity of interest" to find that the sister corporation of a company represented by an attorney was also that attorney's client for conflicts purposes, the court considered the following factors: (1) the two sister entities had substantially similar management personnel; (2) they shared the same corporate headquarters, corporate principles and business philosophy; and (3) the same legal department serviced all of the related entities.[17] *Id.* at 1465.

The same factors that convinced the courts in *Morrison Knudsen, Argonaut* and *Ramada* that a "unity of interest" had been demonstrated are *all* present here. The employees of Hartford Underwriters and each of the Hartford entities M&F has represented, including Pacific, and First State, are all employed by and paid by Hartford Fire. *See* Section II.A.4, above. There is unified legal oversight over all claims involving Hartford Underwriters, First State, Pacific and Hartford Fire. *Id.* This

---

[17]    *Ramada* involved successive representation, and the court ultimately held that disqualification was not necessary because the required showing that the representation of the former client was "substantially related" to the later representation of the related company had not been made. *Id.*

unified oversight extends to corporate management as well. The boards of directors of Pacific and Hartford Underwriters are identical. Hartford Fire has all of the same Board members as Pacific and Hartford Underwriters, as well as one additional member. AA Vol. I, Tab 7, at 173-174 (Costello Decl. ¶¶ 6-7). Many of Hartford Fire's corporate officers serve as officers for multiple HFSG subsidiaries. *Id.* Hartford Fire, Hartford Underwriters, First State, and Pacific have the same Corporate Secretary and Treasurer. *Id.* In sum, although the various Hartford subsidiaries are legally separate and distinct entities for most purposes, the trial court correctly found that Hartford Underwriters and the Hartford entities currently and previously represented by M&F meet the "unity of interest" test under California law, and should be considered one client for purposes of resolving issues regarding conflicts of interest and disqualification.

### 3. Disqualification of M&F Should Have Been Mandatory And Automatic As A Matter Of Law

As discussed above, the trial court correctly found that M&F had a conflict of interest stemming from its simultaneous representation of multiple Hartford entities at the same time it was suing Hartford Underwriters. Under such circumstances, disqualification is automatic. *Flatt v. Superior Court,* 9 Cal. 4th 275, 284 (1994) (in simultaneous representation cases, the rule of disqualification is *per se* or "automatic" in all but a few instances); *State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.,*

72 Cal. App. 4th 1422, 1431 (1999).

The automatic disqualification rule applies even if the concurrent representation is brief. *State Farm,* 72 Cal. App. 4th at 1431 (vacating order denying disqualification because law firm concurrently represented adverse clients during a three-month period). It also applies even where the attorney withdraws from representing one client before the disqualification hearing. *Truck Ins. Exchange v. Fireman's Fund Ins. Co.,* 6 Cal. App. 4th 1050, 1057 (1992) (attorney's withdrawal cannot justify "departure . . . from th[e] well-established principle requiring automatic disqualification" in cases of concurrent representation).

Here, because M&F sued Hartford Underwriters at the same time it was representing several other Hartford entities in nine open matters, under clear California law, disqualification should have been mandatory and automatic. *State Farm,* 72 Cal. App. 4th at 1431. Hartford's showing, for purposes of a conflict of interest analysis, regarding the intertwined legal, operational and financial relationships between Hartford Fire, First State, Pacific and Hartford Underwriters is uncontested. M&F's awareness of the inter-related nature of these entities for conflicts purposes is obvious on its face from the evidence, and is likewise uncontested. And even if M&F were ignorant of the relationship between these entities -- which it clearly was not -- that would not be a defense to disqualification.

Nevertheless, the trial court refused to disqualify M&F by

32

invoking a "laches" theory that is squarely contrary to California law and unsupported by any evidence. This novel theory, if affirmed, would relieve California attorneys of their explicit duty under the Rules of Professional Conduct and California case law to avoid representing conflicting interests. Instead, the theory erroneously would reward lawyers for failing to identify and disclose conflicts, and would burden clients with the duty to ferret out hidden conflicts. That is wrong and unwise. The trial court's ruling was erroneous and should be reversed, for three reasons.

### a. The Obligation To Identify And Resolve Conflicts Rests With The Attorney, Not The Client

The trial court found "that 'someone' [at Hartford] should have discovered the fact that M&F represented plaintiff in this matter long before Ms. Pawloski raised the issue." AA Vol. II, Tab 20, at 353 (April 24 Order). This is wrong as a matter of law, because it rests on a clearly erroneous legal assumption: that it is the client's burden to discover and disclose its attorney's conflicts of interest. The law is exactly the opposite.

California Rule of Professional Conduct 3-310(C) provides that "A member shall not, without the informed written consent of each client: . . . (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict. . . ." The Rule could not more clearly state that it is the *attorney's* obligation to identify and resolve conflicts before accepting a representation. Here, the Rule

33

required M&F to decline to sue Hartford Underwriters on behalf of Demery without Hartford Underwriters' written consent. M&F ignored the rule and sued Hartford Underwriters anyway.

The cases confirm this interpretation of Rule 3-310(C). *State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*, 72 Cal. App. 4th 1422 (1999), is squarely on point. It stated the rule the trial court should have applied here:

> *[I]t is the attorney who is charged with the responsibility of performing conflict checks upon accepting a new client. The client is under no such obligation. . . .* This responsibility is reflected in rule 3-310 which prohibits the attorney from accepting employment adverse to a current client without the client's informed written consent.
>
> Thus, the burden was on [the law firm] to avoid creating a conflict. McCormick should not have accepted the cases referred by Federal when it was aware that it might be filing a lawsuit against Federal on behalf of another client.

