# Exhibit 1

Summary of Comments on Comparison Second Amended Complaint.pdf

11/19/2020 12:34:54 PM

## Compare Results

| Old File: | | New File: |
|---|---|---|
| **17 Plaintiff's Amended Complaint.pdf** | versus | **Second Amended Complaint clean.pdf** |
| 51 pages (821 KB) | | 63 pages (1.53 MB) |
| 7/30/2020 9:59:12 AM | | 11/19/2020 12:30:49 PM |

**Total Changes**

# 514

**Content**

199 Replacements

125 Insertions

118 Deletions

**Styling and Annotations**

34 Styling

38 Annotations

Go to First Change (page 1)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT A. LEVY, D.M.D., LLC; | ) | |
| VANESSA N. KELLER D.M.D. & | ) | |
| TRISHA M. YOUNG D.M.D., P.C.; | ) | |
| RIVKA GOLDENHERSH D.M.D., LLC; | ) | |
| and FARHAD MOSHIRI, AND MAZYAR | ) | |
| MOSHIRI, D.M.D., M.S., P.C., dba Moshiri | ) | |
| Orthodontics, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 4:20-cv-00643-SRC |
| | ) | |
| v. | ) | |
| | ) | |
| HARTFORD FINANCIAL SERVICES | ) | |
| GROUP INC, DBA THE HARTFORD, | ) | |
| HARTFORD CASUALTY | ) | |
| INSURANCE COMPANY, SENTINEL | ) | |
| INSURANCE COMPANY, LIMITED and | ) | |
| TWIN CITY FIRE INSURANCE COMPANY | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I. NATURE OF THE ACTION ............................................................................... 1

II. THE PARTIES.................................................................................................... 6

Plaintiffs ............................................................................................................. 6

Defendants ......................................................................................................... 8

III. JURISDICTION AND VENUE ...................................................................... 10

IV. FACTUAL ALLEGATIONS .......................................................................... 11

A. The Global COVID-19 Pandemic ........................................................... 11

B. Steps Taken by Authorities in Missouri to Control the Pandemic ........... 13

C. Standards and Recommendations Related to the Pandemic for Dental and Orthodontic Practices ........................................................................... 15

D. The Devastating Impact of the COVID-19 Pandemic on Dental and Orthodontic Practices ................................................................................ 19

E. The Hartford's Spectrum Business Owner's Insurance Policy ................ 22

F. Allegations Regarding the Liability of Hartford Financial Services Group ... 26

G. Defendants Either Denied Coverage or Ignored Plaintiffs' Claims ........ 37

1. Plaintiff Levy's Claim ....................................................................... 37

2. Plaintiff Keller's Claim ..................................................................... 40

3. Plaintiff Goldenhersh's Claim ........................................................... 43

4. Plaintiff Moshiri's Claim ................................................................... 44

H. The Hartford's Improper Public Denial of Coverage .............................. 44

V. CLASS ALLEGATIONS .................................................................................. 45

VI. JURY DEMAND ............................................................................................ 49

COUNT I: Business Income Breach Of Contract ................................................ 49

Page: 2

Comments from page 2 continued on next page

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 2 of 51 PageID #: 267"

Annotation Attributes Changed

Annotation Deleted

Annotation Inserted

Text Inserted
" "

Text Inserted
" "

Text Inserted
"Allegations Regarding the Liability of Hartford Financial Services Group ............ 26"

Annotation Inserted

Text Inserted
"G."

Text Replaced
[Old]: "26"
[New]: "37"

Annotation Attributes Changed

Text Replaced
[Old]: "26"
[New]: "37"

Annotation Attributes Changed

Text Replaced
[Old]: "28"
[New]: "40"

Annotation Attributes Changed

Text Replaced
[Old]: "32"
[New]: "43"

Annotation Attributes Changed

Text Replaced
[Old]: "33"
[New]: "44"

Annotation Attributes Changed

Text Replaced
[Old]: "G."
[New]: "H."

Text Replaced
[Old]: "33"
[New]: "44"

Annotation Attributes Changed

Text Replaced
[Old]: "34"
[New]: "45"

## TABLE OF CONTENTS

I.   NATURE OF THE ACTION ........................................................................... 1

II.  THE PARTIES............................................................................................. 6

    Plaintiffs........................................................................................................ 6

    Defendants .................................................................................................... 8

III. JURISDICTION AND VENUE ................................................................... 10

IV.  FACTUAL ALLEGATIONS ...................................................................... 11

    A.   The Global COVID-19 Pandemic........................................................ 11

    B.   Steps Taken by Authorities in Missouri to Control the Pandemic ....... 13

    C.   Standards and Recommendations Related to the Pandemic for Dental and Orthodontic Practices .......................................................................... 15

    D.   The Devastating Impact of the COVID-19 Pandemic on Dental and Orthodontic Practices.. 19

    E.   The Hartford's Spectrum Business Owner's Insurance Policy ............ 22

    F.   Allegations Regarding the Liability of Hartford Financial Services Group ...................... 26

    G.   Defendants Either Denied Coverage or Ignored Plaintiffs' Claims ................... 37

        1.   Plaintiff Levy's Claim ........................................................... 37

        2.   Plaintiff Keller's Claim .......................................................... 40

        3.   Plaintiff Goldenhersh's Claim ................................................ 43

        4.   Plaintiff Moshiri's Claim ....................................................... 44

    H.   The Hartford's Improper Public Denial of Coverage ........................... 46

V.   CLASS ALLEGATIONS ............................................................................ 46

VI.  JURY DEMAND ........................................................................................ 49

COUNT I: Business Income Breach Of Contract........................................... 49



COUNT II: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable to Business Income ...................................................................................................... 50

COUNT III: Declaratory Relief Applicable to Business Income ...................................... 52

COUNT IV: Extra Expense: Breach of Contract .............................................................. 53

COUNT V: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable to Extra Expense ................................................................................................................ 55

COUNT VI: Declaratory Relief Applicable to Extra Expense .......................................... 56

VII.   PRAYER FOR RELIEF ......................................................................................... 58

Annotation Attributes Changed

Text Replaced
[Old]: "39"
[New]: "50"

Annotation Attributes Changed

Text Replaced
[Old]: "41"
[New]: "52"

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 3 of 51 PageID #: 268"

Annotation Attributes Changed

Text Replaced
[Old]: "42"
[New]: "53"

Annotation Attributes Changed

Text Replaced
[Old]: "43"
[New]: "55"

Annotation Attributes Changed

Text Replaced
[Old]: "45"
[New]: "56"

Annotation Attributes Changed

Text Replaced
[Old]: "............................................................................................ 46"
[New]: "............................................................................................ 58"

Text Deleted

PLAINTIFFS ROBERT A. LEVY, D.M.D., LLC; VANESSA N. KELLER D.M.D. & TRISHA M. YOUNG D.M.D., P.C.; RIVKA GOLDENHERSH D.M.D., LLC; and FARHAD MOSHIRI, AND MAZYAR MOSHIRI, D.M.D., M.S., P.C., dba Moshiri Orthodontics, individually and on behalf of other similarly situated persons and entities operating dental and orthodontic practices in Missouri, make the following allegations based upon information and belief, except as to those allegations specifically pertaining to Plaintiffs, which are based on personal knowledge. Plaintiffs bring this action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory and injunctive relief against DEFENDANTS HARTFORD FINANCIAL SERVICES GROUP INC., DBA THE HARTFORD ("The Hartford"), HARTFORD CASUALTY INSURANCE COMPANY ("Hartford Casualty"), SENTINEL INSURANCE COMPANY, LIMITED ("Sentinel"), and TWIN CITY FIRE INSURANCE COMPANY ("Twin City") (collectively "Defendants"), demanding a trial by jury.

## I.   NATURE OF THE ACTION

1.   Plaintiffs have been offering dental and/or orthodontics services in the St. Louis area for many years. To make sure that they would be protected if they were forced to temporarily cease their practices because of unanticipated events beyond their control, they each purchased business insurance policies from The Hartford.

2.   Such an event, namely the worst health crisis to hit the State of Missouri, the United States, and indeed the world in over a century, arrived in early 2020 in the form of a worldwide pandemic of a disease called COVID-19, causing a massive number of illnesses and numerous deaths.

3.   Like Plaintiffs, many other dental and orthodontics practices have purchased insurance from The Hartford to protect against losses from catastrophic events like the current unforeseen COVID-19 pandemic. These policies promise to indemnify the policyholder for actual business



losses incurred when business operations are involuntarily suspended, interrupted, or curtailed because of direct physical loss of or damage to the property. This coverage is commonly known as "business interruption" or "business income" coverage.

4. Insurance is a way to manage risk, providing protection from financial loss. It is particularly appropriate – indeed, vital – for protection against losses that, while unlikely to occur, would be financially devastating if they do occur. Or as The Hartford explains on its website, insurance protects you from the unexpected:[1]

> **Popular Business Insurance Solutions**
> Business insurance, also known as commercial insurance, helps protect business owners from unexpected losses.

5. The Hartford's website includes a clever video to explain why businesses should purchase insurance:



---
[1] https://www.thehartford.com/business-insurance (accessed 6/23/2020).



Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 6 of 51 PageID #: 271"



The narrator begins by saying, "Most business owners don't think they'll ever need to use their insurance," while a hand draws the company's symbol and the word "Business" as shown above. *Id*.



He continues: "But within a 10-year span, over 40% experience an event that leads to a claim."



Continuing: "Making sure unfortunate events won't cost you your livelihood …

3





Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 7 of 51 PageID #: 272"

"… is just one way The Hartford can help you prevail when the unexpected strikes."



"At The Hartford we offer broad protection for small, mid-sized and enterprise-level

businesses across a wide range of industries." *Id.*

6.   The COVID-19 pandemic is the epitome of the unexpected catastrophic event –

especially for dentists. As a result of it, beginning in mid-late March, the State of Missouri asked

dental offices to postpone elective, or non-urgent procedures, and Plaintiffs complied by shutting

down their practices either entirely or except for emergency visits, something they never

expected to have to do.

7.   As a result of the pandemic, in March, 2020, the Centers for Disease Control ("CDC"),

and American Dental Association ("ADA") recommended to all dentists in the United States that

elective, or non-urgent dental procedures be postponed to help reduce the risk of spreading COVID-19.[2]

8.  On the same date, the Missouri Dental Board urged Missouri dentists to adhere to those recommendations.[3]

9.  Beginning in mid-March and continuing for approximately two months, in response to these recommendations and because of the risk of continuing their dental practices during the COVID-19 pandemic, Plaintiffs shut down their practices either entirely, or only saw a few emergency patients.

10. According to surveys conducted by the American Dental Association, nearly all other dental practices in Missouri also completely ceased seeing patients for elective or non-urgent visits for the same reasons.[4]

11. However, despite the provision of business income coverage in its policies, Defendants are refusing to comply with their obligation to pay for business income losses and covered expenses incurred by policyholders as a result of the physical loss of their insured property arising from the COVID-19 pandemic.

12. Defendants seek to justify their decision to unilaterally and preemptively deny coverage owed to their insureds on grounds that are patently specious. They state that there is no coverage because a virus cannot cause physical loss or damage to property as required by the policies. However, beginning in 2006, Defendants' policies specifically *excluded* certain types of property loss or damage caused by viruses (though not the type of losses sustained by Plaintiffs). If

---

[2] https://content.govdelivery.com/accounts/MODIFP/bulletins/282c1ac (accessed 5/8/2010).
[3] Mo. Dep't of Com. & Ins., https://content.govdelivery.com/accounts/MODIFP/bulletins/282c1ac (last visited May 8, 2020).
[4] Health Policy Institute, COVID-19: Economic Impact on Dental Practices (Week of April 6 Results), available at https://surveys.ada.org/reports/RC/public/YWRhc3VydmV5cy01ZThkZDViMDA3YTZhODAwMTAzZTViZTgtVVJfNWlJWDFFU01IdmNDUlVO (accessed 6/24/2020) at 1.

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 9 of 51 PageID #: 274"

viruses could not cause property loss or damage, there would have been no reason to exclude them from the policy because they wouldn't have been covered to begin with. Defendants are grasping at straws and know that there is coverage for Plaintiffs' losses, as well as those of other dental and orthodontics practices.

13. Plaintiffs bring this action on behalf of a class of Missouri dental practices (as defined below) and a subclass of Missouri orthodontics practices (as defined below) that purchased standard commercial property insurance policies from The Hartford that provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered business income and extra expense losses.

14. This action also seeks a declaratory judgment that Defendants are contractually obligated to pay these losses. In addition, Plaintiffs seek damages, attorneys' fees and costs, and any other relief that this Court deems equitable and just, arising out of Defendants' breach of contract and wrongful conduct alleged herein.

## II.  THE PARTIES

**Plaintiffs**

15. Plaintiff Robert A. Levy, D.M.D., LLC ("Plaintiff Levy"), is a dental practice located at 777 South New Ballas Road, Suite 322 East, in St. Louis County, Missouri. Robert A. Levy, D.M.D. has practiced dentistry through that entity for over 30 years. Aside from giving his patients regular checkups and teeth cleaning, the treatments he provides include dental fillings, dental sealants, dentures, dental bridges, dental implants, dental crowns and tooth extractions, as well as dental bonding, porcelain veneers, inlays, onlays and teeth whitening. To make sure that Plaintiff Levy would be protected if it was forced to temporarily cease its practice by unanticipated events beyond its control, Plaintiff Levy purchased a commercial insurance policy



Text Deleted

from The Hartford, with Hartford Casualty shown as the "insurer." That policy is attached hereto as Exhibit A.

16. Plaintiff Levy shut down its practice on March 23 until mid-May when it began opening up its practice. During that period, it saw only a handful of patients and only for urgent problems. After it opened up, the effects of the COVID-19 pandemic continued to negatively impact its practice.

17. Plaintiff Vanessa N. Keller D.M.D. & Trisha M. Young D.M.D., P.C. ("Plaintiff Keller"), is a dental practice located at 165 N. Meramec Ave, Suite 420, in St. Louis County, Missouri. Dr. Keller and Dr. Young have practiced dentistry through that entity for several years. Aside from giving their patients regular checkups and teeth cleaning, the treatments they provide include dental fillings, dental bridges, dental implants, dental crowns, tooth extractions, and root canal procedures. To make sure that Plaintiff Keller would be protected if it was forced to temporarily cease its practice by unanticipated events beyond its control, Plaintiff Keller purchased a commercial insurance policy from The Hartford, with Sentinel Insurance Company, Limited, shown as the "insurer." That policy is attached hereto as Exhibit B.

18. Plaintiff Keller shut down its practice from March 13 through May 18. During that period, it only handled a small number of emergency patients. The effects of the COVID-19 pandemic continue to negatively impact its practice.

19. Plaintiff Rivka Goldenhersh D.M.D., LLC ("Plaintiff Goldenhersh"), is a dental practice located at 620A North McKnight Road, Suite 2A, in St. Louis County, Missouri. Dr. Goldenhersh has practiced dentistry through that entity since February of 2019. Aside from giving her patients regular checkups and teeth cleaning, the treatments she provides include dental fillings, tooth extractions, dental implants, dental bridges, dental crowns, veneers, and

7

teeth whitening. To make sure that it would be protected if it was forced to temporarily cease its practice by unanticipated events beyond its control, Plaintiff Goldenhersh purchased a commercial insurance policy from The Hartford, with Twin City Fire Insurance Company shown as the "insurer." That policy is attached hereto as Exhibit C.

20. Plaintiff Goldenhersh shut down its practice entirely from March 18 through May 17, when it re-opened with reduced hours. The effects of the COVID-19 pandemic continue to negatively impact its practice.

21. Plaintiff Moshiri Orthodontics ("Plaintiff Moshiri"), is an orthodontics practice located at 777 S. New Ballas Road, Suite 116e, in St. Louis County, Missouri. Dr. Farhad Moshiri and Dr. Mazyar Moshiri have practiced orthodontics through that entity for many years. Its practice includes treating patients with braces and Invisalign. It also treats patients for Temporomandibular Joint Disorder. To make sure that Plaintiff Moshiri would be protected if it was forced to temporarily cease its practice by unanticipated events beyond its control, Plaintiff Moshiri purchased commercial insurance policies from The Hartford, with Twin City Fire Insurance Company (4/1/19 – 4/1/20) and Sentinel Insurance Company, Limited (4/1/20 – 4/1/21) as the "insurers," respectively. Those policies are attached hereto as Exhibits D and E, respectively.

22. Plaintiff Moshiri shut down its practice from March 20 through May 17 and only saw a small number of emergency patients during that time. The effects of the COVID-19 pandemic continue to negatively impact its practice.

**Defendants**

23. The Hartford is an insurance company incorporated in Delaware with its principal place of business at One Hartford Plaza, Hartford, CT 06155. On its website, The Hartford states:



Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 11 of 51 PageID #: 276"

"Companies have been protecting themselves in Missouri with business insurance from The Hartford for hundreds of years."[5] Because Missouri has been a state for only 200 years, that means that The Hartford has been doing business by providing insurance in this state for its entire period of statehood.

24. Hartford Casualty is an insurance company incorporated in Indiana with its principal place of business at One Hartford Plaza, Hartford, CT 06155. Hartford Casualty has been registered to do business in Missouri since 1987. It has been licensed by the Missouri Department of Insurance under License Number B424265. In 2019, it received $15.5 million in premiums from Property & Casualty insurance and $6.6 million in premiums from Commercial Multi-Peril insurance in Missouri, while paying out only $5.0 million and $3.5 million on these two lines respectively.[6]

25. Sentinel Insurance Company, Limited is an insurance company incorporated in Connecticut with its principal place of business at One Hartford Plaza, Hartford, CT 06155. It is licensed by the Missouri Department of Insurance under License Number B422066, having been admitted on 2004-11-08. In 2019, it received $16.5 million in premiums from Property & Casualty insurance and $8.3 million in premiums from Commercial Multi-Peril insurance in Missouri while paying out losses of only $10.2 million and $5.8 million for these two lines respectively.[7]

26. Twin City Fire Insurance Company is an insurance company incorporated in Indiana with its principal place of business at One Hartford Plaza, Hartford, CT 06155. It is licensed by the Missouri Department of Insurance under License Number B424279, having been admitted on

---

[5] https://www.thehartford.com/business-insurance/missouri (accessed 7/21/2020).
[6] https://insurance.mo.gov/CompanyAgentSearch/CompanySearch/compSearchDetails.php?id=126149&t=CM&n=HARTFORD+CASUALTY+INSURANCE+CO&c= (accessed (7/21/2020).
[7] https://insurance.mo.gov/CompanyAgentSearch/CompanySearch/compSearchDetails.php?id=42164744&t=MC&n=SENTINEL%20INSURANCE%20COMPANY%20LTD&c= (accessed 7/21/2020).