72 Cal. App. 4th at 1435 (emphasis added) (citation omitted). *See also Blecher & Collins, P.C. v. Northwest Airlines, Inc.*, 858 F.Supp. 1442, 1455, n.14 (C.D. Cal. 1994) (applying California law; "the law places all of the burden of disclosure and consent on the attorney, where it belongs."). Thus, it was M&F's responsibility in August 2004 to determine whether it could, consistent with its ethical duties of loyalty and confidentiality to the Hartford clients it was representing in nine other matters, sue Hartford

34

Underwriters at the same time. Not one of the M&F attorneys claims to have performed this analysis when the firm filed the Demery case.

Put simply, the trial court's ruling is backwards. It wrongly puts the burden on the client, and encourages attorneys *not* to identify and report conflicts of interest, thereby undermining the "paramount concern" in "preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar." *State Farm, supra,* 72 Cal. App. 4th at 1428. The error is patent.

### b. Hartford Underwriters Did Not Delay In Seeking Disqualification

The court then compounded its error by concluding that Hartford Underwriters had "unreasonably and inexcusably delayed in asserting these objections to M&F as counsel for plaintiff." AA Vol. II, Tab 20, at 354 (April 24 Order). This conclusion is invalid for several reasons.

First, it rests on the court's erroneous assumption that Hartford Underwriters had the burden of discovering and disclosing M&F's conflict of interest. As discussed above, this is wrong as a matter of law.

Second, even if delay could justify denying disqualification in certain cases, the law requires that "[t]he delay must be extreme in terms of time and consequence." *State Farm, supra,* 72 Cal. App. 4th at 1434 (quoting *River West, Inc. v. Nickel,* 188 Cal. App. 3d 1297, 1311(1987)).

35

Here, there was no delay at all, let alone an "extreme" delay. It is uncontested that M&F never disclosed its conflict, and that Hartford Underwriters did not discover it until April 7, 2006. AA Vol. I, Tab 12, at 214-216 (Pawloski Decl. ¶¶ 2-9); AA Vol. I, Tab 10, at 209-210 (Pinkowski Decl.¶ 4); AA Vol. I, Tab 11, at 212 (Majewski Decl. ¶ 4). Hartford Underwriters discussed its concerns about the apparent conflict with the trial court that same day, notified the court and counsel on the next court day that it was investigating whether there was a basis for disqualification, and filed its disqualification motion on April 14, 2006. That is not "extreme" delay by any measure.

Finally, even if extreme delay had been established here -- and it was not -- the trial court erroneously assumed that a "laches" or "implied consent" theory can apply where the attorney concurrently represents adverse interests. This, too, is wrong as a matter of law.

A *current* client cannot impliedly consent to having its own attorney sue it. *State Farm, supra,* 72 Cal. App. 4th at 1433-35; *Blecher & Collins,* 858 F.Supp. at 1455 n.14 (under California law, different standards apply to conflicts between current clients and conflicts between former and current clients, and current clients cannot impliedly consent to conflicted representation). The notion that a delay in bringing a disqualification motion may show laches or some kind of "implied consent" to a conflict of interest that warrants denying the motion applies, if at all, only in cases

36

involving *successive* representation. Thus, it was error for the trial court to use this novel theory as a basis to deny disqualification where, as here, the conflict involves *concurrent* representation.

c. **The Order Purports to Make Factual Determinations of Delay and Prejudice Which Were Not Asserted by Demery And For Which There Is No Evidence**

Finally, the trial court found that "the prejudice to plaintiff would be dramatic if M&F is removed from the case." AA Vol. II, Tab 20, at 353 (April 24 Order). The court cites no evidence to support this statement, and there is none. Indeed, Demery did not even contend below that she would suffer any such prejudice. Nor is there one item of evidence in the record to support the trial court's erroneous assumption. Although some delay will certainly result if Demery is compelled to find new counsel, she is simply not "entitled" to go to trial with lawyers who have been found to have a conflict of interest.

The lack of any evidence of prejudice to Demery was drawn into sharp relief when Hartford Underwriters moved to stay the trial pending resolution of this appeal. In seeking a stay, Hartford Underwriters pointed out that the trial court's finding of prejudice was unsupported by any evidence, and noted that, to the contrary, no prejudice to Demery would result from the delay. AA Vol. II, Tab 26, at 394 (Stay Motion); AA

Vol. II, Tab 28, at 428-429 (Stay Reply). Specifically, Hartford

Underwriters noted that (a) Demery has already been fully compensated

under her homeowners' policy for the losses caused by the fire and has

returned to her home, which she says has been repaired; (b) her case, which

was filed in August 2004, is ready for trial and in no danger of dismissal for

failure of diligent prosecution; (c) there is no evidence that her contingent

fee counsel are charging her for their services; and (d) if Demery is

ultimately able to obtain a judgment on her claims, she is entitled to seek

interest on that amount. AA Vol. II, Tab 26, at 394 (Stay Motion).

In opposing the stay, M&F did not contest any of these

facts.[18] Instead, M&F simply asserted that the trial court's finding of

prejudice to Demery was "supported by overwhelming evidence." AA Vol.

II, Tab 27, at 403 (Stay Opposition). Tellingly, M&F provided not a single

citation to any of this supposedly "overwhelming evidence" -- because

there was none. *Id.*

Although the trial court did not cite any evidence of prejudice

to Demery, the court did observe that M&F's expenditure of time in the

---

[18]    M&F's only response was that Demery would somehow be
prejudiced unless Hartford Underwriters agreed that she is entitled to
prejudgment interest. AA Vol. II, Tab 27, at 406 (Stay Opposition).
However, the trial court has already ruled, in response to the parties' *in
limine* motions, that Demery's entitlement, if any, to prejudgment interest is
a matter for the trial court to decide. RT at 171:14-27; 176:13-177:4.