9




Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 12 of 51 PageID #: 277"
Annotation Attributes Changed

1987-04-27. In 2019, it received $44.6 million in premiums from Property & Casualty insurance

and $7.4 million in premiums from Commercial Multi-Peril insurance in Missouri, while paying

out only $19.4 million and $2.5 million on these lines respectively.[§]



Text Deleted

"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 13 of 51 PageID #: 278"



Annotation Attributes Changed

### III. JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is

complete diversity between Defendants and at least one member of the class; there are more than

one hundred members of the class; and the amount in controversy exceeds $5,000,000.00,

exclusive of interest and costs. This Court also has subject matter jurisdiction pursuant to 28

U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes.

28. The facts set forth in this Complaint show that this Court has personal jurisdiction over

these Defendants. In addition, The Hartford regularly sent invoices for the insurance coverage at

issue to insureds in Missouri. *See, e.g.*, an invoice sent by The Hartford to Plaintiff Levy, dated

7/21/20, stating, "Thank you for selecting The Hartford" and directing payments to be mailed to

"The Hartford" or, alternatively, pay online at "www.thehartford.com/servicecenter." Exhibit F

at 1-2. Plaintiff Levy regularly paid its bills by writing checks to The Hartford.

29. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial

part, if not all, of the acts and omissions complained of in this action took place in this district.

---

[§] https://insurance.mo.gov/CompanyAgentSearch/CompanySearch/compSearchDetails.php?id=126287&t
=CM&n=TWIN+CITY+FIRE+INSURANCE+COMPANY&e= (accessed 7/21/2020).

Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 14 of 51 PageID #: 279

**IV. FACTUAL ALLEGATIONS**

**A.  The Global COVID-19 Pandemic**

30. According to the World Health Organization ("WHO") COVID-19 is an infectious

disease for which there is no vaccine or treatment.[9] It spreads easily from person-to-person.[10]

31. When an infected person coughs, sneezes, or even just talks, droplets with the infectious

agent fly into the air from the person's nose or mouth and can thereby infect others.[11] This can

occur even if the person is asymptomatic.[12] As WebMD states, "[s]ome people who don't know

they've been infected can give it to others. This is called asymptomatic spread. You can also pass

it on before you notice any signs of infection, called presymptomatic spread."[13]

32. Thus, absent testing, there is no way to know whether a person with whom one comes

into contact might be spreading the disease.

33. The coronavirus can live in the air for up to three hours, be breathed in by others, and get

into their lungs, where it can infect them.[14]

34. The coronavirus can also infect people who touch surfaces, such as countertops,

doorknobs – and, of course, dental equipment – that contain the virus. It can live on plastic and

stainless steel for up to three days.[15]

35. COVID-19 is a new disease. The first known outbreak was a cluster of cases of

pneumonia in Wuhan, Hubei Province in China in December 2019.[16] The disease did not even

have an official name when WHO declared a "Public Health Emergency of International

---

[9] https://www.who.int/health-topics/coronavirus#tab_1 (accessed 5/10/2020).
[10] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html#:~:text=On%20March%2011%2C%20the,of%20new%20influenza%20viruses. (accessed 5/10/2020).
[11] WHO_https://www.who.int/health-topics/coronavirus#tab_1 (last visited May 10, 2020).
[12] https://www.webmd.com/lung/coronavirus-transmission-overview#1 (accessed 5/10/2020).
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).

Concern" on January 30, 2020.[17] The disease was given its name by WHO on February 11, 2020,

short for "coronavirus disease 2019."[18]

36. After it was first discovered, COVID-19 spread rapidly. On March 11, 2020, "[d]eeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction, WHO made the assessment that COVID-19 can be characterized as a pandemic."[19]

37. A pandemic is "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[20] To be classified as a pandemic, WHO requires "the worldwide spread of a new disease."[21]

38. At the point that WHO labeled COVID-19 a pandemic on March 11, the number of cases outside China in just the past two weeks had increased by 13-fold to 118,000 in 114 countries; more than 4,000 people had lost their lives, and as the Director-General of WHO stated, "[t]housands more [were] fighting for their lives in hospitals."[22]

39. According to the COVID Tracking Project, 2,873 patients at that point had tested positive in the United States, and 43 patients had died.[23] From March 11 on, the number of cases and deaths increased rapidly. By March 23, 2020, the number of cases in this country had increased more than 18 times to 53,611 and deaths had increased by 12 times to 568.

40. As of July 28, 2020, according to the *New York Times*, 4.2 million Americans have tested positive for COVID-19, and 116,000 have died from the disease.[24] That was more than any other

---

[17] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (accessed 5/10/2020).
[18] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200211-sitrep-22-ncov.pdf?sfvrsn=fb6d49b1_2 (accessed 5/10/2020).
[19] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/11/2020).
[20] https://www.merriam-webster.com/dictionary/pandemic (accessed 5/11/2020) (accessed 5/10/2020).
[21] https://www.who.int/csr/disease/swineflu/frequently_asked_questions/pandemic/en/ (accessed 5/10/2020).
[22] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed 5/10/2020).
[23] https://covidtracking.com/data/us-daily (accessed 7/28/2020).
[24] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 7 /82/2020).

country in the world and the 8th and 11th highest on a per capita basis in those two metrics, respectively.[25]

41. Missouri was hit by COVID-19 later than other states, but once it arrived it spread rapidly. As of March 11, 2020, when COVID-19 was first declared a worldwide pandemic, there was only one reported case in Missouri and no deaths. By March 17, there had been eight positive tests and still no deaths.[26] But by April 3, when Gov. Parson issued his Stay at Home Order, positive tests had skyrocketed to 2,113 and 19 Missourians had died of the disease. As of July 27, there had been 42,050 cases, and 1,201 COVID-19 deaths in Missouri. \[27]

42. The rate of infection in St. Louis City and County quickly caught up with and even surpassed the rest of the country in some metrics. As of July 26, 2020, per 100,000 residents in the City and County respectively, there were 1,296 and 1,128 cases and 55 and 63 deaths[28]; that compares to 1,281 cases and 45 deaths per 100,000 in the United States as a whole.[29]

**B. Steps Taken by Authorities in Missouri to Control the Pandemic**

43. On March 13, 2020, a state of emergency presented by COVID-19 was declared in both St. Louis City and St. Louis County.[30]

44. As COVID-19 continued to spread, the City and County of St. Louis both issued Stay at Home Orders.

45. On March 21, 2020, County Executive Dr. Sam Page issued an Executive Order, commanding the Director of the St. Louis County Department of Public Health to issue an order directing that "people stay home when possible" other than, *inter alia*, to "perform tasks

---

[25] *Id.*
[26] Missouri, the COVID Tracking Project, https://covidtracking.com/data/state/missouri (last visited July 26, 2020).
[27] Missouri, the COVID Tracking Project, https://covidtracking.com/data/state/missouri (last visited July 26, 2020).
[28] https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html (accessed 6/22/2020).
[29] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 7/26/2020).
[30] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/covid-19-public-health-emergency-order-and-proclamation.cfm; and https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (both accessed 5/11/2020).

*essential* to the health and safety of individuals, their families, their household members, and their pets, such as … visiting a health care professional or hospital ….”[31]

46. On March 23, 2020, the St. Louis County Director of Public Health issued a Stay at Home Order and, subsequently an Amended Stay at Home Order, that allowed residents to leave home to engage in “Essential Activities,” including “Healthcare Operations,” defined to include dentists. The Order was scheduled to remain in place until 11:59 April 22, 2020.[32]

47. That Order was amended on April 23, 2020, and again on May 4, 2020, extending the Stay at Home Order indefinitely.[33] On May 8, 2020, the St. Louis County Director of Public Health eased the restrictions somewhat, but still noted: “All Gatherings pose an increased risk of transmission and should be voluntarily avoided whenever possible.”[34]

48. Meanwhile, the City of St. Louis issued a Stay at Home Order that, as in St. Louis County, went into effect March 23. It ordered all individuals living in the City to remain at home with certain exceptions including “[t]o perform tasks essential to the health and safety of individuals, their family [and] household members … such as … visiting a health care professional.”[35] That order was extended on April 16, 2020, with no definite ending date.[36] On

[31] https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (accessed 5/11/2020) (emphasis added).
[32] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-amended-stay-at-home-order/;
https://stlouisco.com/portals/8/docs/document%20library/CountyExecutive/Executive%20Orders/Stay%20at%20Home%20Order.pdf (both accessed 5/11/2020).
[33] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-extension-and-amendment-of-stay-at-home-order/; https://stlcorona.com/news/dph-covid-19-update-542020/ (both accessed 5/11/2020.
[34] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-business-and-individual-guidelines-for-social-distancing-and-re-opening/ (accessed 5/13/2020).
[35] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commission-s-Order-5-03-21-2020.pdf (accessed 5/11/2020).
[36] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commissioner-s-Order-No-7.pdf (accessed 5/11/2020).



Page: 17

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 17 of 51 PageID #: 282"

May 11, 2020, the City Health Commissioner entered an order similar to that in St. Louis County, allowing limited re-opening as of May 18.[37]

49. Because the Stay at Home Orders limited out-of-home activities to essential activities, they only allowed visits to a dentist or orthodontist for essential treatments.

**C. Standards and Recommendations Related to the Pandemic for Dental and Orthodontic Practices**

50. Even before the Stay at Home Orders went into effect, authorities were recommending that dental practices close.

51. On March 16, the ADA recommended that dental practices "halt day-to-day non-emergency procedures."[38] On that date, ADA President Chad P. Gehani stated: "[T]he ADA recommends dentists nationwide postpone elective procedures for the next three weeks."[39]

52. On March 18, the CDC urged all dentists to cancel, or at least postpone, all elective and non-urgent dental visits.[40]

53. The CDC explained that these recommendations were based on the risk of infection in dental offices, especially because of the spatter of bodily fluids and microorganisms:

> The practice of dentistry involves the use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes. These instruments create a visible spray that contains large particle droplets of water, saliva, blood, microorganisms and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, dental health care personnel (DHCP), or the patient. The spray also might contain certain aerosols.[41]

---

[37] https://www.stlouis-mo.gov/government/departments/mayor/news/city-of-st-louis-to-begin-gradually-reopening-on-may-18.cfm (accessed 5/13/2020).
[38] https://www.dentalproductsreport.com/view/ada-isds-announce-recommendations-practices-close-due-coronavirus (accessed 7/17/2020).
[39] *Id.*
[40] https://aonaffinity-blob-cdn.azureedge.net/affinitytemplate-dev/media/dentistsadvantagedev/media/risk/alerts/rmalert_coronavirus_march2020.pdf (accessed 7/17/2020).
[41] https://web.archive.org/web/20200327164143/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/11/2020) (footnote omitted).

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 19 of 51 PageID #: 284"
Annotation Attributes Changed
Annotation Attributes Changed

54. CDC went on to explain that the precautions it recommended in other healthcare settings were not possible for dental practices because dental settings "are not designed for or equipped to provide this standard of care. For example, most dental settings do not have airborne infection isolation rooms or single-patient rooms, do not have a respiratory protection program, and do not routinely stock N95 respirators."[42]

55. Accordingly, the CDC recommended that "[s]ervices should be limited to urgent and emergency visits only during this period of the pandemic. These actions help staff and patients stay safe, preserve personal protective equipment and patient care supplies, and expand available health system capacity."[43]

56. On March 23, 2020, the Missouri Dental Board, the body that regulates Missouri dentists, issued a bulletin stating that it supports the CDC and ADA recommendations described above, and it "urged Missouri dentists to adhere to them." The Board also "strongly encouraged" dentists "to take the necessary steps to insure the safety of their patients, staff and themselves by limiting opportunities for this virus to continue to spread."[44]

57. The ADA issued updated guidance on March 31, 2020, as to what constitutes emergency or non-urgent procedures, and included orthodontic procedures in its guidance.[45] It stated: "Orthodontic procedures other than those to address acute issues (e.g. pain, infection, trauma) or other issues critically necessary to prevent harm to the patient" were non-urgent. *Id.*

58. As of April 11, 2020, the American Association of Orthodontists ("AAO"), which represents thousands of orthodontists throughout the United States, was recommending that its

---

[42] https://web.archive.org/web/20200327164143/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/11/2020).
[43] *Id.*
[44] https://content.govdelivery.com/accounts/MODIFP/bulletins/282c1ae (accessed 5/11/2020).
[45] https://success.ada.org/~/media/CPS/Files/Open%20Files/ADA_COVID19_Dental_Emergency_DDS.pdf (accessed 6/23/2020).

members "follow all applicable federal, state, and local authorities' guidance concerning closure recommendations."[46]

59. As of mid-May, 2020, the CDC's recommendations were still in effect.[47] When the CDC reiterated them on April 7, 2020, it noted that the United States Occupational Safety and Health Administration had said that dental healthcare professionals were at very high-risk of COVID-19 "as their jobs are those with high potential for exposure to known or suspected sources of the virus that causes COVID-19 during specific procedures."[48]

60. The CDC did not provide recommendations for resuming non-emergency dental care until May 19, 2020. When it did so, it stated: "Dental settings have unique characteristics that warrant specific infection control considerations."[49] Its specific recommendations included:

a. "Practice universal source control and actively screen for fever and symptoms of COVID-19 for all people who enter the dental facility."

b. "If patients do not exhibit symptoms consistent with COVID-19, provide dental treatment only after you have assessed the patient and considered both the risk to the patient of deferring care and the risk to DHCP of healthcare-associated disease transmission."

c. "Ensure that you have the appropriate amount of personal protective equipment (PPE) and supplies to support your patient volume. If PPE and supplies are limited, prioritize dental care for the highest need, most vulnerable patients first."[50]

[46] https://web.archive.org/web/20200411062455/https://www1.aaoinfo.org/covid-19/ (accessed 6/23/2020).
[47] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/13/2020).
[48] https://web.archive.org/web/20200414014847/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/1/11/2020).
[49] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 6/22/2020).
[50] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 6/22/2020).

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 21 of 51 PageID #: 286"

61. On April 29, 2020, a COVID-19 task force, part of a joint effort by the Office of the Missouri State Dental Director, the Missouri Dental Association, and the Missouri Primary Care Association, published recommendations for Missouri dentists relating to re-opening and listed May 4 as the "date that has been given for resuming operations in Missouri."[51] However, its guidance included screening staff and patients for COVID-19 symptoms, proper use of personal protective equipment, social distancing practices within offices, and other protective measures to ensure patient safety. *Id.* The task force further stated that dentists should avoid procedures that they are not comfortable performing based on the need to protect their patients and staff. *Id.*

62. This was similar to interim guidance issued by the ADA in April of 2020 regarding the re-opening of dental practices, which called for the "highest level of PPE available – masks, goggles and face shield – to help protect patients and the dental team . . ."[52] Other guidance included calling patients to inquire about their current health status, temperature screening, and social distancing measures. *Id.*

63. The AAO formed its own COVID-19 Task Force, which issued interim guidance for re-opening, including maintaining a reduced schedule, social distancing, use of high-volume evacuation during aerosol generating procedures, and proper use of PPE taking into account whether a procedure is aerosol generating.[53]

64. Dentists and orthodontists had difficulties re-opening their practices in early-to-mid May because of the unavailability of sufficient PPE. The *St. Louis Post-Dispatch* reported: "Survey data from the American Dental Association suggests that many dentists in Missouri don't have N95s. Of 125 dental practices surveyed in Missouri the week of May 4, roughly a third had zero

---

[51] https://sitefinity.ada.org/docs/librariesprovider30/publications/covid/task-force-guidelines-for-mo-dental-practices_042920.pdf?sfvrsn=2 (accessed 6/22/2020).
[52] https://www.ada.org/en/press-room/news-releases/2020-archives/may/as-dental-practices-resume-operations-ada-offers-continued-guidance (accessed 6/22/2020).
[53] https://assets-prod-www1.aaoinfo.org/assets-prod-www1/2020/05/PPE-FLOWCHART.pdf (accessed 6/23/2020).



Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 22 of 51 PageID #: 287"



Annotation Attributes Changed

N95 masks in stock, according to data from the ADA's Health Policy Institute."[54] Moreover, only 27% of the dental practices surveyed said that they had "more than two weeks' worth of N95 masks in stock." *Id*.

65. Nationwide, during the week of May 18, 53.2% of dentists who were closed except for emergencies stated the reason was an inadequate supply of PPE.[55]

**D. The Devastating Impact of the COVID-19 Pandemic on Dental and Orthodontic Practices**

66. In the face of the Covid-19 pandemic, Plaintiffs and other Missouri dentists and orthodontists had no choice but to shut down their practices except to see patients for non-elective and urgent care. Any reasonable dentist or orthodontist would have shut down except for such emergencies.