38

Demery matter has been "substantial." AA Vol. II, Tab 20, at 353 (April 24 Order). However, the fact that M&F has invested considerable time and effort on this case may be self-inflicted prejudice to *M&F* if it is disqualified, but it is *not* prejudice to Demery, who is not paying for that time and effort. Moreover, there was no showing (nor could there be) that the attorney who takes over this case would go to trial without first becoming fully familiar with the facts (again, at no cost to Demery), or would fail to take advantage of the work already done by M&F.

Finally, the trial court noted that "the disruption to the Court of a disqualification order on the eve of trial is manifest." AA Vol. II, Tab 20, at 353 (April 24 Order). While Hartford Underwriters is certainly sensitive to the disruption of the trial court's calendar, that disruption was caused not by Hartford Underwriters' disqualification motion, but by M&F's failure to resolve the conflict issue *back in 2004*. In any event, no court's schedule outweighs a clear and current conflict of interest and the prejudice to Hartford Underwriters that would result from being forced to go to trial against its own attorneys. "[T]he paramount concern must be the preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar. Consequently, the recognizably important right to choose one's counsel must yield to the ethical considerations that embody the moral principles of our judicial process." *State Farm,* 72 Cal. App. 4th 1422 at 1428 (citing *Comden v. Superior Court,* 20 Cal. 3d 906,

39

915 (1978)).

**B.** **The Trial Court Erred in Failing to Disqualify M&F On Grounds of Successive Representation**

Hartford Underwriters moved to disqualify M&F on two alternate grounds: concurrent representation (discussed above), and successive representation. M&F's long history (at least 97 matters involving payments to M&F of at least $1.3 million) of representing Hartford companies in coverage and other disputes, including matters involving California homeowners' policies and allegations of bad faith claims handling, provides an additional basis for disqualification. The trial court, however, did not rule on the successive representation issue, but simply denied the disqualification motion. AA Vol. II, Tab 20, at 346-354 (April 24 Order). This was error.

**1.** **The Material Facts Are Not Disputed**

Again, the facts regarding M&F's past representation of Hartford companies are not in dispute. Accordingly, this issue can be resolved as a matter of law.

The undisputed facts are these. Between 1998 and 2002 M&F had handled at least 42 personal lines coverage matters for Hartford's Western Personal Lines Claim Service Center in Phoenix, including matters relating to California homeowners' insurance policies like the one at issue in this case. *See* Section

40

II.A.4, above. The Western Claim Service Center also handled the Demery claim, and five of the Hartford representatives who handled the Demery claim worked at that center (Bruce Krager, Vicki Vancil, Kevin Ault, Randy Davis and Ken Wigboldy).[19] RT 216:12-17; AA Vol. I, Tab 3, at 63 (Disqualification Motion).

These 42 matters handled by M&F included the issuance of written "coverage opinions" in which M&F determined whether a particular insured's claim was or was not covered under various Hartford insurance policies, including California homeowners' policies like Demery's. AA Vol. I, Tab 8, at 176, 191-204 (Blum Decl. ¶¶ 3-6 and Exs. B, C and D thereto). In addition, these matters included at least one matter, the *Rye* claim, which involved allegations of bad faith claims handling and breach of contract, the same claims Demery now asserts against Hartford Underwriters here.[20] AA Vol. I, Tab 12, at 214-250 (Pawloski Decl.

---

[19] All five of these individuals have been identified as trial witnesses in the Demery case. AA Vol. I, Tab 3, at 63 n.2 (Disqualification Motion).

[20] As noted above, because M&F did not disclose its current or prior representation of Hartford entities prior to trial, Hartford's investigation of these issues was necessarily rushed. Therefore, M&F may well have handled other cases involving allegations of bad faith claims handling, or rendered additional coverage opinions involving California homeowners' insurance policies.

41

¶¶ 2-7 and Ex. 1 thereto).

## 2. M&F Must Be Disqualified Because It Formerly Represented Other Hartford Entities In Substantially Related Matters

It is an improper conflict of interest for an attorney who obtains confidential client information from a former client to take on a representation adverse to that client in a future related matter.[21] Accordingly, M&F must be disqualified because it has a long history of representing Hartford companies in the past, and the confidential subject matter of M&F's prior representations is substantially related to Demery's current action against Hartford Underwriters. *See Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft,* 69 Cal.App.4[th] 223, 234 (1999) (for purposes of attorney disqualification, "substantial relationship" test applies in successive representation cases). The test for a "substantial relationship" in a successive representation situation entails an inquiry into "'the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases.'"

---

[21] Rule 3-310(E) of the California Rules of Professional Conduct provides that "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

*H.F. Ahmanson & Co. v. Salomon Brothers, Inc.*, 229 Cal.App.3d 1445, 1455 (1991) (citation omitted).

Where a substantial relationship is shown between the former representation and the current representation, the possession of confidential information is *presumed* and disqualification is mandatory. *Farris v. Fireman's Fund Ins. Co.*, 119 Cal.App.4[th] 671, 683 (2004). "[W]hether [the attorney] actually possesses confidential information that would work to his advantage in his current representation is not the test." *Id.*[22]

    a.    **M&F's Prior Representation Of Hartford Companies In Insurance Coverage Matters Is "Substantially Related" To Its Current Representation of Demery In A Bad Faith and Breach of Contract Matter**

The successive representation case most similar to this one is *Farris v. Fireman's Fund Ins. Co.*, 119 Cal.App.4[th] 671 (2004). *Farris*, like this case, involved an attorney with a long history of handling

---

[22]    Of course, in cases where the actual possession of confidential information is established, it is unnecessary to rely on this presumption. In *Morrison Knudsen*, for example, the information Hancock had obtained from monitoring Morrison's defense attorneys was found to be potentially useful to the District's dispute against Centennial. 69 Cal.App.4[th] 223 at 237. The court therefore found that there was a "substantial relationship" between the dispute between the District and Centennial and the matters Hancock had previously handled on behalf of Morrison and Morrison's underwriters. *Id.* at 234-38. As a result, Hancock was disqualified from any action against Morrison's subsidiary.