67. And that is what happened.

68. As would be expected, these shutdowns had a terrible economic impact on dentists and orthodontists.

69. On April 15, 2020, Marko Vujicic, Ph. D., chief economist and vice president of the ADA's Health Policy Institute ("HPI"), was quoted as saying that "the coming two to three months represent a critical juncture for the economic sustainability of many dental practices."[56]

70. The ADA has conducted a series of nationwide surveys of dentists beginning the week of March 23, 2020. That week 87% of Missouri dentists' practices were either completely closed or

---

[54] https://www.stltoday.com/business/local/dentists-across-st-louis-searching-for-critical-ppe-needed-to-see-patients/article_bc9c62b3-8279-5888-b4f4-079786fb215b.html (accessed 6/22/2020).
[55] https://surveys.ada.org/reports/RC/public/YWRhc3VydmV5cy01ZWMyYjAzMzYxMWNmMTAwMTBiZWU4NDgtVVJfNWlJWDFFU011dmNDUlVO (accessed 6/22/20).
[56] https://us.dental-tribune.com/news/dentists-report-financial-impact-of-covid-19-on-their-practices/ (accessed 5/12/2020)

closed except for emergency patients. The remainder were open but seeing fewer patients than usual.[57]

71. That was bad enough, but April was devastating to dentists' practices. By the next survey, the week of April 6, nationally 97% of dentists were seeing no patients at all or only emergency patients, with the remainder seeing a smaller volume than usual. For Missouri, that number was 95% seeing emergency patients at most and the remainder seeing fewer patients than usual. Eighty percent of Missouri dentists were seeing a patient volume of less than 5% of the typical level, with another 10% at 5-10% of the typical level.[58]

72. The next survey, the week of April 20, was similar. That week again 97% of dentists in the United States were completely shut down except possibly for emergencies; the other few were open but had lower volume than usual.[59]

73. In Missouri that week, 90% were completely closed or seeing only emergency patients, with the rest seeing fewer patients than usual.[60]

74. Not surprisingly, the financial impact on dentists has been terrible. The week of April 20, 76.9% of dentists collected less than 5% in fees compared to what was typical in their practice, and another 13.0% collected between 5 and 10%.[61]

[57] https://surveys.ada.org/results/public/YWRhc3VvdmV5cy1VUl81aUlYMUVTTUh2Y0NSVU4tNWU3Yjg1YTJlOTQ5N2QwMDE2MjdkZmRh?_ga=2.157748348.732403168.1586962644-361293844.1518644424#/pages/Page_e3fd2e25-9bhd-43ce-8252-51794094ac72 (accessed 6/24/2020).
[58] Health Policy Institute, COVID-19: Economic Impact on Dental Practices (Week of April 6 Results), available at https://surveys.ada.org/reports/RC/public/YWRhc3VvdmV5cy01ZThkZDViMDA3YTZhODAwMTAzZTViZTgtVVJfNWIJWDFFU01ldmNDUlVO (accessed 6/24/2020) at 1.
[59] Health Policy Institute, COVID-19: Economic Impact on Dental Practices (Week of April 20 Results), available at https://surveys.ada.org/reports/RC/public/YWRhc3VvdmV5cy01ZTlkYjFlMTRlZDkxOTAwMTU4NTU4ZmItVVJfNWIJWDFFU01ldmNDUlVO (accessed 6/24/2020) at 1.
[60] Id. at 4.
[61] Id. at 6.

Page: 23
Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 23 of 51 PageID #: 288"
Annotation Attributes Changed





Text Deleted
'Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 24 of 51 PageID #: 289'

75. Again, Missouri was typical, with 65.7% collecting less than 5% of the typical amount, and another 14.8% collecting between 5-10% during the week of April 20. Only 4.6% collected even 76% or more of what was typical.[62]

76. The end of March and the full month of April was also devastating for orthodontists. During the week of March 23, 98.5% of orthodontists in the United States were shut down except possibly for emergencies, during the week of April 6 that number increased to 99.4%, and during the week of April 20 that number returned to 98.5%.[63]

77. The financial impact on orthodontists was huge. During the week of April 6, over 50% of orthodontists in the United States collected less than 10% in fees compared to what was typical in their practice, and for the week of April 20 over 60% of orthodontists collected less than 10% of what was typical.[64]

78. In addition, dentists and orthodontists have had to incur extra expenses to re-open. Plaintiffs have had to buy High Efficiency Air ("HEPA") filters, protective gowns, face shields, seat covers, N95 and KN95 masks, fluid-resistant lab coats, additional and higher level disinfection chemicals and sprays, and plexi-glass barriers, among other things. In addition, their staffs have had to spend extra time each day calling and screening patients for virus-like symptoms and they have been unable to treat as many patients because of extra paperwork and disinfection time.

---

[62] Economic Impact at 14.
[63] Health Policy Institute, COVID-19: Economic Impact on Dental Practices (Week of April 20 Results by Specialty), available at https://www.ada.org/~/media/ADA/Science%20and%20Research/HPI/Files/HPI_COVID_Survey_Specialists.pdf?la=en (accessed 6/24/2020) at 1.
[64] *Id.* at 8.

21

Text Deleted

Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 25 of 51 PageID #: 290

**E. The Hartford's Spectrum Business Owner's Insurance Policy**

79. As set forth below, all of Plaintiffs' policies are substantively identical as it relates to coverage for their claims.

80. In exchange for premiums paid to their respective insurers, Plaintiff Levy obtained a Spectrum Business Owner's Policy issued by The Hartford, with Hartford Casualty as the "insurer," Policy Number 84 SBA RV5801 SA, covering a Policy Period from 10/21/2019 to 10/21/2020 (Exhibit A); Plaintiff Keller obtained a Spectrum Business Owner's Policy issued by The Hartford, with Sentinel as the "insurer," Policy Number 84 SBA UI2461 DV, covering a Policy Period from 7/15/2019 to 7/15/2020 (Exhibit B); Plaintiff Goldenhersh obtained a Spectrum Business Owner's Policy issued by The Hartford, with Twin City as the "insurer," Policy Number 76 SBW BD8661 76, covering a Policy Period from 2/01/2020 to 2/01/2021 (Exhibit C); and Plaintiff Moshiri obtained a Spectrum Business Owner's Policy issued by The Hartford, with Twin City as the "insurer," Policy No. 84 SBA BE5261 SA, covering a Policy Period from 4/1/2019 to 4/1/2020 (with Moshiri Orthodontics listed as the named insured) (Exhibit D), and a subsequent policy with Sentinel as the "insurer," Policy Number 84 SBA PA5682 DV, covering a Policy Period from 4/01/2020 to 4/01/2021 (Exhibit E).

81. The policies' Special Property Coverage Form states that the coverage is "for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called 'scheduled premises' in this policy) caused by or resulting from a Covered Cause of Loss." Ex. A at 30; Ex. B at 31; Ex. C at 32; Ex. D at 27; Ex. E at 32 (page numbers of the exhibits are shown in the lower right).



Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 26 of 51 PageID #: 291"

82. In each of the policies, the scheduled premises are the offices where Plaintiffs maintain and conduct their dental or orthodontics practice. Ex. A at 16; Ex. B at 14; Ex. C at 16; Ex. D at 12; Ex. E at 16.

83. "Covered Property" means the buildings and structures at that address, including fixtures, machinery, and certain other property. In other words, the Covered Property is the office suites where Plaintiffs conduct their business. Ex. A at 30; Ex. B at 31; Ex. C at 32; Ex. D at 27; Ex. E at 32.

84. The COVID-19 pandemic caused a direct physical loss of each of the Plaintiffs' Covered Property at the scheduled premises by denying them the ability to physically access and use the property in the normal fashion in their business; it is therefore a covered loss.

85. The coverage provided by the policy includes loss of Business Income:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'. The suspension must be caused by direct physical loss of or physical damage to property at the 'scheduled premises', including personal property in the open (or in a vehicle) within 1,000 feet of the 'scheduled premises,' caused by or resulting from a Covered Cause of Loss.

Ex. A at 39; Ex. B at 40; Ex. C at 41; Ex. D at 36; Ex. E at 412.

86. "Operations" means "your business activities occurring at the 'scheduled premises ….'" Ex. A at 53; Ex. B at 54; Ex. C at 55; Ex. D at 50; Ex. E at 55. In other words, that is Plaintiffs' practice of dentistry or orthodontics.

87. "Period of restoration" means the period "begin[ning] with the date of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the 'scheduled premises'" and ending when the property is restored. Ex. A at 53; Ex. B at 54; Ex. C at 55; Ex. D at 50; Ex. E at 55. Thus, it is the period when the property cannot be used for Plaintiffs' businesses because of the COVID-19 pandemic.



88. The policy provides that, for purposes of the above provision, "suspension" includes "[t]he partial slowdown or complete cessation of your business activities." Ex. A at 39; Ex. B at 40; Ex. C at 41; Ex. D at 36; Ex. E at 41. Because Plaintiffs' business activities suffered a partial slowdown or complete cessation, they each experienced a suspension.

89. COVID-19 is a "Covered Cause of Loss" under the policies. Covered Causes of Loss are defined as follows:

> RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
>
> **a.** Excluded in Section **B., EXCLUSIONS;** or
>
> **b.** Limited in Paragraph **A.4.** Limitations ….

Ex. A at 31; Ex. B at 32; Ex. C at 33; Ex. D at 28; Ex. E at 33. Because the COVID-19 pandemic created a risk of direct physical loss, it is a "Covered Cause of Loss" unless excluded or limited. None of the Exclusions in Section B or the Limitations in Paragraph A.4 apply to COVID-19. *See* Ex. A at 31, 45-47; Ex. B at 32, 46-48; Ex. C at 33, 47-49; Ex. D at 28, 42-44; Ex. E at 33, 47-49. Therefore, COVID-19 is a covered cause of loss.

90. Plaintiffs' policies also cover their "Extra Expense" for expenditures made necessary by the COVID-19 pandemic. Ex. A at 39-40; Ex. B. at 40-41; Ex. C at 41-42; Ex. D at 36-37; Ex. E at 41-42. Specifically, the policies state:

> (1) We will pay reasonable and necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled premises'… caused by or resulting from a Covered Cause of Loss.
>
> \*\*\*
>
> (3) Extra Expense means expense incurred:
>
> > (a) To avoid or minimize the suspension of business and to continue 'operations':

24



(i) At the 'scheduled premises'; …

(b) To minimize the suspension of business if you cannot continue "operations".

(c) (i) To repair or replace any property; or

(ii) … to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage o., Business Income.

We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or physical damage. This Additional Coverage is not subject to the Limits of Insurance.

91. The policies also cover Plaintiffs' Extended Business Income for losses that occur after the property is restored, as follows:

(1) If the necessary suspension of your 'operations' produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(a) Begins on the date property is actually repaired, rebuilt or replaced and 'operations' are resumed; and

(b) Ends on the earlier of:

(i) The date you could restore your 'operations' with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred; or

(ii) 30 consecutive days after the date determined in (1)(a) above.

Loss of Business Income must be caused by direct physical loss or physical damage at the 'scheduled premises' caused by or resulting from a Covered Cause of Loss.

(2) With respect to the coverage provided in this Additional Coverage, suspension means:

(a) The partial slowdown or complete cessation of your business activities; and

(b) That a part or all of the 'scheduled premises' is rendered untenantable as a result of a Covered Cause of Loss.

25

Ex. A at 40; Ex. B at 41; Ex. C at 42; Ex. D at 37; Ex. E at 42.

92. Plaintiffs and Class Members are entitled to coverage under the above provisions.

**F. Allegations Regarding the Liability of Hartford Financial Services Group**

93. The following additional allegations show that Defendant Hartford Financial Services Group (for purposes of this section only referred to for clarity as "HFSG") was a party to the insurance contracts with each Plaintiff and additionally is the alter ego of the nominal insuring companies. It is therefore liable under those contracts.

94. Each of the policies, which are nearly 200 pages or longer, refers to "The Hartford" vastly more times than it does to the nominal "insurer." Here is how the references compare:

| Plaintiff | Policy | Nominal Insurer | References to The Hartford | References to supposed insurer |
|---|---|---|---|---|
| Levy | Ex. A | Hartford Casualty | 75 | 2 |
| Keller | Ex. B | Sentinel | 89 | 2 |
| Goldenhersh | Ex. C | Twin City | 94 | 2 |
| Moshiri | Ex. D | Twin City | 81 | 3 |
| | Ex. E | Sentinel | 82 | 2 |

95. Those totals don't count the Policies' references to "The Hartford" in the company logo below a drawing of a reindeer on the top right of the page. (Those aren't searchable in the pdfs.)

96. Nowhere do the policies indicate that "The Hartford" and the name of the nominal "insurer" are used interchangeably or that the term "The Hartford" is being used to refer to nominal insurer, Sentinel, Twin City, or Hartford Casualty.

97. On The Hartford website, the name "The Hartford" is used to refer to HFSG. Here is its Investor Relations page, which advertises its insurance business, displays the HFSG stock price, and posts news announcements:[65]

[65] https://ir.thehartford.com/investor-relations/default.aspx (accessed 10/7/2020).

**Page: 29**

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 29 of 51 PageID #: 294"

Text Replaced
[Old]: "Defendants Either Denied Coverage or Ignored Plaintiffs' Claims 93. Each of the Plaintiffs made a claim under their policy for their COVID-19 losses and extra expenses. Each of them was either denied or ignored. Defendants deny that the COVID-19 pandemic is a covered cause of loss and refuse to provide any coverage whatsoever. Defendants' denials of Plaintiffs' claims occurred more than thirty days ago and were vexatious and without reasonable cause, such that Plaintiffs are entitled to additional damages, including a reasonable attorneys' fee, pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420. 1. Plaintiff Levy's Claim 94. Dr. Levy called The Hartford in March 2020 to ask if his losses were covered and was told that they were not."
[New]: "Allegations Regarding the Liability of Hartford Financial Services Group 93. The following additional allegations show that Defendant Hartford Financial Services Group (for purposes of this section only referred to for clarity as "HFSG") was"

Text Deleted
"95."

Text Replaced
[Old]: "Despite being told by The Hartford that his losses were not covered, Plaintiff Levy still submitted a written claim on or about May 9, 2020, prior to filing his original Complaint, and had not received a response at the time of filing his original Complaint."
[New]: "a party to the insurance contracts with each"

Text Deleted
"96."

Text Replaced
[Old]: "On May 20, 2020, six days after his original Complaint was filed, Plaintiff Levy received a response from James Turner of The Hartford, asking for more specifics about the claim. Exhibit G. Some of what The Hartford requested, however, was clearly stated in the original Complaint. For example, The Hartford, through its adjuster, asked: "Is the Insured's business closed or is the normal operation of the business suspended for reasons related to the Coronavirus? If so, provide all reasons the business is closed or limited?" Ex. G (portion redacted for attorney–client privilege)."
[New]: "Plaintiff and additionally is the alter ego of the nominal insuring companies. It is therefore liable under those contracts. 94. Each"

Text Deleted
"97."

Text Replaced
[Old]: "Plaintiff Levy's counsel responded to The Hartford on May 21, 2020, requesting that it provide a decision on whether it would extend coverage within 7 days. Given that The Hartford had previously informed Plaintiff Levy that his losses were not covered, counsel for Plaintiff Levy explained that they would not undertake the costs and expense of providing the requested information (much of which was clearly not relevant to the question of coverage) unless The Hartford acknowledged it would be accepting coverage. Ex. H."
[New]: "of the policies, which are nearly 200 pages or longer, refers to "The Hartford" vastly more times than it does"

Text Deleted
"26"

Text Deleted
"99."

Text Deleted
"100."

Text Deleted
"On May 28, 2020, Plaintiff Levy received an emailed response from Jackie Beamish of The Hartford which again requested information but did not agree to accept coverage. Ex. I. Thus, The Hartford declined to inform Plaintiff Levy within 7 days that it would be providing coverage."

Text Replaced
[Old]: "For example, she asked, "Is the Insured's business closed or is the normal operation of"
[New]: "Is how the references compare:"

Text Replaced
[Old]: "In her email, Ms. Beamish stated that she was in possession of both the original claim and the Complaint. Id. Nevertheless, much of what she asked was clearly stated in the original Complaint. Id."
[New]: "the nominal "insurer." Here"

Text Deleted
"98."

Table Row(s) Inserted

Text Replaced
[Old]: "the business suspended for reasons related to the Coronavirus? If so, provide all reasons the business is closed or limited?" Id. On the second page of the Complaint, after referring to recommendations of the CDC and ADA that dentists stop performing non-urgent procedures, Plaintiff alleged: "That same date [March 23, 2020], in response to these recommendations and because of the risk of continuing its dental practice during the COVID-19 pandemic, Plaintiff shut down its practice." Plaintiff's Class Action Complaint, Doc. #1, ¶ 6. Plaintiff also alleged that its loss was not caused by the coronavirus but "by the worldwide pandemic ...." Id. ¶ 71."
[New]: "95. Those totals don't count the Policies' references to "The Hartford" in the company logo below a drawing of a reindeer on the top right of the page."

Comments from page 29 continued on next page

Ex. A at 40; Ex. B at 41; Ex. C at 42; Ex. D at 37; Ex. E at 42.

92. Plaintiffs and Class Members are entitled to coverage under the above provisions.

**F. Allegations Regarding the Liability of Hartford Financial Services Group**

93. The following additional allegations show that Defendant Hartford Financial Services Group (for purposes of this section only referred to for clarity as "HFSG") was a party to the insurance contracts with each Plaintiff and additionally is the alter ego of the nominal insuring companies. It is therefore liable under those contracts.

94. Each of the policies, which are nearly 200 pages or longer, refers to "The Hartford" vastly more times than it does to the nominal "insurer." Here is how the references compare:

| Plaintiff | Policy | Nominal "Insurer" | References to The Hartford | References to supposed insurer |
|---|---|---|---|---|
| Levy | Ex. A | Hartford Casualty | 75 | 2 |
| Keller | Ex. B | Sentinel | 80 | 2 |
| Goldenhersh | Ex. C | Twin City | 94 | 5 |
| Moshiri | Ex. D | Twin City | 81 | 3 |
| | Ex. E | Sentinel | 82 | 2 |

95. Those totals don't count the Policies' references to "The Hartford" in the company logo below a drawing of a reindeer on the top right of the page. (Those aren't searchable in the pdfs.)

96. Nowhere do the policies indicate that "The Hartford" and the name of the nominal "insurer" are used interchangeably or that the term "The Hartford" is being used to refer to the nominal insurer, Sentinel, Twin City, or Hartford Casualty.

97. On The Hartford website, the name "The Hartford" is used to refer to HFSG. Here is its Investor Relations page, which advertises its insurance business, displays the HFSG stock price, and posts news announcements:[65]

[65] https://ir.thehartford.com/investor-relations/default.aspx (accessed 10/7/2020).



(Those aren't searchable in the pdfs.) 96. Nowhere do the policies indicate that "The Hartford" and the name"

Text Deleted
"101."

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 31 of 51 PageID #: 296"

Text Replaced
[Old]: "Ms. Beamish also asked, "Has the Insured confirmed the presence of Coronavirus at their premises? Ex.H. This was also answered in the original Complaint: "There is no evidence that the virus has ever been in his premises." Plaintiff's Class Action Complaint ¶ 71."
[New]: "of the nominal "insurer" are used interchangeably or that the term "The Hartford" is being used"

Text Deleted
"102."

Text Deleted
"103."