43

insurance coverage matters for an insurer, who later sought to take on a plaintiff's bad faith and breach of contract case *against* that insurer. That is exactly what M&F seeks to do here.

In *Farris*, an insured sued Fireman's Fund alleging bad faith and breach of the insurance contract. *Id.* at 676. Fireman's Fund moved to disqualify the insured's attorney and firm under Rule 3-310(E) of the California Rules of Professional Conduct on the ground that the attorney had formerly represented Fireman's Fund in connection with insurance coverage matters. The attorney did not deny the former representation, but argued that the bulk of his work was issuing coverage opinions, which he claimed was "very factual and legally specific" and unrelated to the current bad faith and breach of contract suit. *Id.* at 677-678.

The *Farris* court found the attorney's assertion "disingenuous at worst and naïve at best." *Id.* at 683. The court made it clear that the test "has never been the identity of the specific tasks the attorney was asked to perform in either representation. . . . [T]he question is whether the subject matters, facts or issues are substantially the same." *Id.* at 681-82 (citations omitted).

The *Farris* court held that the attorney's former representation and current representation were substantially related for a number of reasons:

An insurer's acceptance or denial of coverage
necessarily raises legal issues about whether the
insurer conducted an adequate investigation,
whether the insurer gave sufficient
consideration to the interests and expectations
of the insured, whether the insurer reasonably
construed and applied the relevant policy
language, and whether the insurer's
construction and application of the relevant
policy language was consistent with its
treatment of other similarly situated insureds.

*Id.* at 684. In sum, the court concluded that "[c]overage disputes are

substantially related to bad faith actions for the purpose of attorney

disqualification because they both turn on the same issue - whether

or not there is coverage under the terms of the policy." *Id.* (citations

omitted).

> **b.** **The Evidence Establishes The Requisite "Substantial Relationship" Between Demery And The Matters Previously Handled By M&F**

Like the attorney in *Farris*, M&F's prior representation of

Hartford companies included rendering advice on coverage issues. In fact,

a letter drafted by M&F for signature by "The Hartford" in the *Walker* case

contains opinions regarding coverage under a California homeowners'

policy like Demery's. AA Vol. I, Tab 8, at 176, 195-201 (Blum Decl.,

¶¶ 3-6 and Ex. C thereto). M&F does not dispute that it offered coverage

advice to some Hartford companies, but claims that it did not offer such

advice to *Hartford Underwriters*. AA Vol. II, Tab 13, at 265

45

(Disqualification Opposition). That, of course, is irrelevant, because, as noted above, Hartford Underwriters and the other Hartford companies represented by M&F are considered to be a single client for conflicts purposes under California law.

M&F also claimed below that it never represented Hartford Underwriters or Hartford Fire in any bad faith litigation. *Id.; see also* AA Vol. II, Tab 14, at 271, 275 (Michel Decl., ¶¶ 2, 23). That deftly worded statement is not a denial that M&F never represented *other* Hartford companies in bad faith litigation, nor could it be. M&F *did* represent a Hartford company in at least one bad faith matter, the *Rye* case. AA Vol. I, Tab 12, at 214-250 (Pawloski Decl. ¶¶ 2-8 and Ex. 1 thereto).

Michael Michel and Jeff Fackler of M&F were retained by Hartford in the *Rye* case in 2002. *Id.* Through early 2004, they communicated of behalf of Hartford with the insured, Dr. Rye, regarding several issues that are also being litigated in the Demery case, such as Hartford's position with respect to the claimed loss, asbestos remediation, and the payment of "Actual Cash Value" under the policy. *Id.* The *Rye* claim, like the Demery claim, ultimately went to appraisal, and M&F assisted Hartford during the appraisal process. *Id.* One of Demery's claims is that Hartford Underwriters acted improperly during the appraisal. The substantial relationship between the *Rye* case and the Demery matter is evident.

SF/21676441.8

Finally, M&F claims it never advised or had contact with four of the eight individuals who submitted declarations in support of Hartford Underwriters' motion to disqualify and did not have any dealings with any of the defense witnesses in the Demery case. AA Vol. II, Tab 14, at 275-276 (Michel Decl. ¶ 24). Presumably, M&F acknowledges advising or having contact with the other four Hartford declarants. In any event, M&F's protestations are entirely irrelevant to the analysis of whether there is a "substantial relationship" between the factual and legal issues presented in the Demery case and the factual and legal issues presented in the cases M&F previously handled for other Hartford companies. *H.F. Ahmanson & Co. v. Salomon Brothers, Inc.*, 229 Cal.App.3d 1445, 1455 (1991).

The uncontested facts demonstrate that there is a substantial relationship between M&F's former representation of Hartford companies and its current representation of Demery. Accordingly, the trial court's order should be reversed, and M&F should be disqualified in light of its former representation of Hartford entities in substantially related matters.

47

## VI. CONCLUSION

The trial court erred in denying Hartford Underwriters' motion to disqualify M&F. The Order should be reversed, and disqualification should be ordered.