Text Replaced
[Old]: "Another reason why Ms. Beamish's request for this information was not a good faith response is that in its motion to dismiss, Defendant argues that there is no coverage simply because of a "virus exclusion" in the policy."
[New]: "to the nominal insurer, Sentinel, Twin City, or"

Text Replaced
[Old]: "The Hartford's refusal to provide coverage if Plaintiff did not provide information that he had already provided was not a good faith response."
[New]: "to refer"

Text Replaced
[Old]: "65 Thus, whether Plaintiff's business closed and why and whether the coronavirus has ever been found in Plaintiff's premises is irrelevant to The Hartford's reason for contesting coverage. Ms. Beamish was asking for irrelevant information as far as The Hartford was concerned."
[New]: "Hartford Casualty. 97. On"

Font-size "8.03999" changed to "12".

Annotation Deleted

Text Deleted
"104."

Text Replaced
[Old]: "Based on The Hartford and Hartford Casualty's statement to Dr. Levy that his losses were not covered by his policy, combined with their subsequent failure to accept coverage despite multiple written requests, The Hartford and"
[New]: "The Hartford website, the name "The Hartford" is used to refer to HFSG. Here is its Investor Relations page, which advertises its insurance business, displays the HFSG stock price, and posts news announcements:"

Annotation Inserted

Text Inserted
"65 65"

Annotation Inserted

Text Inserted
"https://ir.thehartford.com/investor-relations/default.aspx (accessed 10/7/2020)."

Text Inserted
"26"



98. The Latest News at the bottom of that screenshot states: "The Hartford to Announce," "Announces," "Declares," "Announces." The company referred to as "The Hartford" and doing all this announcing and declaring is unmistakably HFSG.

99. When Plaintiff Goldenhersh renewed its policy in February 2020, it was thanked for being a loyal customer, not of Twin City, but of "The Hartford":



Ex, C at 3. Twin City doesn't have "Hartford" in its name. Clearly, this was HFSG that was offering the thanks.

27

100. The Moshiri Policy that covered the period from April 1, 2019 to April 1, 2020, showed Twin City as the nominal insurer. Ex. D at 12. However, the policy was not called a "Twin City" policy. It was referred to as "your Spectrum policy from "The Hartford":



"your Spectrum policy from The Hartford"

"At renewal of this policy"

*Id.* at 2.

101. That page says that, when "this policy" is renewed, "WE WILL BE PROVIDING YOU ONLY WITH THOSE DOCUMENTS WHICH HAVE CHANGED," so -- in bold-faced underlining to make sure the policyholder gets the message -- "**YOU SHOULD RETAIN ALL OF THESE DOCUMENTS INDEFINITELY.**" *Id.*

102. Moshiri did renew and, in the new policy, was thanked for doing so:



28

---

**Text Replaced**
[Old]: "to Covered Property …." Ex. J at 3 (emphasis added)."
[New]: "100. The Moshiri Policy that covered the period from April 1, 2019 to April 1, 2020, showed Twin City as the nominal insurer. Ex. D at 12."

**Text Deleted**
[Old]: "107."

**Text Replaced**
[Old]: "although The Hartford quoted the policy accurately, it then mis-paraphrased it by stating, "You have not identified any direct physical loss to any property"
[New]: "the policy was not called a "Twin City" policy. It was referred to as "your Spectrum policy from "The Hartford":"

**Image Inserted**

**Text Replaced**
[Old]: "from a Covered Cause of Loss – namely"
[New]: ""your Spectrum policy from The Hartford" "At renewal of this policy""

**Text Replaced**
[Old]: "at a scheduled premises." Ex. J at 3 (emphasis added.) The policy covers a loss "of" the property, not to the property. What it covers that happens "to" the property is damage, not loss. As described above, there was a necessary suspension of Plaintiff Keller's operations caused by a loss "of" the property resulting
[New]: "Id. at 2. 101. That page says that, when "this policy" is renewed, "WE WILL BE PROVIDING YOU ONLY WITH THOSE DOCUMENTS WHICH HAVE CHANGED," so – in bold-faced underlining to make sure the policyholder gets the message – "YOU SHOULD RETAIN ALL OF THESE DOCUMENTS INDEFINITELY." Id. 102. Moshiri did renew and, in the new policy, was thanked for doing so"

Font "TimesNewRomanPSMT" changed to "TimesNewRomanPS-ItalicMT".

**Image Inserted**

**Text Replaced**
[Old]: "29"
[New]: "28"

Ex. E at 2.

103. However, the party that did the renewing was not Twin City, the "insurer" in the old policy. In the new policy, the nominal "insurer" of what had been called "this policy" was Sentinel. Ex. E at 16.

104. Moreover, because the insurer was only providing pages that had changed, that meant that Plaintiff Moshiri had to keep the "Twin City" policy so that it would know what was in the supposed Sentinel policy.

105. Nowhere does the new policy indicate why there is a new nominal insurer or, in other words, why the party that was supposedly doing the renewing was not the nominal insurer on the old policy but an entirely different entity.

106. The signatures of the insurer on each Policy also indicate that HFSG was the real insurer. Here's the signature page:



Ex. A at 28; B at 29; C at 30, D at 25 and E at 30.

107. Note that the signature identifies the signatories as "Our President and Secretary" without saying whose President and Secretary they are. For the President, the answer is that Mr. Elliot is President of HFSG. [66] As for Ms. Levin, on her LinkedIn page as of October 9, 2020, she said

---

[66] https://www.bloomberg.com/profile/person/3700927 (accessed 11/16/2020).

---

**Page: 32**

**Text Replaced**
[Old]: "The worldwide pandemic – because Plaintiff Keller lost access to the property to conduct its normal dental practice."
[New]: "Ex. E at 2. 103. However, the party"

**Text Deleted**
"108."

**Text Deleted**
[Old]: "The explanation attached to The Hartford's denial letter also speculates that 'even if coverage were otherwise available for loss caused by coronavirus, the pollution exclusion could further bar coverage for the loss." Ex. J at 5 (emphasis added). This was not a ground for rejection of the claim."
[New]: "that did the renewing was not Twin City, the 'insurer' in the old policy. In the new policy,"

**Text Deleted**
"109."

**Text Replaced**
[Old]: "The Hartford's explanation further states that '[t]o the extent you are claiming physical loss or physical damage caused by loss of use or loss of market, coverage would be precluded ....' Ex. J at 5. The Hartford's explanation does not explain what is meant by 'loss of use or loss of market,' which is not a defined term in the policy and has no clear meaning."
[New]: "the nominal 'insurer' of what had been called 'this policy' was Sentinel. Ex. E at 16. 104. Moreover, because the insurer was only providing pages that had changed, that meant that Plaintiff Moshiri had to keep the 'Twin City' policy so"

**Text Deleted**
"110."

**Text Replaced**
[Old]: "As a last purported basis, The Hartford's explanation refers to the policy's virus exclusion ('Virus Exclusion'). Ex. J at 5–6. As described below, that purported basis is left out of the explanation The Hartford makes public on its website for why COVID-19 business losses are not covered."
[New]: "that it would know what was in the supposed Sentinel policy. 105. Nowhere"

**Text Deleted**
"111."

**Text Replaced**
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 33 of 51 PageID #: 298"

**Text Replaced**
[Old]: "The Virus Exclusion does not exclude Plaintiff Keller's losses due to the COVID-19 pandemic because those losses were not caused by the presence of a virus on the premises of Plaintiff Keller or the members of the Class; they were caused by the COVID-19 pandemic, rather than the presence of coronavirus on the property of Plaintiff Keller or the members of the Class. 112. The virus exclusion states: i. 'Fungi', Wet Rot, Dry Rot, Bacteria And Virus We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss: (1) Presence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus. Ex. B at 135 (emphasis added) (see also the same provision in the policies of the other Plaintiffs,"
[New]: "does the new policy indicate why there is a new nominal insurer or, in other words, why the party that was supposedly doing the renewing was not the nominal insurer on the old policy but an entirely different entity. 106. The signatures of the insurer on each Policy also indicate that HFSG was the real insurer. Here's the signature page:"

**Image Inserted**

**Text Replaced**
[Old]: "at 135; Ex. C at 127; Ex. D at 127; Ex. E at 136)."
[New]: "at 28; B at 29; C at 30, D at 25 and E at 30. 107. Note that the signature identifies"

**Text Deleted**
"113."

**Text Replaced**
[Old]: "However, the virus exclusion does not apply to Plaintiffs' losses (as The Hartford knows because, as shown below, it did not include it"
[New]: "the signatories as 'Our President and Secretary' without saying whose President and Secretary they are. For the President, the answer is that Mr. Elliot is President of HFSG."

**Annotation Inserted**

**Text Replaced**
[Old]: "on its website as a reason for refusing coverage for losses due to the COVID-19 pandemic). Plaintiffs' losses were not caused by the presence of viruses in their premises. There is no evidence"
[New]: "66 As for Ms. Levin, on her LinkedIn page as of October 9, 2020, she said 66"

Font-size "12" changed to "8.03999".

Comments from page 32 continued on next page

Ex. E at 2.

103. However, the party that did the renewing was not Twin City, the "insurer" in the old policy. In the new policy, the nominal "insurer" of what had been called "this policy" was Sentinel. Ex. E at 16.

104. Moreover, because the insurer was only providing pages that had changed, that meant that Plaintiff Moshiri had to keep the "Twin City" policy so that it would know what was in the supposed Sentinel policy.

105. Nowhere does the new policy indicate why there is a new nominal insurer or, in other words, why the party that was supposedly doing the renewing was not the nominal insurer on the old policy but an entirely different entity.

106. The signatures of the insurer on each Policy also indicate that HFSG was the real insurer. Here's the signature page:



Ex. A at 28; B at 29; C at 30, D at 25 and E at 30.

107. Note that the signature identifies the signatories as "Our President and Secretary" without saying whose President and Secretary they are. For the President, the answer is that Mr. Elliot is President of HFSG. [66] As for Ms. Levin, on her LinkedIn page as of October 9, 2020, she said

---

[66] https://www.bloomberg.com/profile/person/3700927 (accessed 11/16/2020).

that her employer for the past 13 years has also been HFSG, where she was Assistant General Counsel:[67]



108. Ms. Levin has now taken a new position with HFSG and has changed how she shows her employer on her LinkedIn page. She now lists her position as CEO for Racial Equity with "The Harford" and has removed all references to HFSG from her page. However, it is still clear that she was Assistant General Counsel of HFSG:[68]

[67] https://www.linkedin.com/in/lisa-levin-a2297b4a/ (accessed 10/9/2020).
[68] https://www.linkedin.com/in/lisa-levin-a2297b4a/ (accessed 11/15/2020).

---

**Text Replaced**
[Old]: "the virus has ever been in their premises. Plaintiffs' losses were caused by the worldwide pandemic and, as recommended by the CDC and dental organizations, the need to prevent it from spreading to their employees, patients and others."
[New]: "her employer for the past 13 years has also been HFSG, where she was Assistant General Counsel:"

**Annotation Inserted**

**Text Inserted**
"67 Experience:"

**Image Inserted**

**Text Deleted**
"if"

**Text Deleted**
"114."

**Text Replaced**
[Old]: "had intended to exclude losses that might be related to a pandemic or to a virus in another location than the insured's property, it could have so provided but did not."
[New]: "Financial Services Group, Inc., 13 years 108. Ms. Levin has now taken a new position with HFSG"

**Text Deleted**
"115."

**Text Replaced**
[Old]: "Moreover, even if the Virus Exclusion were applicable to the losses of Plaintiff Keller (and the other Plaintiffs and members of the proposed classes), under the principles of regulatory estoppel and general public policy, Defendants should be estopped from enforcing it."
[New]: "and has changed how she shows her employer on her LinkedIn page. She now lists her position as CEO"

**Text Deleted**
"116."

**Text Deleted**
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 34 of 51 PageID #: 299"

**Text Deleted**
"117."

**Text Replaced**
[Old]: "Specifically, in 2006, two insurance industry trade groups, the Insurance Service Office ("ISO") and the American Association of Insurance Services ("AAIS"), represented hundreds of insurers in a national effort to seek approval from state insurance regulators for the adoption of the Virus Exclusion."
[New]: "for Racial Equity"

**Text Replaced**
[Old]: "In filings with state regulators, ISO and AAIS, on behalf of insurers, represented that the adoption of the Virus Exclusion was only meant to "clarify" that coverage for "disease-causing agents" has never been in effect, and was never intended to be included, in the property policies."
[New]: "with "The Harford" and has removed all references to HFSG from her page. However, it is still clear that she was Assistant General Counsel"

**Text Deleted**
"118."

**Annotation Inserted**

**Text Inserted**
"68"

**Text Replaced**
[Old]: "In a July 6, 2006, "ISO Circular" entitled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO represented to"
[New]: "of HFSG"

**Image Inserted**

**Graphic Element Inserted**

**Annotation Inserted**

**Text Inserted**
"67"

Comments from page 33 continued on next page

that her employer for the past 13 years has also been HFSG, where she was Assistant General Counsel:[67]



108. Ms. Levin has now taken a new position with HFSG and has changed how she shows her employer on her LinkedIn page. She now lists her position as CEO for Racial Equity with "The Harford" and has removed all references to HFSG from her page. However, it is still clear that she was Assistant General Counsel of HFSG:[68]

Assistant General Counsel
Jun 2012 – Oct 2020 · 8 yrs 5 mo
Hartford, CT

Advise on corporate governance for publicly held financial services company including review of corporate governance guidelines, committee charters and public disclosures. Draft and counsel on corporate and financial disclosures for Securities Exchange Act of '34 reports and proxy statement. Advise on earnings materials including news releases and external communications for investors. Provide counsel on Finance, Investor Relations, Communications and Business on Reg FD, non-GAAP and material non-public information disclosures. Provide support on transactions and corporate restructuring initiatives.

---



---
[67] https://www.linkedin.com/in/lisa-levin-a2297b4a/ (accessed 10/9/2020).
[68] https://www.linkedin.com/in/lisa-levin-a2297b4a/ (accessed 11/15/2020).

109. Of the companies in the HFSG family, only HFSG is "publicly held," and only HFSG makes disclosures under the Securities Exchange Act of 1934 or issues proxy statements. It is also significant that Ms. Levin lists no present or former responsibilities for Sentinel, Twin City, Hartford Casualty or any other company aside from HFSG. They are not mentioned on her page.

110. In this case, HFSG presented documents to show that in 2019, Mr. Elliot and Ms. Levin were also President and Secretary of HFSG's subsidiaries, including Sentinel, Twin City and Hartford Casualty. However, Quarterly Reports of defendants show that Ms. Levin, was still signing as "Secretary" of Sentinel even when she was no longer Secretary of Sentinel.

111. When Plaintiff Keller's Policy was renewed in 2020, Ms. Levin again signed as "Our Secretary." Ex. G at 30. That policy went into effect on July 15, 2020, and bears a "Process Date" of May 6, 2020. Ex. G at 16. However, at least five weeks earlier, on March 31, 2020, Sentinel's Secretary was not Ms. Levin but was Kevin F. Barnett, as shown in this quarterly statement:

---

**Text Replaced**
[Old]: "The state regulatory bodies: While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the spector of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such polices may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent."
[New]: "109. Of the companies in the HFSG family, only HFSG is "publicly held," and only HFSG makes disclosures under the Securities Exchange Act of 1934"

**Text Deleted**
"119."

**Text Replaced**
[Old]: "Similarly, AAIS, in its "Filing Memorandum" in support of the Virus Exclusion, represented: Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease causing agents. With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended ... This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded... 120. These representations made by the insurance industry were false."
[New]: "or issues proxy statements. It is also significant that Ms. Levin lists no present or former responsibilities for Sentinel, Twin City, Hartford Casualty or any other company aside from HFSG. They are not mentioned on her page. 110. In this case, HFSG presented documents"

**Text Deleted**
"121."

**Text Replaced**
[Old]: "By 2006, the time of the state applications to approve the Virus Exclusion, courts had repeatedly found that property insurance policies covered claims involving disease-causing agents, and had held on numerous occasions that any condition making it impossible to use property for"
[New]: "to show that in 2019, Mr. Elliot and Ms. Levin were also President"

**Text Deleted**
"its intended use constituted "physical loss or damage to such property.""

**Text Deleted**
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 35 of 51 PageID #: 300"

**Text Deleted**
"122."

**Text Deleted**
"123."

**Text Replaced**
[Old]: "The assertions made by the insurance industry and The Hartford to obtain regulatory approval of the Virus Exclusion were misrepresentations and for this reason, among other public policy concerns, The Hartford should be estopped from enforcing the Virus Exclusion to avoid coverage of claims related to the COVID-19 pandemic. 124. In securing approval for the adoption of the Virus Exclusion by misrepresenting to the state regulators that the Virus Exclusion would not change the scope of coverage, The Hartford effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged. 125. Under the doctrine of regulatory estoppel, the Court should not permit The Hartford to benefit from this type"
[New]: "of HFSG's subsidiaries, including Sentinel, Twin City and Hartford Casualty. However, Quarterly Reports of defendants show that Ms. Levin, was still signing as "Secretary" of Sentinel even when she was no longer Secretary of Sentinel. 111. When Plaintiff Keller's Policy was renewed in 2020, Ms. Levin again signed as "Our Secretary." Ex. G at 30. That policy went into effect on July 15, 2020, and bears a "Process Date" of May 6, 2020. Ex. G at 16. However, at least five weeks earlier, on March 31, 2020, Sentinel's Secretary was not Ms. Levin but was Kevin F. Barnett, as shown in this quarterly statement:"

**Text Replaced**
[Old]: "Upon information and belief, the state insurance departments relied on the industry's and The Hartford's representation in approving the Virus Exclusion for inclusion in standard comprehensive policies without a reduction in premiums to balance a reduction in coverage."
[New]: "and Secretary"

**Annotation Inserted**

**Text Inserted**
"69"

**Graphic Element Inserted**

**Annotation Inserted**

**Text Inserted**
"69"

"https://s24.q4cdn.com/767643700/files/doc_downloads/Statutory/Pool/2020/05/1Q20-Sentinel-Insurance-Company-Ltd.pdf"

**Annotation Inserted**

Comments from page 34 continued on next page

109. Of the companies in the HFSG family, only HFSG is "publicly held," and only HFSG makes disclosures under the Securities Exchange Act of 1934 or issues proxy statements. It is also significant that Ms. Levin lists no present or former responsibilities for Sentinel, Twin City, Hartford Casualty or any other company aside from HFSG. They are not mentioned on her page.