BINGHAM McCUTCHEN LLP

By: _____
Robert A. Lewis
Attorneys for Defendant and Appellant
Hartford Underwriters Insurance Company

SF/21676441.8

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 14(c) of the California Rules of Court, counsel certifies that this brief complies with the requirements of Rule 14(b) and, as counted by the Microsoft Word 2000 word-processing computer program by which this brief was produced, contains 11,502 words, including footnotes, but excluding the tables of contents and authorities, and excluding this certificate.

DATED: December 14, 2006    BINGHAM McCUTCHEN LLP

By: _____
Robert A. Lewis
Attorneys for Defendant and Appellant
Hartford Underwriters Insurance Company

SF/21676441.8

United States District Court, N.D. California.

**TERADYNE, INC., Plaintiff,**
v.
**HEWLETT-PACKARD COMPANY, Defendant.**

No. C-91-0344 MHP ENE.

June 6, 1991.

Travis Gordon White, Arnold, White & Durkee, Houston, Tex., for plaintiff.

Jonathan A. Marshall, Jon R. Stark, Thomas A. Canova, Steven I. Wallach, Pennie & Edmonds, New York City, John H. Hauser, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Christopher J. Byrne, Hewlett-Packard Company, Ft. Collins, Colo., for defendant.

MEMORANDUM AND ORDER

PATEL, District Judge.

*1 Teradyne, Inc. ("Teradyne") brings this patent infringement action against Hewlett-Packard Company ("HP"), alleging that circuit board testing devices produced by HP's Manufacturing Test Division infringe three of Teradyne's U.S. patents.

The parties are before the court on defendant's motion to disqualify two of the three law firms representing Teradyne in this action: Fish & Richardson, and Thelen, Marrin, Johnson & Bridges ("Thelen Marrin"). Defendant alleges that Hewlett-Packard is currently a client of each firm, that Hewlett-Packard does not consent to the firms' representation of an adverse party, and that such representation violates the ABA Model Code of Professional Responsibility and the Rules of Professional Conduct of the State Bar of California.

BACKGROUND

Since 1989, Fish & Richardson has represented and continues to represent Apollo Computer, Inc. ("Apollo") in various trademark matters. Barrett Aff. ¶ 10. Patrick Barrett, HP's Assistant General Counsel for Intellectual Property and Trademark Counsel, states that Apollo is "a wholly-owned subsidiary of HP." Barrett Aff. at ¶ 15.

Since 1983, Thelen Marrin has represented the Hewlett-Packard Supplemental Pension Plan and the Hewlett-Packard Profit Sharing Trust; both plans are benefit plans within the meaning of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA").

Fish & Richardson and Thelen Marrin assert that their representation of Teradyne in this action is permitted under both the Rules of Professional Conduct of the State Bar of California and the ABA Model Code and Model Rules of Professional Conduct. They argue that the law firms' clients, a subsidiary of HP and benefit plans of HP respectively, are corporate entities distinct from HP. Thus HP was not their client for purposes of the conflict rules. Moreover, the Apollo matters on which Fish & Richardson worked and the Retirement Plan matters on which Thelen Marrin worked and continues to work are wholly distinct from the current action between Teradyne and HP. It is undisputed that, in the course of the prior representation, the two firms did not have access to any confidential information which could prejudice HP in the current action.

Nevertheless, HP argues that by virtue of the fact that the firms' legal work for Apollo and the Retirement Plans was supervised by the office of HP's legal counsel and paid for by HP, HP was and is the client of each firm for purposes of the conflict rules. Moreover, although HP concedes that representation of Apollo and the Retirement Plans involved matters distinct from those of the present litigation, it asserts that a lawyer's duty of undivided loyalty is a sufficient basis to disqualify Fish & Richardson and Thelen Marrin from participating in this action against an existing client. Def. Motion to Disqualify at 15-16.

DISCUSSION

The issues before the court are: (1) whether HP and its wholly-owned subsidiary Apollo Computer, Inc. are the same or different clients/entities for conflict purposes; and (2) whether HP and its employee Retirement Plans are the same or different clients/entities for conflict purposes. If in either case the clients are the same, the duty of loyalty owed by counsel to its client would preclude Fish & Richardson's and/or Thelen Marrin's continued

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1991 WL 239940, *1 (N.D.Cal.))

Page 272

representation of Teradyne in this action without HP's consent. If in either case the clients are distinct, the duty of loyalty is not violated unless the disputed representation of Teradyne is "directly adverse" to existing representation by Fish & Richardson on behalf of Apollo, and/or existing representation by Thelen Marrin on behalf of the Retirement Plans.

**\*2** The standards of professional conduct governing counsel practicing before this court are specified in Rule 110-3 of the Local Rules, which provides:

Every member of the bar of this court and any attorney permitted to practice in this court under Local Rule 110-2 shall be familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and decisions of any court applicable thereto; ....

Northern District of California Local Rule 110-3.

The local rules of the Northern District do not specifically adopt the provisions of the Model Code to govern the practice of lawyers before its courts. However, district courts may appeal to the ABA Model Code "to supplement and explicate the principles and rules set forth in the California State Bar Act and Rules of Professional Conduct of the State Bar of California covering certain conduct where the state bar act and rules are imprecise or incomplete." Paul E. Iacono Structural Engineer, Inc. v. Humphrey, 722 F.2d 435, 439 (9th Cir.1983) (citations omitted).

California State Bar Rule of Professional Conduct (Professional Conduct") 3-310(B) provides that "[a] member shall not concurrently represent clients whose interests conflict, except with their informed written consent."

Professional Conduct Rule 3-600 deals generally with the representation of an organization vis a vis its agents, officers, etc. Professional Conduct Rule 3-600(a) provides that

[i]n representing an organization, a member shall conform his or her representation to the concept that the client is the organization itself, acting through its highest authorized officer, employee, body, or constituent overseeing the particular engagement.