110. In this case, HFSG presented documents to show that in 2019, Mr. Elliot and Ms. Levin were also President and Secretary of HFSG's subsidiaries, including Sentinel, Twin City and Hartford Casualty. However, Quarterly Reports of defendants show that Ms. Levin, was still signing as "Secretary" of Sentinel even when she was no longer Secretary of Sentinel.

111. When Plaintiff Keller's Policy was renewed in 2020, Ms. Levin again signed as "Our Secretary." Ex. G at 30. That policy went into effect on July 15, 2020, and bears a "Process Date" of May 6, 2020. Ex. G at 16. However, at least five weeks earlier, on March 31, 2020, Sentinel's Secretary was not Ms. Levin but was Kevin F. Barnett as shown in this quarterly statement:[69]

---

[69] https://s24.q4cdn.com/787643700/files/doc_downloads/Statutory/Pool/2020/05/1Q20-Sentinel-Insurance-Company-Ltd.pdf (accessed 11/18/2020) (Ex. H hereto).



112. This was not an exception. Erik Taube, D.M.D., is a dentist in Mascoutah, Illinois, who purchased an insurance policy with a start date of September 10, 2020, from The Hartford with Twin City as the nominal insurer. Ex. I at 16. Ms. Levin again signed as "Our Secretary. *Id.* at 30. That policy has a process date of June 30, 2020. *See, e.g., id.* at 16. On that very date, Mr. Barnett, not Ms. Levin, was Secretary of Twin City.[70]

[70] *See* Twin City's Quarterly Statement As of June 30, 2020, available at https://s24.q4cdn.com/787643700/files/doc_downloads/Statutory/Pool/2020/07/2Q20-Twin-City-Fire-Insurance-Company.pdf (accessed 11/182020) (Ex. J.) Mr. Bradford had been Secretary since at least March 31, 2020. *See* Quarterly Statement As of March 31, 2020, available at https://s24.q4cdn.com/787643700/files/doc_downloads/Statutory/Pool/2020/05/1Q20-Twin-City-Fire-Insurance-Company.pdf (accessed 11/18/2020).

32

Comments from page 35 continued on next page

---

Page: 35

Image Inserted

Text Inserted
"Kevin F. Barnett, Corporate Secretary"

Text Replaced
[Old]: "of duplicitous conduct before the state regulators. 3. Plaintiff Goldenhersh's Claim 126. On or about June 5, 2020, Plaintiff Goldenhersh through counsel submitted a formal claim for coverage of its losses."
[New]: "112. This was not an exception. Erik Taube, D.M.D., is a dentist in Mascoutah, Illinois, who purchased an insurance policy with a start date of September 10, 2020."

Text Deleted
"127."

Text Replaced
[Old]: "In response to the claim, Plaintiffs' counsel received a voicemail from a representative of The Hartford on June 12, 2020, in which the representative stated that he had a couple of questions regarding Plaintiff Goldenhersh's claim."
[New]: "from The Hartford with Twin City as the nominal insurer. Ex. I at 16. Ms. Levin again signed as "Our Secretary. Id. at 30. That policy has a process date of June 30, 2020. See, e.g., id. at 16. On"

Text Deleted
"129."

Text Deleted
"128."

Text Replaced
[Old]: "Plaintiffs' counsel attempted to respond to the Hartford's representative's phone call and left a voicemail that same day asking the representative to provide his questions through email."
[New]: "that very"

Text Replaced
[Old]: "To date, Plaintiffs' counsel have not received such an email from The Hartford and have received no other communication from The Hartford about Plaintiff Goldenhersh's claim."
[New]: "date, Mr. Barnett, not Ms. Levin, was Secretary"

Text Deleted
"130."

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 36 of 51 PageID #: 301"

Annotation Inserted

Text Inserted
"70"

Text Inserted

Text Replaced
[Old]: "Based on The Hartford's failure to respond to Plaintiffs' counsel's request, in addition to The Hartford's public denial of coverage as set forth on its website, addressed below, Plaintiff Goldenhersh construes The Hartford and"
[New]: "of Twin City."

Graphic Element Inserted

Annotation Inserted

Text Replaced
[Old]: "Twin City's conduct as a denial of her claim. 4. Plaintiff Moshiri's Claim 131. In mid-April"
[New]: "70 See Twin City's Quarterly Statement As of June 30, 2020, available at"

Font-size "12" changed to "6.48".

Text Inserted
"https://s24.q4cdn.com/787643700/files/"

Annotation Inserted

Text Replaced
[Old]: "of 2020, Plaintiff Moshiri made a claim for coverage"



[New]: "doc_downloads/Statutory/Pool/2020/q2/2Q20-Twin-City-Fire-Insurance-Company.pdf (accessed 11/182020) (Ex. J.) Mr. Bradford had been Secretary since at least March 31, 2020. See Quarterly Statement As of March 31, 2020, available at"

Font-style changed.
Font-size "12" changed to "9.96001".
Font-color changed.

Annotation Inserted

Text Inserted
"https://s24.q4cdn.com/787643700/files/doc_downloads/Statutory/Pool/2020/05/1Q20-Twin-City-FireInsurance-Company.pdff"

Annotation Inserted

Text Inserted
"(accessed 11/18/2020)."

112. This was not an exception. Erik Taube, D.M.D., is a dentist in Mascoutah, Illinois, who purchased an insurance policy with a start date of September 10, 2020, from The Hartford with Twin City as the nominal insurer. Ex. I at 16. Ms. Levin again signed as "Our Secretary. *Id.* at 30. That policy has a process date of June 30, 2020. *See, e.g., id.* at 16. On that very date, Mr. Barnett, not Ms. Levin, was Secretary of Twin City.[70]

---

[70] *See* Twin City, Quarterly Statement As of June 30, 2020, available at https://s24.q4cdn.com/787643700/files/doc_downloads/Statutory/Pool/2020/q2/2Q20-Twin-City-Fire-Insurance-Company.pdf (accessed 11/182020) (Ex. J.) Mr. Bradford had been Secretary since at least March 31, 2020. *See* Quarterly Statement As of March 31, 2020, available at https://s24.q4cdn.com/787643700/files/doc_downloads/Statutory/Pool/2020/05/1Q20-Twin-City-Fire-Insurance-Company.pdff (accessed 11/18/2020).



Kevin F. Barnett, Corporate Secretary

113. The fact that an Assistant General Counsel of HFSG was signing policies of HFSG's subsidiaries as "Our Secretary" even though someone else was the Secretary of those subsidiaries shows that the companies are simply interchangeable entities.

114. The only other signatory on the policies is that of Susan L. Castaneda, shown as Authorized Representative on the Declarations pages. *See* Ex. A at 16, B at 15, C at 17, D at 12, and E at 16.

115. According to her page on LinkedIn, Ms. Castaneda is Vice President and P&C Compliance Officer of "The Hartford," where she has worked for nearly 15 years; her page doesn't mention Sentinel, Twin City or Hartford Casualty, just The Hartford:

---

https://www.linkedin.com/in/susan-castaneda-8479b950/ (accessed 10/9/2020).



116. In her case, "The Hartford" unmistakably means HFSG. Ms. Castaneda is shown on the website of a Compliance conference in May 2019 speaking on a panel and identified as being "of the Hartford Financial Services Group."[72]



"Susan Castaneda (left) of The Hartford Financial Services Group"

117. In other words, Ms. Castaneda is a compliance officer with HFSG, calls her employer "The Hartford," and signed Plaintiff's insurance policies as the "Authorized Representative."

[72] https://www.complianceweek.com/best-of-cw2019/photos-compliance-week-2019/27132.article (accessed 10/9/2020). To see her photo, one must scroll through a number of pictures.



Image Inserted

Text Replaced
[Old]: "the courtesy of a written response explaining the reasons for its denial."
[New]: "116. In her case, "The Hartford" unmistakably means HFSG. Ms. Castaneda is shown on the website of a Compliance conference in May 2019 speaking on a panel and identified as being "of the Hartford Financial Services Group.""

Annotation Inserted

Text Inserted
"72 "Susan Castaneda (left)"

Image Inserted

Text Deleted
"G."

Text Replaced
[Old]: "The Hartford's Improper Public Denial of Coverage 132. The Hartford states the purported basis"
[New]: "of the Hartford Financial Services Group" 117. In other words, Ms. Castaneda is a compliance officer with HFSG, calls her employer "The Hartford," and signed Plaintiff's insurance policies as the "Authorized Representative.""

Font "TimesNewRomanPS-BoldMT" changed to "TimesNewRomanPSMT".

Graphic Element Inserted

Annotation Inserted

Text Inserted
"72"

Text Replaced
[Old]: "of its denial of coverage on its web site: COVID-19 Business Interruption Claims We're closely monitoring COVID-19,"
[New]: "https://www.complianceweek.com/best-of-cw2019/photos-compliance-week-2019/27132.article (accessed 10/9/2020). To see her photo, one must scroll through a number of pictures."

Font-style changed.
Font-size "12" changed to "9.96001".
Font-color changed.

Text Inserted
"34"

118. In addition, two individuals, Jackie Beamish and Charles Weimer, who have been publicly identified as being employed by HFSG signed letters denying claims for coverage of COVID-19 losses. Ex. K and L. On Ms. Beamish's letter, she identified herself as "Inside Claim Rep." On Facebook, she identifies her position as Claims Adjuster, not with Hartford Casualty, the nominal insurer of the Levy Policy, but with Hartford Financial Services Group: [73]



"Claims adjuster at Hartford Financial Services Group"

119. Mr. Weimer signed the letter denying the Keller claim. Ex. L at 3. According to Zoominfo.com, he also works for HFSG. [74]

120. In a submission in this case, HFSG presented evidence to show that Ms. Castaneda, Ms. Beamish and Mr. Weimer were all employees of a separate subsidiary of HFSG, Hartford Fire Insurance Company ("Hartford Fire"). There is a good reason for that. The vast majority of those in the Hartford Family are employed by Hartford Fire. That seems to be where they put their employees, regardless of where they supposedly do their work. In its most recent Form 10-K, The Hartford told the SEC that it had 19,500 employees. [75] Yet, according to Dun & Bradstreet, fully 89%, or 17,399 to be exact, are employed by Hartford Fire. [76]

[73] https://www.facebook.com/jbeamer43 (accessed 9/9/2020).
[74] E https://www.zoominfo.com/p/Charles-Weimer/-1814767848 (accessed 9/9/2020).
[75] 2019 SEC Form 10-K, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000874766/4bf6650d-8159-494e-815e-ee7336e7fa38.pdf (accessed 10/1/2020) at 19.
[76] https://www.dnb.com/business-directory/company-profiles.hartford_fire_insurance_company.9e5d672855a329d5f557f8e8cb47d7b7.html (accessed 10/15/2020.

35

Comments from page 38 continued on next page

Text Replaced
[Old]: "and we know it's affecting businesses across the country. Although most property insurance includes business interruption coverage, coverage may be unavailable or limited because viruses generally do not cause physical loss or damage to property as required by the policy. If you want to submit a claim for your business, click below."
[New]: "118. In addition, two individuals, Jackie Beamish and Charles Weimer, who have been publicly identified as being employed by HFSG signed letters denying claims for coverage of COVID-19 losses. Ex. K"

Annotation Deleted

Text Replaced
[Old]: "66 133. This explanation is illogical and a sham because The Hartford knows that viruses can cause physical loss of or damage to property under the policies. For that reason, as shown above, the policies include a Virus Exclusion, which excludes some coverages resulting from viruses. That exclusion, which was added in or about 2006, appears on a page headed with this statement: "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." Ex."
[New]: "and L. On Ms. Beamish's letter, she identified herself as "Inside Claim Rep." On Facebook, she identifies her position as Claims Adjuster, not with Hartford Casualty, the nominal insurer of the Levy Policy, but with Hartford Financial Services Group: 73 "Claims adjustor"

Font-size "8.03999" changed to "12".

Image Inserted

Text Replaced
[Old]: "A at 135; Ex."

Text Replaced
[New]: "at Hartford Financial Services Group" 119. Mr. Weimer signed the letter denying the Keller claim. Ex. L"

Text Deleted
"C at 127; Ex. D at 127; Ex."

Text Replaced
[Old]: "E at 136. 134. If"
[New]: "at 3. According to Zoominfo.com, he also works for HFSG."

Annotation Inserted

Text Replaced
[Old]: "a virus, even one that was present or active in the property, does not cause physical loss of or damage to the property, there would have been absolutely no reason for Defendants to change the policy by excluding viruses under certain conditions or to state in the policy that the 66"
[New]: "74 120. In a submission in this case, HFSG presented evidence to show that Ms. Castaneda, Ms. Beamish and Mr. Weimer were all employees of a separate subsidiary of HFSG, Hartford Fire Insurance Company ("Hartford Fire"). There is a good reason for that. The vast majority of those in the Hartford Family are employed by Hartford Fire. That seems to be where they put their employees, regardless of where they supposedly do their work. In its most recent Form 10-K, The Hartford told the SEC that it had 19,500 employees."

Font-size "12" changed to "8.03999".

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 37 of 51 PageID #: 302"

Annotation Attributes Changed

Text Replaced
[Old]: "https://www.thehartford.com/commercial-property-insurance/claims (accessed 5/13/2020) (emphasis added)."
[New]: "75 Yet, according"

Font-style changed.
Font-size "9.96001" changed to "8.03999".
Font-color changed.

Text Replaced
[Old]: "provision changes"
[New]: "to Dun & Bradstreet, fully 89%, or 17,399 to be exact, are employed by Hartford Fire."

Annotation Inserted

118. In addition, two individuals, Jackie Beamish and Charles Weimer, who have been publicly identified as being employed by HFSG signed letters denying claims for coverage of COVID-19 losses. Ex. K and L. On Ms. Beamish's letter, she identified herself as "Inside Claim Rep." On Facebook, she identifies her position as Claims Adjuster, not with Hartford Casualty, the nominal insurer of the Levy Policy, but with Hartford Financial Services Group:[73]



"Claims adjuster at Hartford Financial Services Group"

119. Mr. Weimer signed the letter denying the Keller claim. Ex. L at 3. According to Zoominfo.com, he also works for HFSG.[74]

120. In a submission in this case, HFSG presented evidence to show that Ms. Castaneda, Ms. Beamish and Mr. Weimer were all employees of a separate subsidiary of HFSG, Hartford Fire Insurance Company ("Hartford Fire"). There is a good reason for that. The vast majority of those in the Hartford Family are employed by Hartford Fire. That seems to be where they put their employees, regardless of where they supposedly do their work. In its most recent Form 10-K, The Hartford told the SEC that it had 19,500 employees.[75] Yet, according to Dun & Bradstreet, fully 89%, or 17,359 to be exact, are employed by Hartford Fire.[76]

[73] https://www.facebook.com/fbeamer43 (accessed 9/9/2020).

[74] E https://www.zoominfo.com/p/Charles-Weimer/-1814767848 (accessed 9/9/2020).

[75] 2019 SEC Form 10-K, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000874766/4bf6650d-8159-4f81-e315e-ee7336e7fa38.pdf (accessed 10/1/2020) at 19.

[76] https://www.dnb.com/business-directory/company-profiles.hartford_fire_insurance_company.9e5d672855a329d5f5578e8cb47d7b7.html (accessed 10/15/2020.

Text Inserted
"76 73"

Annotation Inserted

Text Inserted
"https://www.facebook.com/lbeamer43 (accessed 9/9/2020). 74 E"

Annotation Inserted

Text Inserted
"https://www.zoominfo.com/p/Charles-Weimer/-1814767848 (accessed 9/9/2020). 75 2019 SEC Form 10-K, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000874766/4bf6650d-8159494e-815e-ee7336e7fa38.pdf (accessed 10/1/2020) at 19. 76"

Annotation Inserted

Text Inserted
"https://www.dnb.com/business-directory/company-profiles.hartford_fire_insurance_company.9e5d672855a329d"

Annotation Inserted

Text Inserted
"5f5578e8eb47d7b7.html (accessed 10/15/2020."

Text Replaced
[Old]: "33"
[New]: "35"

121. According to a California court, "[w]ith the exception of a single foreign subsidiary, the individual employees of all of the HFSG subsidiaries … are each employed by and paid by Hartford Fire." *Demery v. Hartford Underwriters Ins. Co.*, 2008 WL 534721, at *6 (Cal. App. 2008).

122. By that measure, Sentinel, Twin City, and Hartford Casualty have no employees at all and couldn't do anything, much less issue insurance policies or pay claims. They appear to just be shells.

123. And that also appears to be why these nominal employees of Hartford Fire publicly represent themselves as employees of HFSG – in other words, it's all basically one entity. 

124. The above facts show that HFSG is a party to the Policies.

125. The above facts also show that Sentinel, Twin City and Hartford Casualty are the alter egos of HFSG.

126. The above facts show that Sentinel, Twin City and Hartford Casualty are so dominated by HFSG as to be a mere instrument of HFSG and indistinct from it.

127. The above facts show that Sentinel, Twin City and Hartford Casualty are controlled and influenced by HFSG.

128. The above facts show that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetrate a fraud.

129. The public inconvenience, wrong, or fraud that the corporate cloak is being used to defeat has to do with the many lawsuits brought against HFSG and its subsidiaries for coverage of business income losses due to COVID-19.

130. Hartford entities have been sued in more than 200 COVID-19 cases, with more filed every week.[77] Many are class actions, some nationwide, many state-wide and not limited to a particular industry group as this case is.[78] Damages – the total losses due to COVID-19 shutdowns of all Hartford insureds – may be inconceivably huge, more than the subsidiaries can pay themselves.

131. Thus, the corporate cloak is being used to avoid having to pay Business Income losses that HFSG owes or potentially owes from a huge national catastrophe such as the COVID-19 pandemic.

132. Moreover, the wrong caused by HFSG's control of Sentinel, Twin City and Hartford Casualty is the proximate cause of injury to Plaintiffs and Class Members who dealt with Sentinel, Twin City and Hartford Casualty.