This circuit has held that disqualification of a law firm based upon representation of a client in a lawsuit against an existing client requires no showing of specific "adverse effect" resulting from such representation. Unified Sewerage Agency v. Jelco Inc., 646 F.2d 1339, 1345 (9th Cir.1981). Moreover, disqualification of one attorney in a law firm is imputed to all attorneys in that firm. Picker Intern., Inc. v. Varian Associates, Inc., 869 F.2d 578, 583-84 (Fed.Cir.1989).

## I. MOTION TO DISQUALIFY FISH & RICHARDSON

### A. Identity of Client

The parties do not dispute that Apollo Computer, Inc. is a wholly-owned subsidiary of Hewlett-Packard. Barrett Affidavit at ¶ 15. HP's 10-K Report with the Securities and Exchange Commission lists Apollo as a "Domestic Subsidiary" of HP organized as a Delaware corporation. Pl. Opp. to Motion for Disqualification, Ex. A.

HP has cited cases holding that a parent corporation is a client of a law firm for conflict purposes by virtue of that firm's representation of a subsidiary. Hartford Acc. and Indem. Co. v. RJR Nabisco, Inc., 721 F.Supp. 534, 540 (S.D.N.Y.1989) (conflict found under Canon 5 of the ABA Code of Professional Responsibility); Stratagem Development Corp. v. Heron Int'l, N.V., 756 F.Supp. 789, 792-93 (S.D.N.Y.1991) (conflict found under New York Code of Professional Responsibility).

**\*3** However, plaintiff has cited and provided to the court a copy of Formal Opinion No. 1989-113 of the State Bar of California's Standing Committee on Professional Responsibility and Conduct ("Formal Opinion") addressing the question whether an attorney may undertake representation adverse to a wholly-owned subsidiary of an existing corporate client under the state's Rules of Professional Responsibility. Pl. Opp. to Motion for Disqualification, Ex. B. The hypothetical presented there involved an attorney who currently represents the parent corporation and is asked to bring a lawsuit against a wholly-owned subsidiary of that

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
(Cite as: 1991 WL 239940, *3 (N.D.Cal.))

Page 273

corporation. The parent is a large, publicly-held corporation; it is not a party to the lawsuit and there is no prospect that it will be made a party.

The Formal Opinion, interpreting Rules 3-310(B) and 3-600 of the State Bar of California Rules of Professional Responsibility and Conduct, concludes that such representation is permissible where: (1) the attorney has not represented and does not now represent the subsidiary, see Formal Opinion (Pl. Opp. to Motion for Disqualification, Ex. B) at 2; (2) the subsidiary is not the "alter ego" of the parent corporation, id. at 5-6; and (3) there is no adversity between the corporation and the subsidiary on the subject of the representation. Id. at 1-2. The Opinion makes clear that the "identity of client" inquiry is fact-specific. The fact that the existing client is the parent and the opposing party in the contemplated representation is a wholly-owned subsidiary is not by itself dispositive of whether the two are "the same client" for conflict purposes.

The Formal Opinion reasons that "the client is the parent and not the subsidiary and ... the attorney's duties are owed only to the parent corporation." Id. at 3. Specifically, given that the parent and subsidiary are not a single client for conflict purposes, the authors concluded that bringing suit against the subsidiary would not violate the attorney's duty of loyalty to the parent unless there are or may be "direct" adverse consequences on the parent. "Direct" consequences are limited to the case in which the parent is or may be made a party to the suit against the subsidiary, or where the parent is directly related to the case or transaction in which the attorney will undertake representation against the subsidiary. Id. at 4-5.

The express exception to this rule is where the corporation and its subsidiary should be treated as a single entity because the subsidiary is acting essentially as the alter ego of the parent. Id. at 5-6.

Finally, the Formal Opinion notes that an attorney might be precluded from undertaking representation adverse to the subsidiary if the attorney had "obtained confidential information directly from the nonclient subsidiary [in the course of representing the parent] under circumstances where the subsidiary could reasonably expect that the attorney had a duty to keep such information confidential." Id. at 7.

*4 The case at bar is a permutation of the hypothetical dealt with in the Formal Opinion: Fish & Richardson has HP's subsidiary as its existing client and is undertaking representation of Teradyne against HP itself. However, the court sees no reason not to consider the reasoning of the Formal Opinion in connection with this situation as well.

There is no allegation that, in the course of representing Apollo, Fish & Richardson obtained confidential information regarding HP that may prejudice HP's interests in this action. Nor is there any allegation that Fish & Richardson would breach its duty of loyalty to Apollo because an adverse outcome for HP in the present suit would have anything more than an indirect adverse effect on Apollo.

The Formal Opinion rejects the assumption that sole ownership of a subsidiary necessarily entails that the parent and its subsidiary are one for purposes of the conflict rules. Id. at 3. However, it expressly notes that parent and subsidiary should be treated as the same client for conflict purposes if the doctrine of alter ego applies:

In determining whether there is a sufficient unity of interests to require an attorney to disregard separate corporate entities for conflict purposes, the attorney should evaluate the separateness of the entities involved, whether corporate formalities are observed, the extent to which each entity has distinct and independent managements and board of directors and whether, for legal purposes, one entity could be considered the alter ego of the other.

Formal Opinion (Def. Motion for Disqualification, Ex. B) at 6 (citing 6 Witkin, Summary of California Law (8th ed.1974) section 11 at p. 4323).