### G. Defendants Either Denied Coverage or Ignored Plaintiffs' Claims

133. Each of the Plaintiffs made a claim under their policy for their COVID-19 losses and extra expenses. Each of them was either denied or ignored. Defendants deny that the COVID-19 pandemic is a covered cause of loss and refuse to provide any coverage whatsoever. Defendants' denials of Plaintiffs' claims occurred more than thirty days ago and were vexatious and without reasonable cause, such that Plaintiffs are entitled to additional damages, including a reasonable attorneys' fee, pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420.

#### 1. Plaintiff Levy's Claim

134. Dr. Levy called The Hartford in March 2020 to ask if his losses were covered and was told that they were not.

---

[77] https://cclt.law.upenn.edu/ (accessed 11/15/2020).
[78] *See* Hartford's Resp. in Opp. to Order to Show Cause Purs. to 28 U.S.C.§ 1407, Doc. 146 in MDL No. 2963, at 13-17.

135. Despite being told by The Hartford that his losses were not covered, Plaintiff Levy still submitted a written claim on or about May 9, 2020, prior to filing his original Complaint, and had not received a response at the time of filing his original Complaint.

136. On May 20, 2020, six days after his original Complaint was filed, Plaintiff Levy received a response from James Turner of The Hartford, asking for more specifics about the claim. Exhibit M. Some of what The Hartford requested, however, was clearly stated in the original Complaint. For example, The Hartford, through its adjuster, asked: "Is the Insured's business closed or is the normal operation of the business suspended for reasons related to the Coronavirus? If so, provide all reasons the business is closed or limited?" Ex. M (portion redacted for attorney-client privilege).

137. Plaintiff Levy's counsel responded to The Hartford on May 21, 2020, requesting that it provide a decision on whether it would extend coverage within 7 days. Given that The Hartford had previously informed Plaintiff Levy that his losses were not covered, counsel for Plaintiff Levy explained that they would not undertake the costs and expense of providing the requested information (much of which was clearly not relevant to the question of coverage) unless The Hartford acknowledged it would be accepting coverage. Ex. N.

138. On May 28, 2020, Plaintiff Levy received an emailed response from Jackie Beamish of The Hartford which again requested information but did not agree to accept coverage. Ex. K. Thus, The Hartford declined to inform Plaintiff Levy within 7 days that it would be providing coverage.

139. In her email, Ms. Beamish stated that she was in possession of both the original claim and the Complaint. Id. Nevertheless, much of what she asked was clearly stated in the original Complaint. Id.

---

**Text Replaced**
[Old]: "by Defendants that made claims with any Defendant for Extra Expense Coverage related to COVID-19 and for which Defendants have denied a claim for the expenses or have otherwise failed to acknowledge or accept as a covered expense, or pay for the covered expenses (the "Orthodontics Extra Expense Coverage Subclass")."
[New]: "Despite being told by The Hartford that his losses were not covered, Plaintiff Levy still submitted a written claim on or about May 9, 2020, prior to filing his original Complaint, and had not received a response at the time of filing his original Complaint."

**Text Inserted**
"135."

**Text Replaced**
[Old]: "Excluded from each of the above Classes are Defendants, including any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by"
[New]: "On May 20, 2020, six days after his original Complaint was filed, Plaintiff Levy received a response from James Turner of The Hartford, asking for more specifics about the claim. Exhibit M. Some of what The Hartford requested, however, was clearly stated in the original Complaint. For example, The Hartford, through its adjuster, asked: "Is the Insured's business closed or is"

**Text Deleted**
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 38 of 51 PageID #: 303"

**Text Deleted**
"137."

**Text Replaced**
[Old]: "Defendants, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families."
[New]: "the normal operation of the business suspended for reasons related to"

**Text Replaced**
[Old]: "Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or division into subclasses after having"
[New]: "the Coronavirus? If so, provide all reasons the business is closed or limited?" Ex. M (portion redacted for attorney-client privilege)."

**Text Replaced**
[Old]: "had an opportunity to conduct discovery."
[New]: "Plaintiff Levy's counsel responded to The Hartford on May 21, 2020, requesting that it provide a decision on whether it would extend coverage within 7 days. Given that The Hartford had previously informed Plaintiff Levy that his losses were not covered, counsel for Plaintiff Levy explained that they would not undertake the costs"

**Text Inserted**
"137."

**Text Deleted**
"138."

**Text Replaced**
[Old]: "This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Rule 23 of the Federal Rules of Civil Procedure."
[New]: "and expense of providing the requested information (much of which was clearly not relevant to the question of coverage) unless"

**Text Deleted**
"139."

**Text Replaced**
[Old]: "Numerosity. Fed. R. Civ. P. 23(a)(1). The members"
[New]: "The Hartford acknowledged it would be accepting coverage. Ex. N."

Font "TimesNewRomanPS-BoldMT" changed to "TimesNewRomanPSMT".

**Text Replaced**
[Old]: "of each Class are so numerous that joinder of all members is impractical. The precise number of Class members can be ascertained from Defendants' records."
[New]: "On May 28, 2020, Plaintiff Levy received an emailed response from Jackie Beamish of The Hartford which again requested information but did not agree to accept coverage. Ex. K. Thus, The Hartford declined to inform Plaintiff Levy within 7 days that it would be providing coverage."

**Text Inserted**
"138."

**Text Replaced**
[Old]: "Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to each Class, which predominate over any questions affecting individual members of each respective Class. These common questions of law and fact include, without limitation: a. Whether Plaintiffs and"
[New]: "In her email, Ms. Beamish stated that she was in possession of both the original claim and the Complaint. Id. Nevertheless, much of what she asked was"

Comments from page 41 continued on next page

135. Despite being told by The Hartford that his losses were not covered, Plaintiff Levy still submitted a written claim on or about May 9, 2020, prior to filing his original Complaint, and had not received a response at the time of filing his original Complaint.

136. On May 20, 2020, six days after his original Complaint was filed, Plaintiff Levy received a response from James Turner of The Hartford, asking for more specifics about the claim. Exhibit M. Some of what The Hartford requested, however, was clearly stated in the original Complaint. For example, The Harford, through its adjuster, asked: "Is the Insured's business closed or is the normal operation of the business suspended for reasons related to the Coronavirus? If so, provide all reasons the business is closed or limited?" Ex. M (portion redacted for attorney-client privilege).

137. Plaintiff Levy's counsel responded to The Hartford on May 21, 2020, requesting that it provide a decision on whether it would extend coverage within 7 days. Given that The Hartford had previously informed Plaintiff Levy that his losses were not covered, counsel for Plaintiff Levy explained that they would not undertake the costs and expense of providing the requested information (much of which was clearly not relevant to the question of coverage) unless The Hartford acknowledged it would be accepting coverage. Ex. N.

138. On May 28, 2020, Plaintiff Levy received an emailed response from Jackie Beamish of The Hartford which again requested information but did not agree to accept coverage. Ex. K. Thus, The Hartford declined to inform Plaintiff Levy within 7 days that it would be providing coverage.

139. In her email, Ms. Beamish stated that she was in possession of both the original claim and the Complaint. *Id.* Nevertheless, much of what she asked was clearly stated in the original Complaint. *Id.*

140. For example, she asked, "Is the Insured's business closed or is the normal operation of the business suspended for reasons related to the Coronavirus? If so, provide all reasons the business is closed or limited?" *Id.* On the second page of the Complaint, after referring to recommendations of the CDC and ADA that dentists stop performing non-urgent procedures, Plaintiff alleged: "That same date [March 23, 2020], in response to these recommendations and because of the risk of continuing its dental practice during the COVID-19 pandemic, Plaintiff shut down its practice." Plaintiff's Class Action Complaint, Doc. #1, ¶ 6. Plaintiff also alleged that its loss was not caused by the coronavirus but "by the worldwide pandemic …." *Id.* ¶ 71.

141. Ms. Beamish also asked, "Has the Insured confirmed the presence of Coronavirus at their premises? Ex.K. This was also answered in the original Complaint: "There is no evidence that the virus has ever been in his premises." Plaintiff's Class Action Complaint ¶ 71.

142. The Hartford's refusal to provide coverage if Plaintiff did not provide information that he had already provided was not a good faith response.

143. Another reason why Ms. Beamish's request for this information was not a good faith response is that in its motion to dismiss, Defendant argues that there is no coverage simply because of a "virus exclusion" in the policy.[79] Thus, whether Plaintiff's business closed and why and whether the coronavirus has ever been found in Plaintiff's premises is irrelevant to The Hartford's reason for contesting coverage. Ms. Beamish was asking for irrelevant information as far as The Hartford was concerned.

144. Based on The Hartford and Hartford Casualty's statement to Dr. Levy that his losses were not covered by his policy, combined with their subsequent failure to accept coverage

[79] Memorandum of Law in Support Of Defendant Hartford Casualty Insurance Company's Motion to Dismiss Plaintiff's Complaint, Doc. #13.

Comments from page 42 continued on next page

[New]: "Based on The Hartford and Hartford Casualty's statement to Dr. Levy that his losses were not covered by his policy, combined with their subsequent failure to accept coverage 79 Memorandum of Law in Support Of Defendant Hartford Casualty Insurance Company's Motion to Dismiss Plaintiff's Complaint, Doc. #13."

Text Inserted
"144."

Text Inserted
"39"

140. For example, she asked, "Is the Insured's business closed or is the normal operation of the business suspended for reasons related to the Coronavirus? If so, provide all reasons the business is closed or limited?" *Id.* On the second page of the Complaint, after referring to recommendations of the CDC and ADA that dentists stop performing non-urgent procedures, Plaintiff alleged: "That same date [March 23, 2020], in response to these recommendations and because of the risk of continuing its dental practice during the COVID-19 pandemic, Plaintiff shut down its practice." Plaintiff's Class Action Complaint, Doc. #1, ¶ 6. Plaintiff also alleged that its loss was not caused by the coronavirus but "by the worldwide pandemic …." *Id.* ¶ 71.

141. Ms. Beamish also asked, "Has the Insured confirmed the presence of Coronavirus at their premises? Ex.K. This was also answered in the original Complaint: "There is no evidence that the virus has ever been in his premises." Plaintiff's Class Action Complaint ¶ 71.

142. The Hartford's refusal to provide coverage if Plaintiff did not provide information that he had already provided was not a good faith response.

143. Another reason why Ms. Beamish's request for this information was not a good faith response is that in its motion to dismiss, Defendant argues that there is no coverage simply because of a "virus exclusion" in the policy.[79] Thus, whether Plaintiff's business closed and why and whether the coronavirus has ever been found in Plaintiff's premises is irrelevant to The Hartford's reason for contesting coverage. Ms. Beamish was asking for irrelevant information as far as The Hartford was concerned.

144. Based on The Hartford and Hartford Casualty's statement to Dr. Levy that his losses were not covered by his policy, combined with their subsequent failure to accept coverage

---

[79] Memorandum of Law in Support Of Defendant Hartford Casualty Insurance Company's Motion to Dismiss Plaintiff's Complaint, Doc. #13.

despite multiple written requests, The Hartford and Hartford Casualty have denied Plaintiff Levy's claim.

**2. Plaintiff Keller's Claim**

145. Dr. Keller submitted a formal claim for her losses on The Hartford's website on March 15, 2020. In response, The Hartford rejected the claim by letter dated June 4, 2020, signed by Charles Weimer, along with a four-page attachment, explaining the purported basis of its decision. Exhibit L hereto.

146. The explanation attached to The Hartford's denial letter states that The Hartford based its decision on language of the policy that states, in part, "We will pay for direct physical *loss of* or physical damage to Covered Property …." Ex. L at 3 (emphasis added.)

147. However, although The Hartford quoted the policy accurately, it then mis-paraphrased it by stating, "You have not identified any direct physical loss *to* any property at a scheduled premises." Ex. L at 3 (emphasis added.) The policy covers a loss "of" the property, not *to* the property. What it covers that happens "to" the property is damage, not loss. As described above, there was a necessary suspension of Plaintiff Keller's operations caused by a loss "of" the property resulting from a Covered Cause of Loss – namely the worldwide pandemic – because Plaintiff Keller lost access to the property to conduct its normal dental practice.

148. The explanation attached to The Hartford's denial letter also speculates that "even if coverage were otherwise available for loss caused by coronavirus, the pollution exclusion *could* further bar coverage for the loss." Ex. L at 5 (emphasis added). This was not a ground for rejection of the claim.

149. The Hartford's explanation further states that "[t]o the extent you are claiming physical loss or physical damage caused by loss of use or loss of market, coverage would be precluded

40

....." Ex. L at 5. The Hartford's explanation does not explain what is meant by "loss of use or loss of market," which is not a defined term in the policy and has no clear meaning.

150. As a last purported basis, The Hartford's explanation refers to the policy's virus exclusion ("Virus Exclusion"). Ex. L at 5-6. As described below, that purported basis is left out of the explanation The Hartford makes public on its website for why COVID-19 business losses are not covered.

151. The Virus Exclusion does not exclude Plaintiff Keller's losses due to the COVID-19 pandemic because those losses were not caused by the presence of a virus on the premises of Plaintiff Keller or the members of the Class; they were caused by the COVID-19 pandemic, rather than the presence of coronavirus on the property of Plaintiff Keller or the members of the Class.

152. The virus exclusion states:

**i. "Fungi", Wet Rot, Dry Rot, Bacteria And Virus**

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

(1) *Presence*, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or *virus*.

Ex. B at 135 (emphasis added) (*see also* the same provision in the policies of the other Plaintiffs, Ex. A at 135; Ex. C at 127; Ex. D at 127; Ex. E at 136).

153. However, the virus exclusion does not apply to Plaintiffs' losses (as The Hartford knows because, as shown below, it did not include it on its website as a reason for refusing coverage for losses due to the COVID-19 pandemic). Plaintiffs' losses were not caused by the presence of viruses in their premises. There is no evidence that the virus has ever been in their premises. Plaintiffs' losses were caused by the worldwide pandemic and, as recommended by the CDC and

---

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 40 of 51 PageID #: 305"

Text Replaced
[Old]: "144. Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2). Defendants' unlawful and unfair conduct is uniform as to all members of each Class. Defendants have acted or refused to act on grounds that apply generally to each Class, so that final injunctive relief or declaratory relief is appropriate with respect to each Class as a whole. 145. In addition, particular issues are appropriate for certification under Fed. R. Civ. P. 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance"
[New]: "...." Ex. L at 5. The Hartford's explanation does not explain what is meant by "loss of use or loss of market," which is not a defined term in the policy and has no clear meaning."

Text Replaced
[Old]: "the disposition of this matter and the parties' interests thereon. Such particular issues include, but are"
[New]: "As a last purported basis, The Hartford's explanation refers to the policy's virus exclusion ("Virus Exclusion"). Ex. L at 5-6. As described below, that purported basis is left out of the explanation The Hartford makes public on its website for why COVID-19 business losses are not covered."

Text Inserted
"150."

Text Replaced
[Old]: "not limited to: a. Whether the policies issued by Defendants cover Class members' Business Income losses and Extra Expenses due to the COVID-19 pandemic and public health and stay-at-home orders referred to herein; b. Whether the coverages for Business Income losses and Extra Expenses provided by Defendants' policies are precluded by exclusions or other limitations in those policies; c. Whether Defendants breached contracts by denying coverage for Business Income losses and Extra Expenses due to the COVID-19 pandemic; and e. Whether Plaintiff and Class members are entitled to actual damages and/or declaratory relief as a result of Defendants' wrongful conduct. VI. JURY DEMAND 146. Plaintiffs demand a trial by jury on all claims so triable."
[New]: "The Virus Exclusion does not exclude Plaintiff Keller's losses due to the COVID-19 pandemic because those losses were not caused by the presence of a virus on the premises of Plaintiff Keller or the members of the Class; they were caused by the COVID-19 pandemic, rather than the presence of coronavirus on the property of Plaintiff Keller or the members of"

Text Inserted
"151."

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 41 of 51 PageID #: 306"

Text Replaced
[Old]: "COUNT I: BUSINESS INCOME BREACH OF CONTRACT (By Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass) 147. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead them as the cause of action in the alternative. 148. Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class and Orthodontics Business Income Coverage Subclass against Defendants under Missouri law. 149. Plaintiffs' Policies and the policies of other Business Income Coverage Class and Orthodontics Business Income Coverage Subclass Members are insurance contracts under which Defendants were paid premiums in exchange"
[New]: "the Class. 152. The virus exclusion states: i. "Fungi", Wet Rot, Dry Rot, Bacteria And Virus We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss: (1) Presence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus. Ex. B at 135 (emphasis added) (see also the same provision in the policies of the other Plaintiffs, Ex. A at 135; Ex. C at 127; Ex. D at 127; Ex. E at 136)."

Font "TimesNewRomanPS-BoldMT" changed to "TimesNewRomanPSMT".

Text Inserted
"37"

Text Replaced
[Old]: "for promises to pay Plaintiffs for their covered losses under the Policies and for Class members' covered losses. 150. In Plaintiffs' policies, Defendants expressly agree to pay for losses of Business Income incurred as a result of causes not excluded, including losses caused by the COVID-19 pandemic. Specifically, Defendants promise to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension. 151. A covered loss has resulted in business suspensions, which have caused Plaintiffs and Class members lost Business Income and Extended Business Income. 152. The business suspensions and losses triggered the Business Income"
[New]: "However, the virus exclusion does not apply to Plaintiffs' losses (as The Hartford knows because, as shown below, it did not include it on its website as a reason for refusing coverage for losses due to the COVID-19 pandemic). Plaintiffs' losses were not caused by the presence of viruses in their premises. There is no evidence that the virus has ever been in their premises. Plaintiffs' losses were caused by the worldwide pandemic and, as recommended by the CDC"

Text Inserted
"153."

Text Replaced
[Old]: "38"
[New]: "41"

dental organizations, the need to prevent it from spreading to their employees, patients and others.

154. If The Hartford had intended to exclude losses that might be related to a pandemic or to a virus in another location than the insured's property, it could have so provided but did not.

155. Moreover, even if the Virus Exclusion were applicable to the losses of Plaintiff Keller (and the other Plaintiffs and members of the proposed classes), under the principles of regulatory estoppel and general public policy, Defendants should be estopped from enforcing it.

156. Specifically, in 2006, two insurance industry trade groups, the Insurance Service Office ("ISO") and the American Association of Insurance Services ("AAIS"), represented hundreds of insurers in a national effort to seek approval from state insurance regulators for the adoption of the Virus Exclusion.