Although HP has not argued explicitly that Apollo is its alter ego and that this case falls under the alter ego exception to the finding of the Formal Opinion, many of the factors cited in the Opinion, which indicate that corporate form should be disregarded, are present here. Thus, defendant argues that Fish & Richardson's representation of Apollo should be construed as representation of HP itself for conflict purposes because Apollo's legal work, including retention of outside counsel Fish & Richardson, is supervised by the HP legal department. Def.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1991 WL 239940, *4 (N.D.Cal.))

Page 274

Motion for Disqualification at 3-5, Barrett Aff. ¶¶ 3, 4. In its conduct of trademark matters for Apollo, Fish & Richardson reports directly to and receives instructions directly from Robert Mayes, HP's Senior Regional Attorney responsible for intellectual property matters of Apollo. Barrett Aff. ¶ 9. All correspondence on Apollo matters is directed to and from the Hewlett-Packard Company, id., and billing is sent to and paid directly by HP. Barrett Aff., Ex. 12. In addition, after HP's acquisition of Apollo and by January 1, 1990, most of Apollo's business "was converted from the status of being part of HP's wholly-owned subsidiary to being part of HP itself," and most of its employees became employees of HP. Def. Reply, Motion for Disqualification at 4. As a result, "of the several distinct departments of Apollo Computer, Inc. that existed before the acquisition of HP, only one remains a part of HP's wholly owned subsidiary" and "[t]he other departments are no longer a part of Apollo Computer, Inc., but have become fully integrated into HP itself." Id. at 4 (citing Barrett Supp. Aff. ¶¶ 2-10).

*5 The court finds that HP's control and supervision of the legal affairs of Apollo, and specifically its direct role in the retention and supervision of the work of Fish & Richardson as outside counsel, represents a significant identity of legal interest between Apollo and its parent HP. This identity of interest is sufficient for a finding that the two should be treated as a single client for the limited purpose of determining whether there is a conflict between Fish & Richardson's representation of Apollo and its representation of Teradyne in the present action against HP. See Hartford Acc. and Indem. Co. v. RJR Nabisco, Inc., 721 F.Supp. at 540 (parent deemed client of subject law firm through representation of its subsidiary where parent supervised and directed course of litigation on behalf of subsidiary).

B. Rymer's Departure from Fish & Richardson

However, this finding does not resolve the issue of disqualification. William Rymer, not Fish & Richardson, is listed as counsel for Teradyne in the captions of the filings in the present motion. Rymer is currently a partner at Fish & Richardson. For approximately fifteen years, he has been principal outside counsel for Teradyne in its patent-related matters. Rymer Decl. ¶ 2. At the end of

June of this year, he will leave Fish & Richardson and open his own practice in Providence, Rhode Island; he will continue to represent Teradyne in the present action and other matters. Id. at ¶ 3. Rymer states that "Fish & Richardson no longer represents Teradyne in the above-captioned matter. I do, alone in New England as I shall after June 30, and may now do and do consistently with my partnership agreement with Fish & Richardson." Id. During his tenure at Fish & Richardson, Rymer did not perform any work on Apollo matters, id. at ¶ 5, and it is clear that he will do no work on Apollo matters after his formal separation from Fish & Richardson. Id.

Plaintiff argues that in deciding whether attorney Rymer should be disqualified, the relevant test should be the disqualification standard for former representation, a standard less demanding than that for simultaneous adverse representation.

However, defendant protests that the former representation standard is not applicable because a violation of the conflict rules had occurred at the time the complaint was filed, and that violation cannot be cured now by Rymer's resignation from Fish & Richardson. They argue that to permit Rymer's resignation to convert the situation from one in which HP is the present client (of Fish & Richardson) to one in which HP is the former client (of Rymer) would sanction the stratagem of "withdraw[ing] from the less favored representation before a disqualification motion is filed in order to be able to enjoy the less restrictive former-client conduct rules." Def. Reply in Support of Motion for Disqualification at 18 (quoting C. Wolfram, Modern Legal Ethics § 7.4.1. at 359). See Unified Sewerage Agency, etc. v. Jelco Inc., 646 F.2d 1339, 1345 n. 4 (9th Cir.1981) (present client standard continues to apply even where the representation ceases prior to filing of motion to disqualify).

C. Conclusion

*6 The court finds that the disqualification standard for adverse simultaneous representation should apply to the facts of this case. The degree of connectedness between HP and Apollo, particularly the fact that all of Apollo's legal work was referred to and handled by HP's office of legal counsel, leads the court to conclude that although

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1991 WL 239940, *6 (N.D.Cal.))

Page 275

HP and Apollo may be separate entities for some purposes, they are one client for purposes of the conflict rules. Fish & Richardson and William Rymer are therefore disqualified from further representation of plaintiff Teradyne in this matter.

## II. MOTION TO DISQUALIFY THELEN MARRIN

Defendant argues that HP is a client of Thelen Marrin by virtue of that firm's representation of the HP Plan and the HP Trust over the past seven and one half years. State of California Rule of Professional Responsibility 3-310 and the attorney's duty of undivided loyalty therefore precludes Thelen Marrin's representation of Teradyne unless HP and Teradyne give their informed written consent. Because HP has not consented to Thelen Marrin's representation of Teradyne in this lawsuit, HP argues that Thelen Marrin must be disqualified from further participation in this action.

HP is the "plan sponsor" of two employee benefit ERISA plans under section 401(a) of the Internal Revenue Code: the Hewlett-Packard Supplemental Pension Plan and the Hewlett-Packard Profit Sharing Trust (collectively "the Retirement Plans" or "the Plans").