157. In filings with state regulators, ISO and AAIS, on behalf of insurers, represented that the adoption of the Virus Exclusion was only meant to "clarify" that coverage for "disease-causing agents" has never been in effect, and was never intended to be included, in the property policies.

158. In a July 6, 2006, "ISO Circular" entitled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO represented to the state regulatory bodies:

> While property polices have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such polices may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent.

159. Similarly, AAIS, in its "Filing Memorandum" in support of the Virus Exclusion, represented:

> Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease causing agents. With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended . . .

---

**Text Deleted**
"153."

**Text Replaced**
[Old]: "Extended Business Income coverage under Plaintiffs' policies and other Class members' policies."
[New]: "dental organizations,"

**Text Replaced**
[Old]: "Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums."
[New]: "the need to prevent it from spreading to their employees, patients and others."

**Text Replaced**
[Old]: "Defendants, without justification, have refused performance under Plaintiffs' policies and other Class members' policies by denying coverage for these losses and such denials were"
[New]: "If The Hartford had intended to exclude losses that might be related to a pandemic or to a virus"

**Text Deleted**
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 42 of 51 PageID #: 307"

**Text Replaced**
[Old]: "vexatious and without reason. Accordingly, Defendants are in breach of the policies and other Class members' policies."
[New]: "In another location than the insured's property, it could have so provided but did not."

**Text Replaced**
[Old]: "Due to Defendants' breach of Plaintiffs' policies and other Class members' policies, Plaintiffs and other members of the Business Income Coverage Class and Orthodontics Business Income Coverage Subclass have suffered actual and substantial damages for which Defendants are liable, including additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420,"
[New]: "Moreover, even if the Virus Exclusion were applicable to the losses of Plaintiff Keller (and the other Plaintiffs and members of the proposed classes), under the principles of regulatory estoppel and general public policy, Defendants should be estopped from enforcing it."

**Text Replaced**
[Old]: "in an amount to be proved at trial. COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME (By Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass)"
[New]: "Specifically, in 2006, two insurance industry trade groups, the Insurance Service Office ("ISO") and the American Association of Insurance Services ("AAIS"), represented hundreds of insurers"

**Text Inserted**
"156."

**Text Deleted**
"156."

**Text Replaced**
[Old]: "Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative."
[New]: "In a national effort to seek approval from state insurance regulators for the adoption of the Virus Exclusion."

**Text Replaced**
[Old]: "Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class and Orthodontics Business Income Coverage Subclass against Defendants under Missouri law."
[New]: "In filings with state regulators, ISO and AAIS, on behalf of insurers, represented that the adoption of"

**Text Deleted**
"158."

**Text Replaced**
[Old]: "Defendants have breached the duty of good faith and fair dealing owed to Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass in the following respects: a. Unreasonably acting"
[New]: "the Virus Exclusion was only meant to "clarify" that coverage for "disease-causing agents" has never been in effect, and was never intended to be included, in the property policies."

**Text Replaced**
[Old]: "or failing to act in a manner that deprives Plaintiffs and the Class of the benefits of their policies; b. Unreasonably engaging in a pattern and practice of acting or failing to act"
[New]: "In a July 6, 2006, "ISO Circular" entitled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO represented to the state regulatory bodies: While property polices have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such polices may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent."

**Text Inserted**
"158."

**Text Replaced**
[Old]: "in a manner that deprives Plaintiffs and the Class of the benefits of their policies; c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiffs' and the Class' claims;"

Comments from page 45 continued on next page

dental organizations, the need to prevent it from spreading to their employees, patients and others.

154. If The Hartford had intended to exclude losses that might be related to a pandemic or to a virus in another location than the insured's property, it could have so provided but did not.

155. Moreover, even if the Virus Exclusion were applicable to the losses of Plaintiff Keller (and the other Plaintiffs and members of the proposed classes), under the principles of regulatory estoppel and general public policy, Defendants should be estopped from enforcing it.

156. Specifically, in 2006, two insurance industry trade groups, the Insurance Service Office ("ISO") and the American Association of Insurance Services ("AAIS"), represented hundreds of insurers in a national effort to seek approval from state insurance regulators for the adoption of the Virus Exclusion.

157. In filings with state regulators, ISO and AAIS, on behalf of insurers, represented that the adoption of the Virus Exclusion was only meant to "clarify" that coverage for "disease-causing agents" has never been in effect, and was never intended to be included, in the property policies.

158. In a July 6, 2006, "ISO Circular" entitled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO represented to the state regulatory bodies:

> While property polices have not been a source of recovery for losses involving contamination by disease-causing agents, the spector of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such polices may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent.

159. Similarly, AAIS, in its "Filing Memorandum" in support of the Virus Exclusion, represented:

> Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease causing agents. With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended . . .

[New]: "Similarly, AAIS, in its "Filing Memorandum" in support of the Virus Exclusion, represented: Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease causing agents. With the possibility of a pandemic, there is concern that claims may result"

**Text Inserted**
"159."

**Text Deleted**
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 43 of 51 PageID #: 308"

**Text Replaced**
[Old]: "d. Unreasonably engaging in a pattern and practice of failing"
[New]: "in efforts to expand coverage to create recovery for loss where no coverage was originally intended …"

**Text Replaced**
[Old]: "39"
[New]: "42"

This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded…

160. These representations made by the insurance industry were false.

161. By 2006, the time of the state applications to approve the Virus Exclusion, courts had repeatedly found that property insurance policies covered claims involving disease-causing agents, and had held on numerous occasions that any condition making it impossible to use property for its intended use constituted "physical loss or damage to such property."

162. Upon information and belief, the state insurance departments relied on the industry's and The Hartford's representation in approving the Virus Exclusion for inclusion in standard comprehensive policies without a reduction in premiums to balance a reduction in coverage.

163. The assertions made by the insurance industry and The Hartford to obtain regulatory approval of the Virus Exclusion were misrepresentations and for this reason, among other public policy concerns, The Hartford should be estopped from enforcing the Virus Exclusion to avoid coverage of claims related to the COVID-19 pandemic.

164. In securing approval for the adoption of the Virus Exclusion by misrepresenting to the state regulators that the Virus Exclusion would not change the scope of coverage, The Hartford effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged.

165. Under the doctrine of regulatory estoppel, the Court should not permit The Hartford to benefit from this type of duplicitous conduct before the state regulators.

**3. Plaintiff Goldenhersh's Claim**

166. On or about June 5, 2020, Plaintiff Goldenhersh through counsel submitted a formal claim for coverage of its losses.

167. In response to the claim, Plaintiffs' counsel received a voicemail from a representative of The Hartford on June 12, 2020, in which the representative stated that he had a couple of questions regarding Plaintiff Goldenhersh's claim.

168. Plaintiffs' counsel attempted to respond to the Hartford's representative's phone call and left a voicemail that same day asking the representative to provide his questions through email.

169. To date, Plaintiffs' counsel have not received such an email from The Hartford and have received no other communication from The Hartford about Plaintiff Goldenhersh's claim.

170. Based on The Hartford's failure to respond to Plaintiffs' counsel's request, in addition to The Hartford's public denial of coverage as set forth on its website, addressed below, Plaintiff Goldenhersh construes The Hartford and Twin City's conduct as a denial of her claim.

**4.  Plaintiff Moshiri's Claim**

171. In mid-April of 2020, Plaintiff Moshiri made a claim for coverage of its losses to The Hartford over the phone on two separate occasions and was told both times that there was no coverage for its losses under its policies. The Hartford did not give Plaintiff Moshiri the courtesy of a written response explaining the reasons for its denial.

**H.  The Hartford's Improper Public Denial of Coverage**

172. The Hartford states the purported basis of its denial of coverage on its web site:

**COVID-19 Business Interruption Claims**

We're closely monitoring COVID-19, and we know it's affecting businesses across the country. Although most property insurance includes business interruption coverage, coverage may be unavailable or limited *because viruses generally do not cause physical loss or damage to property as required by the policy.* If you want to submit a claim for your business, click below. [80]

173. This explanation is illogical and a sham because The Hartford knows that viruses can cause physical loss or damage to property under the policies. For that reason, as shown above,

[80] https://www.thehartford.com/commercial-property-insurance/claims (accessed 5/13/2020) (emphasis added).

44

the policies include a *Virus Exclusion*, which excludes some coverages resulting from viruses. That exclusion, which was added in or about 2006, appears on a page headed with this statement: "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." Ex. A at 135; Ex. B at 135; Ex. C at 127; Ex. D at 127; Ex. E at 136.

174. If a virus, even one that was present or active in the property, does not cause physical loss of or damage to the property, there would have been absolutely no reason for Defendants to change the policy by excluding viruses under certain conditions or to state in the policy that the provision changes the policy. The fact that Defendants felt the need to include an exclusion for viruses shows that Defendants know that viruses most certainly *can* cause loss of or damage to the property.

## V. CLASS ALLEGATIONS

175. Plaintiffs bring this action on behalf of themselves and as a representative of all others who are similarly situated. Pursuant to Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following classes and subclasses:

All persons and entities operating dental practices in Missouri with Business Income (including Extended Business Income) coverage issued by Defendants that made claims with any Defendant for suspension (*i.e.*, the partial slowdown or complete cessation of their business activities) or business related to COVID-19, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered losses (the "Business Income Coverage Class").

All persons and entities operating orthodontics practices in Missouri with Business Income (including Extended Business Income) coverage issued by Defendants that made claims with any Defendant for suspension (*i.e.*, the partial slowdown or complete cessation of their business activities) of business related to COVID-19, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered losses (the "Orthodontics Business Income Coverage Subclass").

All persons and entities operating dental practices in Missouri with Extra Expense coverage issued by Defendants that made claims with any Defendant for Extra Expense Coverage related to COVID-19 and/or which Defendants have denied a

45

claim for the expenses or have otherwise failed to acknowledge or accept as a covered expense, or pay for the covered expenses (the "Extra Expense Coverage Class").

All persons and entities operating orthodontics practices in Missouri with Extra Expense coverage issued by Defendants that made claims with any Defendant for Extra Expense Coverage related to COVID-19 and for which Defendants have denied a claim for the expenses or have otherwise failed to acknowledge or accept as a covered expense, or pay for the covered expenses (the "Orthodontics Extra Expense Coverage Subclass").

176. Excluded from each of the above Classes are Defendants, including any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

177. Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

178. This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Rule 23 of the Federal Rules of Civil Procedure.

179. **Numerosity.** Fed. R. Civ. P. 23(a)(1). The members of each Class are so numerous that joinder of all members is impractical. The precise number of Class members can be ascertained from Defendants' records.

180. **Commonality and Predominance.** Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to each Class, which predominate over any questions affecting individual members of each respective Class. These common questions of law and fact include, without limitation:

   a. Whether Plaintiffs and the Class members suffered a covered loss under the common policies issued to members of the Class;

   b. Whether Defendants wrongfully denied all claims based on COVID-19;

**Text Inserted**
"claim for the expenses or have otherwise failed to acknowledge or accept as a covered expense, or pay for the covered expenses (the "Extra Expense Coverage Class"). All persons"

**Text Deleted**
"COUNT III: DECLARATORY RELIEF APPLICABLE TO BUSINESS INCOME (By Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass)"

**Text Deleted**
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 44 of 51 PageID #: 309"

**Text Replaced**
[Old]: "161. Plaintiffs reallege and incorporate by reference"
[New]: "and entities operating orthodontics practices in Missouri with Extra Expense coverage issued by Defendants that made claims with any Defendant for Extra Expense Coverage related to COVID-19 and for which Defendants have denied a claim for the expenses or have otherwise failed to acknowledge or accept as a covered expense, or pay for the covered expenses (the "Orthodontics Extra Expense Coverage Subclass")."

**Text Replaced**
[Old]: "the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth"
[New]: "Excluded from each of the above Classes are Defendants, including any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families."

**Text Inserted**
"176."

**Text Inserted**
"Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery."

**Text Inserted**
"177."

**Text Replaced**
[Old]: "herein and."
[New]: "This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Rule 23 of the Federal Rules of Civil Procedure."

**Text Inserted**
"178."

**Text Inserted**
"Numerosity. Fed. R. Civ. P. 23(a)(1). The members of each Class are so numerous that joinder of all members is impractical. The precise number of Class members can be ascertained from Defendants' records."

**Text Inserted**
"179."

**Text Replaced**
[Old]: "to the extent necessary, plead this cause"
[New]: "Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to each Class, which predominate over any questions affecting individual members of each respective Class. These common questions of law and fact include, without limitation: a. Whether Plaintiffs and the Class members suffered a covered loss under the common policies issued to members of the Class; b. Whether Defendants wrongfully denied all claims based on COVID-19;"

Font "TimesNewRomanPSMT" changed to "TimesNewRomanPS-BoldMT".

**Text Inserted**
"180."

**Text Inserted**
"46"

c. Whether Defendants' Business Income coverage applies to a suspension of business caused by COVID-19 and/or in response to the presence or threat of COVID-19;

d. Whether Defendants' Extra Expense coverage applies to efforts to avoid or minimize a loss caused by COVID-19;

e. Whether Defendants have breached their contracts of insurance through a uniform and blanket denial of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19;

f. Whether Plaintiffs and the Class members suffered damages as a result of Defendants' actions.

181. **Typicality.** Fed. R. Civ. P. 23 (a)(3). Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Plaintiffs and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendants' unlawful conduct.

182. **Adequacy.** Fed. R. Civ. P. 23(a)(4). Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

183. **Superiority.** Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also

47

Comments from page 50 continued on next page

---

**Text Replaced**
[Old]: "of action in the alternative. 162."
[New]: "c. Whether Defendants' Business Income coverage applies to a suspension of business caused by COVID-19 and/or in response to the presence or threat of COVID-19; d. Whether Defendants' Extra Expense coverage applies to efforts to avoid or minimize a loss caused by COVID-19; e. Whether Defendants have breached their contracts of insurance through a uniform and blanket denial of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response"

**Text Replaced**
[Old]: "163. This Court has jurisdiction to declare"
[New]: "to the presence or threat of COVID-19; f. Whether Plaintiffs and the Class members suffered damages as a result of Defendants' actions."

**Text Deleted**
"Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class and the Orthodontics Business Income Coverage Subclass against Defendants under Missouri law."

**Text Replaced**
[Old]: "the rights and other legal relations pursuant"
[New]: "Typicality. Fed. R. Civ. P. 23 (a)(3). Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Plaintiffs and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendants' unlawful conduct."

Font "TimesNewRomanPSMT" changed to "TimesNewRomanPS-BoldMT".

**Text Inserted**
"181."

**Text Replaced**
[Old]: "to 28 U.S.C. §§ 2201-2202. 164."
[New]: "Adequacy. Fed. R. Civ. P. 23(a)(4). Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Accordingly,"

Font "TimesNewRomanPSMT" changed to "TimesNewRomanPS-BoldMT".

**Text Inserted**
"182."

**Text Deleted**
"The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the policies and other Class members' policies."

**Text Deleted**
"A covered loss has resulted in business suspensions, which have caused Plaintiffs and Class members losses."

**Text Deleted**
"166."

**Text Deleted**
"167."

**Text Replaced**
[Old]: "168. Plaintiffs and the"
[New]: "Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes."

**Text Deleted**
"Plaintiffs' Policies and the policies of other Business Income Coverage Class members and class members of the Orthodontics Business Income Coverage Subclass are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies."

**Text Deleted**
"In the Policies, Defendants expressly agreed to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the policy. Specifically, Defendants promised to pay for losses of Business Income sustained as a result of a business suspension."

**Text Deleted**
"165."

**Text Replaced**
[Old]: "other Class members have complied with all applicable provisions"
[New]: "Superiority. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy. Even if Class members themselves could afford such individual litigation, the court system"

c. Whether Defendants' Business Income coverage applies to a suspension of business caused by COVID-19 and/or in response to the presence or threat of COVID-19;

d. Whether Defendants' Extra Expense coverage applies to efforts to avoid or minimize a loss caused by COVID-19;

e. Whether Defendants have breached their contracts of insurance through a uniform and blanket denial of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19;

f. Whether Plaintiffs and the Class members suffered damages as a result of Defendants' actions.

181. **Typicality.** Fed. R. Civ. P. 23 (a)(3). Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Plaintiffs and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendants' unlawful conduct.

182. **Adequacy.** Fed. R. Civ. P. 23(a)(4). Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

183. **Superiority.** Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also

create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Finally, Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

184. **Injunctive and Declaratory Relief.** Fed. R. Civ. P. 23(b)(2). Defendants' unlawful and unfair conduct is uniform as to all members of each Class. Defendants have acted or refused to act on grounds that apply generally to each Class, so that final injunctive relief or declaratory relief is appropriate with respect to each Class as a whole.

185. In addition, particular issues are appropriate for certification under Fed. R. Civ. P. 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests thereon. Such particular issues include, but are not limited to:

    a. Whether the policies issued by Defendants cover Class members' Business Income losses and Extra Expenses due to the COVID-19 pandemic and public health and stay-at-home orders referred to herein;

    b. Whether the coverages for Business Income losses and Extra Epenses provided by Defendants' policies are precluded by exclusions or other limitations in those policies;

    c. Whether Defendants breached contracts by denying coverage for Business Income losses and Extra Expenses.



d.  Whether Defendants engaged in bad faith efforts to dissuade insureds from making claims for Business Income losses and Extra Expenses due to the COVID-19 pandemic; and

e.  Whether Plaintiff and Class members are entitled to actual damages and/or declaratory relief as a result of Defendants' wrongful conduct.

## VI. JURY DEMAND

186. Plaintiffs demand a trial by jury on all claims so triable.

### COUNT I: BUSINESS INCOME BREACH OF CONTRACT
### (By Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass)

187. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

188. Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class and Orthodontics Business Income Coverage Subclass against Defendants under Missouri law.

189. Plaintiffs' Policies and the policies of other Business Income Coverage Class and Orthodontics Business Income Coverage Subclass Members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiffs for their covered losses under the Policies and for Class members' covered losses.