These are employer-sponsored plans rather than plans set up pursuant to a collective bargaining agreement. Hewlett-Packard exclusively manages and administers the Plans from its Palo Alto offices; neither Plan has any independent office, legal department, employees, or personnel. HP's legal department has exclusive responsibility for all legal matters regarding the HP Plan and HP Trust other than matters that are referred to outside counsel such as Thelen Marrin. Lev.Aff. ¶ 4.

In September 1983 HP formally retained Thelen Marrin to represent the Plans' interests in investments made in Osborne Computer Corporation ("Osborne"). Id. at ¶ 7. Thelen Marrin had advised HP and other Osborne investors of a possible suit alleging inter alia securities fraud. Def. Motion for Disqualification at 9. Abraham Lev's affidavit and correspondence between HP and Thelen Marrin indicate that HP's legal department formally retained Thelen Marrin; that Thelen Marrin was expressly told that it would be representing HP's interests in proceedings involving

Osborne; that HP's corporate counsel Abraham Lev would be handling the matter "in house" and all communications, pleadings, etc. should be directed to Lev; and that Lev would be reviewing and participating in the Osborne litigation and "reviewing tactical decisions ... to the extent possible." Lev.Aff. ¶¶ 8. As a result of Thelen Marrin's representation in the Osborne matter, HP's interest in the litigation has been between 11.11-12.00%, and HP has paid between 11.11-12.00% of Thelen Marrin's fees and expenses in the case. Id. at ¶ 20. HP's share has always been paid directly by HP, and not by either the HP Plan or the HP Trust. Id. at ¶ 24.

*7 By letter dated February 6, 1981, Peter Anderson of Thelen Marrin informed HP that the firm had been retained by Teradyne in this action against HP. Anderson stated that although he was aware that his firm represented the HP Plan and the HP Trust, he had concluded that there was no conflict of interest because HP itself was not a client of the firm. Id., Ex. 11 at 2. Plaintiffs continue to maintain that position in their opposition to the motion for disqualification.

Plaintiffs are correct that by law, HP must maintain the Plans as entities separate and distinct from itself. 29 U.S.C. §§ 1103(a), (c). The statute provides that assets of the plan are to be held in trust, with the trustee exercising exclusive authority and discretion to manage and control the plan's assets; moreover, the assets of the plan are not to inure to the benefit of the employer. Id.

However, the court does not accept the suggested inference that "by definition representation of the Retirement Plans does not constitute representation of HP." Pl. Opp. to Motion for Disqualification at 6. Although there may be circumstances in which a plan and the employer will have distinct or incompatible interests, the particular circumstances under which Thelen Marrin came to represent the HP Plan and the HP Trust indicate that in its representation of the Plans in the Osborne litigation, Thelen Marrin's client was Hewlett-Packard. HP's retention of Thelen Marrin and the review and participation by HP's legal counsel in the Osborne litigation indicate that for purposes of that litigation, HP's interests and the interests of the Plans were identical.

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1991 WL 239940, *7 (N.D.Cal.))

Page 276

The court therefore finds that Hewlett-Packard is an existing client of Thelen Marrin for purposes of the conflict rules. Because Rule 3-310 of the Rules of Professional Responsibility requires that HP and Teradyne informed consent to Thelen Marrin's representation of Teradyne in this action, and because HP does not consent to the representation, the court GRANTS defendant's motion for disqualification as to Thelen Marrin.

CONCLUSION

For the above reasons, the court finds that HP and Apollo were a single client with respect to Fish & Richardson's trademark-related work for Apollo. Furthermore, Rymer's departure from Rish & Richardson does not prevent the application of the disqualification standard for adverse simultaneous representatiton. The court therefore GRANTS defendant's motion to disqualify William Rymer from further representation of Teradyne in this action.

In addition, the court finds that the degree of management and control of the HP Plan and HP Trust by HP and its legal department is such that the Plan and HP should be considered a single client for purposes of the conflict rules. The court therefore GRANTS defendant's motion to disqualify the law firm Thelen, Marrin, Johnson & Bridges from further representation of Teradyne in this action.

IT IS SO ORDERED.

1991 WL 239940 (N.D.Cal.), 20 U.S.P.Q.2d 1143

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



## PROOF OF SERVICE

I am over eighteen years of age, not a party in this action, and employed in San Francisco County, California at Three Embarcadero Center, San Francisco, California 94111-4067. I am readily familiar with the practice of this office for collection and processing of correspondence for mail/fax/hand delivery/next business day delivery, and they are deposited that same day in the ordinary course of business.

On December 14, 2006, I served the attached:

### Appellant's Opening Brief

☐ (BY FAX) by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date. The facsimile machine I used complied with California Rules of Court, Rule 2003(3) and the transmission was reported as complete and without error by the machine. Pursuant to California Rules of Court, Rule 2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of which is attached to this declaration.

☐ (BY MAIL) by causing a true and correct copy of the above to be placed in the United States Mail at San Francisco, California in sealed envelope(s) with postage prepaid, addressed as set forth below. I am readily familiar with this law firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence is deposited with the United States Postal Service the same day it is left for collection and processing in the ordinary course of business.

☐ (EXPRESS MAIL/OVERNIGHT DELIVERY) by causing a true and correct copy of the document(s) listed above to be delivered by federal express in sealed envelope(s) with all fees prepaid at the address(es) set forth below.

☒ (PERSONAL SERVICE) by causing a true and correct copy of the above documents to be hand delivered in sealed envelope(s) with all fees fully paid to the person(s) at the address(es) set forth below.

Michael D. Michel, Esq.
Michel & Fackler
2000 Powell Street, Suite 1000
Emeryville, CA 94608

Supreme Court of California (4 Copies)
350 McAllister Street
San Francisco, CA 94102-4797

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on December 14, 2006

_Ruby J. Converse_

Ruby J. Converse