190. In Plaintiffs' policies, Defendants expressly agree to pay for losses of Business Income incurred as a result of causes not excluded, including losses caused by the COVID-19 pandemic. Specifically, Defendants promise to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

49

Text Replaced
[Old]: "Class members' policies. 170."
[New]: "d. Whether Defendants engaged in bad faith efforts to dissuade insureds from making claims for Business Income losses and Extra Expenses due to the COVID-19 pandemic; and e. Whether Plaintiff and Class members are entitled to actual damages and/or declaratory relief as a result of Defendants' wrongful conduct. VI. JURY DEMAND 186. Plaintiffs demand a trial by jury on all claims so triable. COUNT I: BUSINESS INCOME BREACH OF CONTRACT (By Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass)"

Text Deleted
"172."

Text Deleted
"A case or controversy exists regarding Class members' rights and Defendants' obligations under the terms of the Class members' policies. COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT (By Plaintiffs, the Extra Expense Coverage Class, and the Orthodontics Extra Expense Coverage Subclass)"

Text Replaced
[Old]: "Plaintiffs and the Class members seek a judicial determination of whether the policies provide coverage for Plaintiffs' and Class members' losses."
[New]: "187."

Text Deleted
"171."

Text Replaced
[Old]: "173."
[New]: "Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class and Orthodontics Business Income Coverage Subclass against Defendants under Missouri law."

Text Inserted
"188."

Text Replaced
[Old]: "174."
[New]: "Plaintiffs' Policies and the policies of other Business Income Coverage Class and Orthodontics Business Income Coverage Subclass Members are insurance contracts under which Defendants were paid premiums in exchange for promise to pay Plaintiffs for their covered losses under the Policies and for Class members' covered losses."

Text Replaced
[Old]: "Plaintiffs bring this claim individually and on behalf of the Extra Expense Coverage Class and the Orthodontics Extra Expense Coverage Subclass against Defendants under Missouri law."
[New]: "189."

Text Replaced
[Old]: "175."
[New]: "In Plaintiffs' policies, Defendants expressly agree to pay for losses of Business Income incurred as a result of causes not excluded, including losses caused by the COVID-19 pandemic. Specifically, Defendants promise to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension."

Text Replaced
[Old]: "Plaintiffs' policies and the policies of other Extra Expense Coverage Class members and members of the Orthodontic Extra Expense Coverage Subclass are insurance contracts under which Defendants were paid premiums in exchange for promise to pay Class members' losses for claims covered by the Policies."
[New]: "190."

Text Replaced
[Old]: "42"
[New]: "49"

191. A covered loss has resulted in business suspensions, which have caused Plaintiffs and Class members lost Business Income and Extended Business Income.

192. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under Plaintiffs' policies and other Class members' policies.

193. Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

194. Defendants, without justification, have refused performance under Plaintiffs' policies and other Class members' policies by denying coverage for these losses and such denials were vexatious and without reason. Accordingly, Defendants are in breach of the policies and other Class members' policies.

195. Due to Defendants' breach of Plaintiffs' policies and other Class members' policies, Plaintiffs and other members of the Business Income Coverage Class and Orthodontics Business Income Coverage Subclass have suffered actual and substantial damages for which Defendants are liable, including additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420, in an amount to be proved at trial.

**COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME**
**(By Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass)**

196. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

197. Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class and Orthodontics Business Income Coverage Subclass against Defendants under Missouri law.

Comments from page 53 continued on next page

---

**Markup Comments:**

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 46 of 51 PageID #: 311"

Text Replaced
[Old]: "176."
[New]: "A covered loss has resulted in business suspensions, which have caused Plaintiffs and Class members lost Business Income and Extended Business Income."

Text Replaced
[Old]: "In Plaintiffs' policies and the policies of other Extra Expense Coverage Class members, Defendants expressly agree to pay for extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiffs' and Class members' premises, to repair or replace any property, and other expenses."
[New]: "191."

Text Replaced
[Old]: "177. The extra expenses triggered the Extra Expense"
[New]: "The business suspensions and losses triggered the Business Income and Extended Business Income"

Text Replaced
[Old]: "A covered loss has resulted in a business suspension. These suspensions have caused Plaintiffs and Class members to incur extra expenses."
[New]: "192."

Text Deleted
"178."

Text Inserted
"193."

Text Deleted
"179."

Text Inserted
"194."

Text Replaced
[Old]: "the"
[New]: "Plaintiffs'"

Text Deleted
"expenses and"

Text Deleted
"180."

Text Inserted
"195."

Text Replaced
[Old]: "member"
[New]: "members"

Text Replaced
[Old]: "Class members"
[New]: "members of the Business Income Coverage Class and Orthodontics Business Income Coverage Subclass"

Text Replaced
"COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME (By Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass)"

Text Deleted
"181."

Text Replaced
[Old]: "COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO EXTRA EXPENSE (By Plaintiffs, the Extra Expense Coverage Class, and the Orthodontics Extra Expense Coverage Subclass)"
[New]: "196."

Font "TimesNewRomanPS-BoldMT" changed to "TimesNewRomanPSMT".

Text Deleted
"182."

Text Replaced
[Old]: "Extra Expense Class and the Orthodontics Extra Expense"

191. A covered loss has resulted in business suspensions, which have caused Plaintiffs and Class members lost Business Income and Extended Business Income.

192. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under Plaintiffs' policies and other Class members' policies.

193. Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

194. Defendants, without justification, have refused performance under Plaintiffs' policies and other Class members' policies by denying coverage for these losses and such denials were vexatious and without reason. Accordingly, Defendants are in breach of the policies and other Class members' policies.

195. Due to Defendants' breach of Plaintiffs' policies and other Class members' policies, Plaintiffs and other members of the Business Income Coverage Class and Orthodontics Business Income Coverage Subclass have suffered actual and substantial damages for which Defendants are liable, including additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420, in an amount to be proved at trial.

**COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME**
**(By Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass)**

196. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

197. Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class and Orthodontics Business Income Coverage Subclass against Defendants under Missouri law.

198. Defendants have breached the duty of good faith and fair dealing owed to Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass in the following respects:

    a. Unreasonably acting or failing to act in a manner that deprives Plaintiffs and the Class of the benefits of their policies;

    b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiffs and the Class of the benefits of their policies;

    c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiffs' and the Class' claims;

    d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiffs' and the Class' policies;

    e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiffs' and the Class' claims;

    f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiffs' and the Class' claims;

    g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiffs' and the Class' losses;

    h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

    i. Unreasonably failing to give at least as much consideration to the interests of Plaintiffs and the Class as they give to their own interests;

    j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

    k. Unreasonably placing their own financial interests above the interests of Plaintiffs and the Class; and

    l. Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds.

199. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing.

200. As a result of this breach, Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass have been damaged in an amount to be proven at trial, including additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420.

**COUNT III: DECLARATORY RELIEF APPLICABLE TO BUSINESS INCOME**
**(By Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass)**

201. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

202. Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class and the Orthodontics Business Income Coverage Subclass against Defendants under Missouri law.

203. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

204. Plaintiffs' Policies and the policies of other Business Income Coverage Class members and class members of the Orthodontics Business Income Coverage Subclass are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

205. In the Policies, Defendants expressly agreed to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the policy. Specifically, Defendants promised to pay for losses of Business Income sustained as a result of a business suspension.

206. A covered loss has resulted in business suspensions, which have caused Plaintiffs and Class members losses.

Text Inserted
"200. As a result of this breach, Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass have been damaged in an amount to be proven at trial, including additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420. COUNT III: DECLARATORY RELIEF APPLICABLE TO BUSINESS INCOME (By Plaintiffs, the Business Income Coverage Class, and the Orthodontics Business Income Coverage Subclass) 201. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative. 202. Plaintiffs bring this claim individually and on behalf of the Business Income Coverage Class and the Orthodontics Business Income Coverage Subclass against Defendants under Missouri law. 203. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202. 204. Plaintiffs' Policies and the policies of other Business Income Coverage Class members and class members of the Orthodontics Business Income Coverage Subclass are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies. 205. In the Policies, Defendants expressly agreed to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the policy. Specifically, Defendants promised to pay for losses of Business Income sustained as a result of a business suspension. 206. A covered loss has resulted in business suspensions, which have caused Plaintiffs and Class members losses."

Text Inserted
"52"

207.  The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the policies and other Class members' policies.

208.  Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

209.  Defendants, without justification, have refused performance under the policies and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the policies and other Class members' policies.

210.  Plaintiffs and the Class members seek a judicial determination of whether the policies provide coverage for Plaintiffs' and Class members' losses.

211.  A case or controversy exists regarding Class members' rights and Defendants' obligations under the terms of the Class members' policies.

**COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT**
**(By Plaintiffs, the Extra Expense Coverage Class, and the Orthodontics Extra Expense Coverage Subclass)**

212. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

213. Plaintiffs bring this claim individually and on behalf of the Extra Expense Coverage Class and the Orthodontics Extra Expense Coverage Subclass against Defendants under Missouri law.

214. Plaintiffs' policies and the policies of other Extra Expense Coverage Class members and members of the Orthodontic Extra Expense Coverage Subclass are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policies.

53

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 47 of 51 PageID #: 312"

Text Replaced
[Old]: "183."
[New]: "207. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the policies and other Class members' policies. 208. Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums. 209. Defendants, without justification, have refused performance under the policies and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the policies and other Class members' policies. 210. Plaintiffs and the Class members seek a judicial determination of whether the policies provide coverage for Plaintiffs' and Class members' losses. 211. A case or controversy exists regarding Class members' rights and Defendants' obligations under the terms of the Class members' policies. COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT (By Plaintiffs, the Extra Expense Coverage Class, and the Orthodontics Extra Expense Coverage Subclass) 212. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative. 213. Plaintiffs bring this claim individually and on behalf of the Extra Expense Coverage Class and the Orthodontics Extra Expense Coverage Subclass against Defendants under Missouri law. 214. Plaintiffs' policies and the policies of other Extra Expense Coverage Class members and members of the Orthodontic Extra Expense Coverage Subclass are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policies."

Text Inserted
"53"

215. In Plaintiffs' policies and the policies of other Extra Expense Coverage Class members, Defendants expressly agree to pay for extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiffs' and Class members' premises, to repair or replace any property, and other expenses.

216. A covered loss has resulted in a business suspension. These suspensions have caused Plaintiffs and Class members to incur extra expenses.

217. The extra expenses triggered the Extra Expense coverage under Plaintiffs' policies and other Class members' policies.

218. Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

219. Defendants, without justification, have refused performance under the policies and other Class members' policies by denying coverage for these losses and expenses and such denials were vexatious and without reason. Accordingly, Defendants are in breach of the policies and other Class members' policies.

220. Due to Defendants' breach of Plaintiffs' policies and other Class member policies, Plaintiffs and other Class members have suffered actual and substantial damages for which Defendants are liable, including additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420, in an amount to be proved at trial.

54

Text Inserted
"215. In Plaintiffs' policies and the policies of other Extra Expense Coverage Class members, Defendants expressly agree to pay for extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiffs' and Class members' premises, to repair or replace any property, and other expenses. 216. A covered loss has resulted in a business suspension. These suspensions have caused Plaintiffs and Class members to incur extra expenses. 217. The extra expenses triggered the Extra Expense coverage under Plaintiffs' policies and other Class members' policies. 218. Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums. 219. Defendants, without justification, have refused performance under the policies and other Class members' policies by denying coverage for these losses and expenses and such denials were vexatious and without reason. Accordingly, Defendants are in breach of the policies and other Class members' policies. 220. Due to Defendants' breach of Plaintiffs' policies and other Class member policies, Plaintiffs and other Class members have suffered actual and substantial damages for which Defendants are liable, including additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420, in an amount to be proved at trial."

Text Inserted
"54"

**COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO EXTRA EXPENSE**
**(By Plaintiffs, the Extra Expense Coverage Class, and the Orthodontics Extra Expense Coverage Subclass)**

221. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

222. Plaintiffs bring this claim individually and on behalf of the Extra Expense Class and the Orthodontics Extra Expense Coverage Subclass against Defendants under Missouri law.

223. Defendants have breached the duty of good faith and fair dealing owed to Plaintiffs, the Extra Expense Class, and the Orthodontics Extra Expense Subclass with respect to the Extra Expense provisions in the following respects:

    a. Unreasonably acting or failing to act in a manner that deprives Plaintiffs and the Class the benefits of their policies;

    b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiffs and the Class of the benefits of their policies;

    c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiffs and the Class' claims;

    d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiffs' and the Class' policies;

    e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiffs' and the Class' claims;

    f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiffs' and the Class' claims;

    g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiffs' and the Class' losses;

    h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

Text Inserted
"COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO EXTRA EXPENSE (By Plaintiffs, the Extra Expense Coverage Class, and the Orthodontics Extra Expense Coverage Subclass) 221. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative. 222. Plaintiffs bring this claim individually and on behalf of the Extra Expense Class and the Orthodontics Extra Expense Coverage Subclass against Defendants under Missouri law. 223."

Text Replaced
[Old]: "44"
[New]: "55"

 i. Unreasonably failing to give at least as much consideration to the interests of Plaintiffs and the Class as they give to their own interests;

 j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

 k. Unreasonably placing their own financial interests above the interests of Plaintiffs and the Class; and

 l. Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds.

224. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of the policies.

225. As a result of this breach, Plaintiffs, the Extra Expense Class, and the Orthodontics Extra Expense Coverage Subclass have been damaged in an amount to be proven at trial, including additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420.

**COUNT VI: DECLARATORY RELIEF APPLICABLE TO EXTRA EXPENSE**
**(By Plaintiffs, the Extra Expense Class and the Orthodontics Extra Expense Coverage Subclass)**

226. Plaintiffs reallege and incorporate by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

227. Plaintiffs bring this claim individually and on behalf of the Extra Expense Class and the Orthodontics Extra Expense Coverage Subclass against Defendants under Missouri law.

228. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

229. Plaintiffs' policies and the policies of other Extra Expense Class members and members of the Orthodontic Extra Expense Coverage Subclass are insurance contracts under which

Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

230. In Plaintiffs' policies and the policies of other Extra Expense Class members and members of the Orthodontic Extra Expense Coverage Subclass, Defendants expressly agree to pay extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiffs' and Class members' premises, to repair or replace any property, and other expenses.

231. The COVID-19 pandemic has caused Plaintiffs and members of the Extra Expense Class and the Orthodontic Extra Expense Coverage Subclass covered losses.

232. These covered losses have resulted, and will result, in extra expenses, which have caused Plaintiffs and Class members losses.

233. The extra expenses triggered the Extra Expense coverage under Plaintiffs' policies and other Class members' policies.

234. Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

235. Defendants, without justification, have refused performance under Plaintiffs' policies and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of Plaintiffs' policies and other Class members' policies.

236. Plaintiffs and the Class members seek a judicial determination of whether the Extra Expense provisions of the policies provide coverage for Plaintiffs' and Class members' losses.

57



Text Replaced
[Old]: "190."
[New]: "230."

Text Deleted
"Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 49 of 51 PageID #: 314"

Text Replaced
[Old]: "191."
[New]: "231."

Text Replaced
[Old]: "192."
[New]: "232."

Text Replaced
[Old]: "193."
[New]: "233."

Text Replaced
[Old]: "194."
[New]: "234."

Text Replaced
[Old]: "195."
[New]: "235."

Text Replaced
[Old]: "196."
[New]: "236."

Text Replaced
[Old]: "46"
[New]: "57"

237. An actual case or controversy exists regarding Extra Expense Class members' rights and Defendants' obligations under the terms of the Extra Expense provisions of Plaintiffs' policies and other Class members' policies.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment against Defendants, as follows:

1. An order certifying appropriate classes and/or subclasses, designating Plaintiffs as the class representatives and their counsel as class counsel;

2. A judicial declaration declaring the meaning of the provisions concerning the Business Income and Extra Expense coverage;

3. An award of damages to Plaintiffs and the Class in an amount to be determined at trial;

4. An award of additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420;

5. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded, as allowed by law;

6. An award of costs and attorneys' fees, as allowed by law; and

6. Such other or further relief as may be appropriate.

Dated: November 19, 2020          Respectfully submitted,

**LAW OFFICE OF RICHARD S. CORNFELD, LLC**

By:   _/s/ Richard S. Cornfeld_
          Richard S. Cornfeld, #31046MO
          Daniel S. Levy, #66039MO
          1010 Market Street, Suite 1645
          St. Louis, Missouri 63101
          P. 314-241-5799
          F. 314-241-5788
          rcornfeld@cornfeldlegal.com

58

dlevy@cornfeldlegal.com

And

Anthony S. Bruning, #30906MO
Anthony S. Bruning, Jr., #60200MO
Ryan J. Bruning, #62773MO
THE BRUNING LAW FIRM, LLC
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
P. 314-735-8100 / F. 314-898-3078
tony@bruninglegal.com
aj@bruninglegal.com
ryan@bruninglegal.com

And

Alfredo Torrijos (*Pro Hac Vice* to be submitted)
ARIAS SANGUINETTI WANG & TORRIJOS, LLP
6701 Center Drive West, 14th Floor
Los Angeles, CA
T: (310) 844-9696
F: (310) 861-0168
alfredo@aswtlawyers.com

And

Mark C. Goldenberg, #0990221
Thomas P. Rosenfeld #06301406
Kevin P. Green #06299905
GOLDENBERG HELLER & ANTOGNOLI, P.C.
2227 South State Route 157
Edwardsville, IL 62025
618-656-5150
mark@ghalaw.com
tom@ghalaw.com
kevin@ghalaw.com

***Attorneys for Plaintiffs***

59

---

**Annotations:**

- **Text Deleted:** "Case: 4:20-cv-00643-SRC Doc. #: 17 Filed: 07/29/20 Page: 51 of 51 PageID #: 316"
- **Text Inserted:** "And Mark C. Goldenberg, #0990221 Thomas P. Rosenfeld #06301406 Kevin P. Green #06299905 GOLDENBERG HELLER & ANTOGNOLI, P.C. 2227 South State Route 157 Edwardsville, IL 62025 618-656-5150"
- **Annotation Inserted**
- **Text Inserted:** "mark@ghalaw.com"
- **Annotation Inserted**
- **Text Inserted:** "tom@ghalaw.com"
- **Annotation Inserted**
- **Text Inserted:** "kevin@ghalaw.com"
- **Text Replaced:** [Old]: "47" [New]: "59"

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of November, 2020, the foregoing was filed with the Court Clerk via the Court's electronic filing system and served on upon all counsel of record via the Court's electronic notification system.

_/s/ Richard S. Cornfeld_