**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT E. LEVY, D.M.D., LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.:  4:20-cv-00643-SRC |
| | ) | |
| HARTFORD FINANCIAL SERVICES | ) | |
| GROUP INC., et al., | ) | |
| | ) | |
| Defendants, | ) | |

**Memorandum and Order**

The COVID-19 pandemic—the coronavirus—has caused many disruptions in various aspects of daily life.  In this case, several dentists shut down their practices in the wake of governmental and dental-association guidance aimed at slowing the spread of the virus.  The dentists then filed claims on their insurance policies to recoup their losses, but the insurers denied the claims on the basis of the policies' virus exclusion, and now move for judgment on the pleadings.  Doc. 56.  The Court now addresses that motion and determines whether the policies exclude coverage for the coronavirus-related shutdowns of the dentists' practices.

## I.      Background

Plaintiffs allege that they purchased insurance from Defendants to protect their dental practices against losses from catastrophic events.  During the onset of the COVID-19 pandemic, Plaintiffs shut down their practices entirely, or only saw a few emergency patients, and made claims under their insurance policies for the losses caused by the shutdowns.  Defendants denied each claim, asserting that the policies did not cover losses caused by the COVID-19 pandemic, and therefore they had no obligation to provide any coverage.

Plaintiffs assert six claims: 1) business income breach of contract; 2) breach of the implied covenant of good faith and fair dealing applicable to business income 3) declaratory relief applicable to business income; 4) extra expense breach of contract; 5) breach of the implied covenant of good faith and fair dealing applicable to extra expense; and 6) declaratory relief applicable to extra expense.  Plaintiffs also seek to represent four classes of plaintiffs allegedly holding similar policies and suffering similar losses from the COVID-19 pandemic.

After Twin City, Sentinel, and Hartford Casualty answered Plaintiffs first amended complaint, Hartford Financial Services Group filed a motion to dismiss.  Docs. 21–22.  The Court granted Hartford Financial's motion to dismiss without prejudice.  Doc. 48.  Plaintiffs then sought leave to file a second amended complaint to raise additional allegations regarding Hartford Financial.  Doc. 51.  The Court held a status conference, during which it denied without prejudice the motion for leave to file a second amended complaint.  Docs. 52, 53.  At that conference, counsel for Defendants advised the Court that Defendants intended to bring a motion for judgment on the pleadings as to the remaining defendants.  Defendants subsequently filed that motion, which the Court addresses below.

## II.    Standard

Rule 12(c) of the Federal Rules of Civil Procedure provides that after the pleadings are closed, a party may move for judgment on the pleadings.  A motion under Rule 12(c) is determined by the same standards applied to a motion under Rule 12(b)(6).  *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1233 n.3 (8th Cir. 2010).  To survive a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  A plaintiff need not provide specific facts in support of his allegations, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam), but "must include sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level." *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008) (citing *Twombly*, 550 U.S. at 555 & n.3).  This obligation requires a plaintiff to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id*. at 562 (quoted case omitted).  This standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim or element]." *Id*. at 556.

On a motion to dismiss, the court accepts as true all of the factual allegations contained in the complaint, even if it appears that "actual proof of those facts is improbable," *id*. at 556, and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief.  *Id*. at 550 U.S. at 555–56; Fed. R. Civ. P. 8(a)(2).  The principle that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions, however.  *Iqbal*, 556 U.S. at 678 (stating "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").  Although legal conclusions can provide the framework for a complaint, the pleader must support them with factual allegations.  *Id*. at 679.  The court reviews the plausibility of the plaintiff's claim "as a whole, not the plausibility of each individual allegation." *Zoltek Corp. v. Structural Polymer Group*, 592 F.3d 893, 896 n.4 (8th Cir. 2010).

"When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint as well as materials that are necessarily embraced by the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (internal citations omitted); *see also Cent. Telecommunications, Inc. v. City of Jefferson City, Mo*., 589 F. Supp. 85, 91 (W.D. Mo. Feb. 29, 1984) ("The scope of a court's inquiry on a Rule 12(b)(6) motion is limited to the pleadings.").

## III.  Discussion

### A.  Breach of contract and declaratory judgment (Counts I, III, IV, VI)

Plaintiffs assert that the policies provide coverage for Plaintiffs' losses and Defendants failure to pay constitutes a breach of contract.  Plaintiffs also seek a declaratory judgment that their policies provide coverage for the alleged losses.  These claims necessarily depend on an interpretation of the insurance policies at issue.

#### 1.  The policies

Plaintiffs each purchased business-interruption insurance from Defendants.  Docs. 17-1, 17-2, 17-3, 17-4, 17-5.  Under the "Special Property Coverage Form," the policies provide that Defendants:

> will pay for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called "scheduled premises" in this policy) caused by or resulting from a Covered Cause of Loss.

Docs. 17-1 at p. 31, 17-2 at p. 32, 17-3 at p. 33, 17-4 at p. 28, 17-5 at p. 33.  The policies define "Covered Cause of Loss" as:

> RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
>
> **a.**  Excluded in Section **B., EXCLUSIONS**; or

4

   **b.** Limited in Paragraph **A.4**.

Docs. 17-1 at p. 32, 17-2 at p. 33, 17-3 at p. 34, 17-4 at p. 29, 17-5 at p. 34.  The policies provide

additional coverage for business income, extended business income, and extra expense as

follows:

 **o.** **Business Income**

  **(1)** We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises," including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises," caused by or resulting from a Covered Cause of Loss.

   . . .

  **(5)** With respect to the coverage provided in this Additional Coverage, suspension means:

   **(a)** The partial slowdown of your business activities; or

   **(b)** That part or all of the "scheduled premises" is rendered untenantable as a result of a Covered Cause of Loss if coverage for Business Income applies to the policy.

 **p.** **Extra Expense**

  **(1)** We will pay reasonable and necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or physical damage to property at the "scheduled premises," including personal property in the open (or in a vehicle) within 1,000 feet, caused by or resulting from a Covered Cause of Loss.

. . .

 **r.** **Extended Business Income**

  **(1)** If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

   **(a)** Begins on the date property is actually repaired, rebuilt or replaced . . . .

. . .

Loss of Business Income must be caused by direct physical loss or physical damage at the "scheduled premises" caused by or resulting from a Covered Cause of Loss.

Docs. 17-1 at 40–41, 17-2 at 41–42, 17-3 at 42–43, 17-4 at 37–38, 17-5 at 42–43.  The policies define "period of restoration" as the period of time that:

**a.** Begins with the date of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the "scheduled premises", and

**b.** Ends on the date when:

**(1)** The property at the "scheduled premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality;

**(2)** The date when your business is resumed at a new, permanent location.

Docs. 17-1 at p. 54, 17-2 at p. 55, 17-3 at p. 56, 17-4 at p. 51, 17-5 at p. 56.  By endorsement, Paragraph B.1 of the Specialty Coverage Form contains an exclusion for "fungi," wet rot, dry rot, bacteria, and virus.  This exclusion provides that Defendants:

will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

**(1)** Presence, growth, proliferation, spread or any activity of "fungi", wet rot, dry rot, bacteria or virus.

**(2)** But if "fungi", wet rot, dry rot, bacteria or virus results in a "specified cause of loss" to Covered Property, we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)** When "fungi", wet or dry rot, bacteria or virus results from fire or lightning; or

**(2)** To the extent that coverage is provided in the Additional Coverage – Limited Coverage for "Fungi", Wet Rot, Dry Rot, Bacteria and Virus with respect to loss or damage by a cause of loss other than fire or lightning.

6

This exclusion applies whether or not the loss event results in widespread damage or affects a substantial area.

Docs. 17-1 at p. 136, 17-2 at p. 136, 17-3 at p. 128, 17-4 at p. 128, 17-5 at p. 137.  The

"Additional Coverage –Limited Coverage for "Fungi", Wet Rot, Dry Rot, Bacteria and Virus"

referenced in the exclusion provides:

**1.  Limited Coverage For "Fungi", Wet Rot, Dry Rot, Bacteria and Virus**

    **a.** The coverage described in **1.b.** below only applies when the "fungi", wet or dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

        **(1)** A "specified cause of loss" other than fire or lightning;

        **(2)** Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises

    **b.** We will pay for loss or damage by "fungi", wet rot, dry rot, bacteria and virus. As used in this Limited Coverage, the term loss or damage means:

        **(1)** Direct physical loss or direct physical damage to Covered Property caused by "fungi", wet rot, dry rot, bacteria or virus, including the cost of removal of the "fungi", wet rot, dry rot, bacteria or virus;

        **(2)** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot, dry rot, bacteria or virus; and

        **(3)** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot, dry rot, bacteria or virus are present.

   . . .

    **f.** The following applies only if a Time Element Coverage applies to the "scheduled premises" and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Time Element Coverage.

        **(1)** If the loss which resulted in "fungi", wet or dry rot, bacteria or virus does not in itself necessitate a suspension of "operations", but such

> suspension is necessary due to loss or damage to property caused by "fungi", wet or dry rot, bacteria or virus, then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive. If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet or dry rot, bacteria or virus, but remediation of "fungi", wet or dry rot, bacteria or virus prolongs the "period of restoration", we will pay for loss and expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive.

Docs. 17-1 at p. 137, 17-2 at p. 137, 17-3 at p. 129, 17-4 at p. 129, 17-5 at p. 138.  The policies

define "specified cause of loss" as:

> Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

Docs. 17-1 at p. 55, 17-2 at p. 56, 17-3 at p. 57, 17-4 at p. 52, 17-5 at p. 57.  The Policies define

"equipment breakdown accident" as:

> **(a)** Mechanical breakdown, including rupture or bursting caused by centrifugal force
>
> **(b)** Artificially generated electric current, including electric arcing, that disturbs electrical devices, appliances or wires.
>
> **(c)** Explosion of steam boilers, steam piping, steam engines or steam turbines owned or leased by you, or operated under your control.
>
> **(d)** Physical loss or physical damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such boilers or equipment.
>
> **(e)** Physical loss or physical damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

Docs. 17-1 at p. 34, 17-2 at p. 35, 17-3 at p. 36, 17-4 at p. 31, 17-5 at p. 36.

### 2.      Applicable law

The parties agree that Missouri state law applies.  Doc. 57 at p. 13 n.3, 58 at p. 10.  "The interpretation of an insurance policy is a question of law[,]" *McCormack Baron Mgmt. Servs., Inc. v. Am. Guarantee & Liab. Ins. Co.,* 989 S.W.2d 168, 171 (Mo. 1999), to which Missouri courts apply general contract-interpretation principles.  *Gohagan v. Cincinnati Ins. Co.*, 809 F.3d 1012, 1015 (8th Cir. 2016) (citing *Todd v. Mo. United Sch. Ins. Council,* 223 S.W.3d 156, 160 (Mo. 2007).  "In disputes over the meaning of contract language, '[t]he key is whether the contract language is ambiguous or unambiguous.'"  *Id.* (quoting *Todd*, 223 S.W.3d at 160).  The Court must give effect to the intention of the parties, which "is presumptively expressed by the 'plain and ordinary meaning' of the policy's provisions," *id.* (quoting *Secura Ins. v. Horizon Plumbing, Inc.,* 670 F.3d 857, 861 (8th Cir. 2012)), which the court reads "in the context of the policy as a whole."  *Id.* (quoting *Secura Ins*., 670 F.3d at 861)).  The Court resolves any ambiguities in the policy in favor of the insured.  *Id.* (citing *Rice v. Shelter Mut. Ins. Co.*, 301 S.W.3d 43, 47 (Mo. 2009)).

### 3.      Virus Exclusion

Defendants argue that the virus exclusion bars Plaintiffs' claims.  In short, Defendants state that the virus exclusion applies to the Special Property Coverage Form, which contains each of the coverages under which Plaintiffs seek to recover.  Defendants further contend that because Plaintiffs' alleged losses fall within the virus exclusion, the Plaintiffs cannot recover under the policies.  The Court agrees.

Plaintiffs allege that as a result of the COVID-19 pandemic, the Centers for Disease Control and American Dental Association recommended to dentists and orthodontists "in the United States that elective, or non-urgent dental procedures be postponed to help reduce the risk of spreading

COVID-19," and that the Missouri Dental Board "urged" the same.  *See* Doc. 17 at ¶¶ 7–8, 57.
Plaintiffs shut down their practices except for urgent problems in response to these
recommendations and because of the risk of continuing their dental practices during the COVID-
19 pandemic.  *See id.* at ¶ 9.  Plaintiffs further allege that their "losses were caused by the
worldwide pandemic and, as recommended by the CDC and dental organizations, the need to
prevent it from spreading to their employees, patients and others."  *See id.* at ¶ 113.  Simply put,
Plaintiffs allege their losses were caused by efforts to prevent the spread of COVID-19.  The
alleged losses fall squarely within the virus exclusion, which unambiguously bars coverage for
losses "directly or indirectly" caused by the "spread or any activity of . . . [a] virus."

The Court's conclusion aligns with the decisions of other federal courts, which have
nearly unanimously found the plain language of the virus exclusion at issue unambiguous and
that losses caused by COVID-19 related shutdowns fall within the exclusion.  *See Wilson v.
Hartford Cas. Ins. Co.*, No. CV 20-3384, 2020 WL 5820800, at *9 (E.D. Pa. Sept. 30, 2020)
(dismissing all of the plaintiff's COVID-19 claims with prejudice "since the virus exclusion and
its exemptions are clear and unambiguous"); *Founder Inst. Inc. v. Hartford Fire Ins. Co.,* No. 20-
cv-04466-VC, 2020 WL 6268539, at *1 (N.D. Cal. Oct. 22, 2020) ("Assuming—for argument's
sake only—that the claim for loss of business income due to the shelter-in-place orders would
otherwise be covered by Founder's insurance policy, the claim clearly falls within the virus
exclusion"); *Nahmad v. Hartford Cas. Ins. Co.*, No. 1:20-CV-22833, 2020 WL 6392841, at *9
(S.D. Fla. Nov. 2, 2020) ("[T]he Court does not agree that Plaintiffs' distinction between the
government orders versus the virus as the immediate cause of their losses avoids the plain
language of the virus exclusion."); *Franklin EWC, Inc. v. Hartford Fin. Servs. Grp., Inc.*, No. 20-
cv-04434 JSC, 2020 WL 5642483, at *2 (N.D. Cal. Sept. 22, 2020) (deciding that "the Virus

Exclusion applies under its plain and unambiguous language" because the insured's "loss was caused directly or indirectly by the virus").

Plaintiffs offer a few arguments why the exclusion does not apply.  First, Plaintiffs suggest that Defendants' decision to draft its own virus exclusion rather than the "virus exclusion language drafted by the Insurance Service Office which is common in policies by other insurers" resulted in a "disjointed and confusing exclusion."  Doc. 58 at pp. 13–14.  This argument simply amounts to stating that Defendants could have drafted a clearer exclusion; but that does not mean that the exclusion at issue is ambiguous.

Next, Plaintiffs do not directly dispute that COVID-19 caused their losses, instead arguing that for the virus exclusion to apply, the virus must have been present at the insured property.  Doc. 58 at pp. 9–10.  In a related argument, Plaintiffs also suggest that the exclusion's grouping of "virus" with non-disease-causing agents such as "dry rot" and "wet rot" establishes that the exclusion precludes coverage for contamination arising at the insured premises.  Doc. 58 at p. 15.  In support of the latter argument, Plaintiffs cite *Urogynecology Specialist of Florida LLC v. Sentinel Insurance Company, Ltd*., 2020 WL 5939172 (M.D. Fla. Sept. 24, 2020). Evaluating the same exclusion as the one present here, the Court found that "denying coverage for losses stemming from COVID-19, however, does not logically align with the grouping of the virus exclusion with other pollutants such that the Policy necessarily anticipated and intended to deny coverage for these kinds of business losses."  *Id*. at *4.

Plaintiffs construe the exclusion too narrowly in making these arguments, as the virus exclusion also applies to the "growth," "proliferation," "spread," or "any activity" of a virus. Moreover, the exclusion applies regardless of whether the claimed loss is "caused directly or indirectly" by a virus.  Docs. 17-1 at p. 136, 17-2 at p. 136, 17-3 at p. 128, 17-4 at 128, 17-5 at p.

137.  Put together, the virus exclusion can apply to "any activity" of a virus that "indirectly" causes a business income loss.  Thus, the language of policy provides that a virus need not be present on the premises or arise from contamination on the premises for the exclusion to apply.

Other federal courts have likewise found that the same or similar exclusions apply even when the plaintiffs do not allege that the virus was present on the insured premises.  *See Nahmad*, 2020 WL 6392841, at *10 n. 5 (S.D. Fla. Nov. 2, 2020) (finding that the same virus exclusion applied even though the "complaint does not allege that coronavirus was present at the premises" because onsite contamination not required); *LJ New Haven LLC v. Amguard Ins. Co.*, No. 3:20-CV-00751 (MPS), 2020 WL 7495622, at *6 (D. Conn. Dec. 21, 2020) (explaining that the virus exclusion "includes no suggestion that it is limited to situations in which the virus has contaminated the insured's premises"); *Diesel Barbershop, LLC v. State Farm Lloyds*, No. 5:20-CV-461-DAE, 2020 WL 4724305, *6 (W.D. Tex. Aug. 13, 2020).

Additionally, *Urogynecology* is distinguishable from this case, and from the cases holding that the virus exclusion precludes coverage.  The *Urogynecology* court declined to reach "a decision on the merits of the plain language of the policy" because certain "forms" referenced in the exclusion for loss caused by a "virus" were not included in the policy or provided to the court.  2020 WL 5939172, at *4.  In contrast, courts that have examined the entire policy have found the policy language unambiguous and reject *Urogynecology*'s conclusion.  *See 1210 McGavock St. Hosp. Partners, LLC v. Admiral Indem. Co.*, No. 3:20-CV-694, 2020 WL 7641184, at *6 (M.D. Tenn. Dec. 23, 2020); *N&S Rest. LLC v. Cumberland Mut. Fire Ins. Co.*, No. CV2005289RBKKMW, 2020 WL 6501722, at *5 (D.N.J. Nov. 5, 2020).  The Court has been provided the entire policy and, like most courts evaluating the same or similar exclusions,

concludes that the virus exclusion unambiguously excludes coverage for business losses caused by measures meant to slow-down the spread of COVID-19.

Finally, the Court briefly addresses Plaintiffs' allegations that Defendants should be estopped from enforcing the virus exclusion under the principles of regulatory estoppel and public policy.  Doc. 17 at ¶ 115.  Plaintiffs allege that insurance industry groups made false statements to regulators to secure the approval of the virus exclusion and thus Defendants cannot apply the exclusion as a result.  *Id*. at ¶¶ 116–25.  Defendants assert numerous arguments why estoppel does not apply in its motion for judgment on the pleadings, Doc. 57 at pp. 13–16, and Plaintiffs fail to oppose these arguments in its opposition.

As an initial matter, the parties do not cite, and the Court has not found, any case applying Missouri law that has applied the doctrine of regulatory estoppel in any context even arguably analogous to the present.  Additionally, courts may not consider extrinsic evidence when the contract language is unambiguous.  *J.C. Penney Life Ins. Co. v. Transit Cas. Co. in Receivership*, 299 S.W.3d 668, 673 (Mo. Ct. App. 2009) (citation omitted).  Because the Court has concluded that the virus exclusion is unambiguous, it cannot consider the statements made to regulators.

Even if an equitable doctrine applied, Plaintiffs have not pleaded any inconsistency with the statements made by the insurance industry groups and the position Defendants take in this case.  *See Shores v. Express Lending Servs., Inc.*, 998 S.W.2d 122, 127 (Mo. Ct. App. 1999) (explaining that equitable estoppel under Missouri law requires "an admission, statement, or act by the person to be estopped that is inconsistent with the claim that is later asserted and sued upon").  Plaintiffs allege that the industry groups made statements in 2006 representing that the policies were not intended to cover virus-related losses.  Doc. 17 at ¶¶ 117–19.  In fact, one

13

insurance group, recognizing a concern that a pandemic may result in claims that aim to expand coverage where no coverage was originally intended, explained that "this endorsement clarifies that loss . . . caused by . . . any virus . . . is excluded." *Id.* at ¶ 119. Defendants take the same position here, arguing that the virus exclusion does not cover losses caused by a virus. For this reason, federal courts applying the laws of a state that recognizes regulatory estoppel have repeatedly declined to apply the doctrine in COVID-19 insurance-coverage cases. *See Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, No. CV 20-1869, 2020 WL 7395153, at *9-10 (E.D. Pa. Dec. 17, 2020); *Kessler Dental Assocs., P.C. v. Dentists Ins. Co.*, No. 2:20-CV-03376-JDW, 2020 WL 7181057, at *3 (E.D. Pa. Dec. 7, 2020); *Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, No. CV 20-3198, 2020 WL 6545893, at *4-5 (E.D. Pa. Nov. 6, 2020).

In sum, the Court concludes that the virus exclusion bars coverage for Plaintiffs' losses and thus the Plaintiffs are not entitled to recover under the policies.

#### 4.    Time-element coverage under B.1.f

Plaintiffs argue that even if the virus exclusion does apply, Plaintiffs can still recover under the time-element coverage provided in Section B.1.f. of the "Additional Coverage – Limited Coverage for 'Fungi,' Wet Rot, Dry Rot, Bacteria and Virus" provision. Doc. 58 at 16-20. "Time element" serves as a term of art in the insurance industry referring to coverages measured in time. *See Independent. Barbershop, LLC v. Twin City Fire Ins. Co.*, No. A-20-CV-00555-JRN, 2020 WL 6572428, at *4 (W.D. Tex. Nov. 4, 2020). Business interruption and extra expense losses have been identified as time-element coverages. *See Altru Health Sys. v. Am. Prot. Ins. Co.*, 238 F.3d 961, 963 (8th Cir. 2001). Here, the Business Income coverage in Plaintiffs' policies is a time-element coverage because it applies to "loss of Business Income that occurs within 12 consecutive months after the date of direct physical loss or physical damage."

Docs. 17-1 at 40-41; Doc. 17-2 at 41-42; Doc. 17-3 at 42-43; Doc. 17-4 at 37-38; Doc. 17-5 at 42-43.

Defendants do not dispute that the coverages that Plaintiffs to seek recover under constitute time-element coverages.  Rather, they argue that Section B.1.f. cannot be viewed as a standalone provision and must be viewed in combination with Sections B.1.a and B.1.b.  Because Section B.1.a. imposes conditions for coverage that Plaintiffs have not alleged, Plaintiffs may not recover under Section B.1.f.  Additionally, Defendants argue that even if Section B.1.f. could be viewed separately, Plaintiffs would still not be entitled to coverage because they failed to satisfy the terms of B.1.f.

The Court agrees that even if B.1.f. did provide standalone coverage, Plaintiffs are not entitled to coverage.   To recover under B.1.f, Plaintiffs must allege that they suffered a loss that resulted in a virus, where the loss did not itself necessitate a suspension of operations, but that the virus that resulted from that loss did cause a suspension.  Defendants provide an example that the Court finds instructive, stating that B.1.f. would apply "if a loss, such as damage from a hurricane, did not itself necessitate a suspension of operations, but fungi that resulted from the hurricane required a suspension."  Doc. 59 at p. 13.  Here, while Plaintiffs allege that their loss came as a result of a virus, they do not allege any "loss which resulted in a virus."  Accordingly, Plaintiffs may not recover under B.1.f.

Plaintiffs cite to *Independent Barbershop* for support, which found that the plaintiff "plead a plausible claim for relief pertaining to coverage under Section B.1.f."  2020 WL 6572428, at *4.  The court found that B.1.f. was not limited to certain contributing causes as found in Section B.1.a.  *Id.*  However, the court did not address whether the plaintiff had adequately met the prerequisites necessary for recovery under B.1.f. to apply.  Having concluded

that Plaintiffs failed to allege the prerequisites, the Court declines to follow *Independent Barbershop*.

### 5.     Direct physical loss of or damage to

The parties do not dispute that even if the virus exclusion does not apply, Plaintiffs must demonstrate that the virus caused "direct physical loss of or physical damage to" the insured properties to recover the business income, extended business income, or extra expense they seek. *See* Docs. 17-1 at pp. 40–41, 17-2 at pp. 41–42, 17-3 at pp. 42–43, 17-4 at pp. 37-38, 17-5 at pp. 42–43. Instead, the parties dispute whether Plaintiffs alleged direct physical loss of or physical damage to the insured premises.

Plaintiffs argue that they sufficiently alleged a "direct physical loss of" property because they "were deprived of . . . their property for the purpose of providing dental care." Doc. 58 at p. 16. Stated differently, Plaintiffs contend that "direct physical loss of" includes "loss of use" of property. In making this argument, Plaintiffs stress that the word "of" is vital, as it suggests that "loss of property" and "damage to property" must mean different things. Defendants counter by stating that alleging mere loss of use is insufficient because "direct physical loss of" requires allegations that the insured property was physically altered in some manner.

The policies do not define "direct physical loss of" and thus the Court must "rely on the plain and ordinary meaning of the phrase." *See Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 763 (8th Cir. 2020) (applying Missouri law) (citations omitted). As in *Ballas Nails & Spa, LLC v. Travelers Casualty Insurance Company of America*, No. 4:20 CV 1155 CDP, 2021 WL 37984 (E.D. Mo. Jan. 5, 2021), and *BBMS, LLC v. Cont'l Cas. Co.*, No. 20-0353-CV-W-BP, 2020 WL 7260035 (W.D. Mo. Nov. 30, 2020), the Court finds it appropriate to begin its analysis by looking to *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787 F.2d 349 (8th Cir. 1986). The

16

plaintiff in *Hampton Foods* sought coverage for the losses it suffered when forced to vacate its building due to danger of the building's collapse.  787 F.2d at 351.  Applying Missouri law, *Hampton Foods* found the following policy ambiguous: "[t]his policy insures against loss of or damage to the property insured * * * resulting from all risks of direct physical loss[.]"  *Id.* (alterations in original).

Based on *Hampton Foods*'s conclusion, *BBMC* concluded that the phrase "direct physical loss" had been ruled ambiguous by the Eighth Circuit and thus must be construed in favor of the plaintiffs.  2020 WL 7260035, at *3.  Yet, as *Ballas* correctly notes, the policy's coverage for "all risks" of direct physical loss created the ambiguity, with the court reasoning that the term "all risks" could be reasonably construed in different ways.  2021 WL 37984, at *3.  Moreover, *Hampton Foods* found that even though the policy was ambiguous, "not every risk of loss is covered by the policy."  787 F.2d at 351 (citations omitted).  Nevertheless, the Court found that the policy covered the plaintiff's losses resulting from its sudden evacuation of the collapsing building because it had "suffered direct, concrete and immediate loss due to extraneous physical damage to the building."  *Id.* at 351, 352.

Thus, as *Ballas* found, "direct physical loss" requires an actual physical event affecting the property and not mere loss of use.  2021 WL 37984, at *3; *see also BBMS*, 2020 WL 7260035, at *3 (finding that "direct physical loss" requires some physical event or force on, in or affecting the property in question and not mere "loss of use"); *Zwillo V, Corp. v. Lexington Ins. Co.*, No. 4:20-00339-CV-RK, 2020 WL 7137110, at *4 (W.D. Mo. Dec. 2, 2020) (rejecting the plaintiffs' argument that "the loss of the ability to access property constitutes physical loss of property" because "'direct physical loss of or damage to property' requires physical alteration of property, or put another way, a tangible impact that physically alters property.").  Here, Plaintiffs

17

do not allege a physical event affecting the property.  Instead, "the circumstances [] are akin to two cases recognized by the Eighth Circuit in *Hampton Foods* that fell outside the scope of direct physical loss – each involving circumstances where the insured physical property was not directly affected by the claimed event." *Ballas*, 2021 WL 37984, at *4 (citing *Hampton Foods*, 787 F.2d at 352 (citing *Bros., Inc. v. Liberty Mut. Fire Ins. Co*., 268 A.2d 611 (D.C. Cir. 1970) (no direct physical damage due to business falloff attributable to imposition of curfew restrictions during civil disturbance); *Cleland Simpson Co. v. Fireman's Ins. Co. of Newark, N.J.*, 140 A.2d 41 (Pa. 1958) (no direct physical loss coverage for lack of access to property due to mere fear of possibility of fire during hurricane))).

Other Eighth Circuit case law supports the conclusion that "direct physical loss of" requires some physical event affecting the property.  In *Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co.*, an earthquake disabled a substation that provided electric power to two factories.  400 F.3d 613, 614 (8th Cir. 2005).  Without power, the factories could not manufacture the products it had contracted to produce.  The insured argued that the factories suffered "direct physical loss" because of their inability to function due to a lack of electricity, even though they had not suffered physical damage from the earthquake.  *Id*. at 616.  Applying Minnesota law, the court found that loss of use did not constitute "direct physical loss or damage." *Id*.  The court further explained that the circumstances in that case differed from when the loss of use stemmed from physical contamination of the property.  *Id*.

The Eighth Circuit, again applying Minnesota law, addressed a similar circumstance in *Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.*, 465 F.3d 834 (8th Cir. 2006).  There, a company could not receive beef from its Canadian supplier due to an embargo that barred the transportation of meat from Canada into the United States because of concerns about mad cow

disease.  The insured argued that the closing of the border caused direct physical loss to its beef

product.  *Id*. at 836.  The court rejected the argument because the beef itself was not physically

contaminated.  *Id*. at 838.  The Eighth Circuit did state, however, that the insured's argument

might be stronger if the policy's language included the word "of" rather than "to," as in "direct

physical loss of property."  *Id*.

Despite this statement in *SourceFoods*, courts applying it have attributed it no

significance.  For example, a federal district court in Minnesota evaluating policy language

providing "direct physical loss of," cited to *SourceFoods* to support its conclusion that physical

contamination was required, and mere loss of use was not sufficient.  *Seifert v. IMT Ins. Co.*, No.

CV 20-1102 (JRT/DTS), 2020 WL 6120002 (D. Minn. Oct. 16, 2020); *see also BBMS*, 2020 WL

7260035, at *3; *Ballas*, 2021 WL 37984, at *3.

For support, Plaintiffs rely on *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-CV-03127-

SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020), and *Blue Springs Dental Care, LLC v.*

*Owners Ins. Co*., No. 20-CV-00383-SRB, 2020 WL 5637963 (W.D. Mo. Sept. 21, 2020).  The

Court finds *Studio 417* and *Blue Springs* distinguishable because the plaintiffs in those cases

alleged that the insured property had been contaminated by COVID-19.  In *Studio 417*, the

plaintiffs alleged that "COVID-19 . . . attached to and deprived Plaintiffs of their property,

making it unsafe and unusable, resulting in direct physical loss to the premises and property."

2020 WL 4692385, at *4 (internal quotations omitted).  Similarly, the plaintiffs in *Blue Springs*

alleged that "the presence of COVID-19 on and around the insured property deprived Plaintiffs

of the use of their property and also damaged it."  2020 WL 5637963, at *4.  Here, Plaintiffs do

not allege that COVID-19 contaminated their properties; rather they argue that they shut down

their practices in compliance with industry and government instructions given to slow the spread of COVID-19, resulting in direct physical loss of use of the property.

Plaintiffs further rely on *Mehl v. The Travelers Home and Marine Insurance Company*, No. 4:16 CV 1325 CDP (E.D. Mo. May 2, 2018), where Judge Perry rejected the argument that "direct physical loss" meant actual physical damage.  However, in her opinion in *Ballas*, Judge Perry distinguished *Mehl* because "unlike the policy here — the specific policy language at issue in *Mehl* included coverage for 'loss of use.'"  2021 WL 37984, at *4 n.2.  The Court finds *Mehl* distinguishable for the same reason.

Plaintiffs also point to cases outside the Eighth Circuit to support the argument that "direct physical loss of or damage to property" provides coverage for lost operations or the inability to use property.  But those cases still support Defendants' position that the harm must be to the property itself.  For example, in *Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002), the court found that "physical loss or damage" to a structure occurs "only if an actual release of asbestos fibers from asbestos containing materials has resulted in contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable, or if there exists an imminent threat of the release of a quantity of asbestos fibers that would cause such loss of utility."  Similarly, in *Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823 (3d Cir. 2005), the Court concluded that the inability to use one's house constituted a physical loss when water contamination caused the loss of use.  But Plaintiffs here have not alleged any contamination occurring on the premises or anything else physical that rendered the property uninhabitable; to the contrary, Plaintiffs Levy, Keller, and Moshiri allege that they continued using their property for emergency dental services.  Other federal courts addressing whether losses stemming from COVID-19 shutdowns

have likewise concluded that *Port Auth.* and *Hardinger* necessitate a finding that a physical act affected the property.  *See e.g.*, *Santo's Italian Cafe LLC v. Acuity Ins. Co.*, No. 1:20-CV-01192, 2020 WL 7490095 (N.D. Ohio Dec. 21, 2020); *Kessler*, 2020 WL 7181057 (E.D. Pa. Dec. 7, 2020); *Handel*, 2020 WL 6545893 (E.D. Pa. Nov. 6, 2020).

Plaintiffs further argue that "loss of" and "damage to" must have different meanings because the terms are separated by "or," a term that's "ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings."  Doc. 58 at 21 (citing *Hoeft v. True Mfg. Co., Inc*., 604 S.W.3d 337, 341 (Mo. Ct. App. 2020)).  However, Plaintiffs ignore that "direct" and "physical" modify the words "loss" and "damage," and thus indicate that both terms require a direct physical alteration to the property at issue.  *Zwillo*, 2020 WL 7137110, at *4; *see also Mama Jo's Inc. v. Sparta Ins. Co.,* 823 F. App'x 868, 879 (11th Cir. 2020) (concluding that "direct" and "physical" modified "loss" and imposed a requirement that the loss be actual); *Cetta, Inc. v. Admiral Indem. Co*., No. 20 Civ. 4612 (JPC), 2020 WL 7321405, at *6 (S.D.N.Y. Dec. 11, 2020) (concluding that because "physical" modified "loss," the plain meaning of the phrase excluded "intangible" losses).  Moreover, "direct physical loss of" and "direct physical damage to" can support different meanings—"loss of" referring to complete destruction of the insured premises, while "damage to" refers to any other injury requiring repair.  *Henry's Louisiana Grill, Inc. v. Allied Ins. Co. of Am.*, No. 1:20-CV-2939-TWT, 2020 WL 5938755 (N.D. Ga. Oct. 6, 2020); *see also*, *Cetta*, 2020 WL 732 1405, at *9; *Water Sports Kauai v. Fireman's Fund Ins. Co*., No. 20-cv-03750, 2020 WL 6562332, at *6 (N.D. Cal. Nov. 9, 2020).

Additionally, "[r]eading the 'phrase direct physical loss of or damage to' in the broader context of the Polic[ies]" further bolsters the Court's conclusion that Plaintiffs must demonstrate some physical alteration to the premises to recover.  *Cetta,* 2020 WL 7321405, at *6.  The

Business Income and Extra Expense sections provide coverage during "the period of restoration," which begins twenty-four hours after the "direct physical loss or damage" and ends on the date when the insured property "should be repaired, rebuilt or replaced" or "when [the] business is resumed at a new, permanent location." *See, e.g.,* Doc. 17-1 at 54.  Similarly, the Extended Business Income section "[b]egins on the date property is actually repaired, rebuilt or replaced." *See id*. at 41.  The terms "rebuilt," "repair," and "replace" in the definition of "period of restoration" indicate that the policy provides coverage for "the length of time set aside for physical repairs to physical loss of damage." *Santo's Italian Cafe LLC v. Acuity Ins. Co.*, No. 1:20-CV-01192, 2020 WL 7490095, at \*10 (N.D. Ohio Dec. 21, 2020).  In other words, construing "direct physical loss of" to cover mere loss of use would render the "period of restoration" definition superfluous because such losses cannot be "rebuilt, repaired, or replaced." Moreover, the range of contemplated harm, from repairs to starting anew at a different location, aligns with an understanding that 'loss of' means total destruction while 'damage to' means some amount of harm or injury." *Henry's*, 2020 WL 5938755, at \*6.  Thus, because Plaintiffs do not allege that anything on their premises needs to be "repaired, rebuilt, or replaced" or that they must resume at a new location, they have failed to allege losses covered by their policies. *See Cetta*, 2020 WL 7321405, at \*6; *Santo's Italian Café*, 2020 WL 7490095, at \*10; *Water Sports Kauai*, 2020 WL 6562332, at \*6-7.

Lastly, other federal courts have found that the same policy language at issue requires more than mere loss of use.  *See, e.g.*, *Santo's Italian Café*, 2020 WL 7490095, at \*12; *Cetta*, 2020 WL 7321405; *SA Palm Beach LLC v. Certain Underwriters at Lloyd's, London*, No. 9:20-cv-80677-UU, 2020 WL 7251643 (S.D. Fla. Dec. 9, 2020); *Kessler Dental*, 2020 WL 7181057, at \*4; *Palmer Holdings & Investments, Inc. v. Integrity Ins. Co*., No. 4:20-cv-154-JAJ, 2020 WL

7258857, at *7-11 (S.D. Iowa Dec. 7, 2020); *El Novillo Rest. v. Certain Underwriter's at Lloyd's, London*, No. 1:20-cv-21525-UU, 2020 WL 7251362, at *3-6 (S.D. Fla. Dec. 7, 2020); *Water Sports Kauai*, 2020 WL 6562332, at *6-7 (N.D. Cal. Nov. 9, 2020); *Handel*, 2020 WL 6545893, at *3; *Nahmad*, 2020 WL 6392841, at *6-8.

In sum, the great weight of authority supports Defendants' position that "direct physical loss of" requires some physical event to occur on the property itself.  Although measures aimed at slowing the spread of COVID-19 shut down Plaintiffs' practices and thus deprived them of using their insured properties, Plaintiffs failed to allege that any direct physical event occurred on their properties.  As such, Plaintiffs losses are not covered under the policies and the Court dismisses Counts I, III, IV, and VI.

### B.   Breach of the implied covenant of good faith and fair dealing claims (Counts II and V)

In Counts II and V in their Complaint, Plaintiffs allege that Defendants breached the implied covenant of good faith and fair dealing.  Defendants seek to dismiss these claims and Plaintiffs did not address Defendants' arguments in opposing the motion for judgment on the pleadings, which provides an independent basis for dismissing these claims.  *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009).  The claims also fail as a matter of law.

In Missouri, recovery "by the insured against the insurance company for the policy benefit . . . is limited to that provided by the law of contract plus, if section 375.420 applies, the enhancements provided by the statute." *See Overcast v. Billings Mut. Ins. Co*., 11 S.W.3d 62, 68 (Mo. banc 2000) (citation omitted).  "[A]n insurance company's denial of coverage itself is actionable only as a breach of contract and, where appropriate, a claim for vexatious refusal to pay." *Id*. at 69.  As such, courts dismiss claims for breach of the implied duty of good faith and

23

fair dealing predicated on denial of insurance. *See*, *e.g.*, *Tuten v. Allied Prop. & Cas. Ins. Co.*, No. 6:13-CV-03258-BCW, 2013 WL 12155320 (W.D. Mo. Nov. 1, 2013).

To the extent Plaintiffs' citations to the vexatious refusal to pay sections of the Missouri Revised Statutes attempt to state a vexatious refusal to pay claim, those claims also fail.  In Missouri, vexatious refusal to pay requires plaintiffs to prove the existence of an insurance policy, that the insured refuses to pay, and the insurers refusal was without reasonable cause or excuse. *32nd St. Surgery Ctr., LLC v. Right Choice Managed Care*, 820 F.3d 950, 957 (8th Cir. 2016) (citing *D.R. Sherry Constr. Ltd. v. Am. Family Mut. Ins. Co.*, 316 S.W.3d 899, 907 (Mo. 2010)).  Because the Court concluded that the insurance policies did not provide Plaintiffs coverage, Defendants had reasonable cause to refuse to pay Plaintiffs' claims.  Thus, Plaintiffs cannot establish a vexatious refusal to pay claim. *See Smith v. Zurich Am. Ins. Co.*, No. 4:16CV00187 ERW, 2017 WL 3168566, at *5 (E.D. Mo. July 26, 2017).  Accordingly, the Court dismisses Counts II and V.

## IV.     Supplemental Authority

Since completing the briefing on the motion, Defendants submitted additional authorities supporting their position.  Doc. 62.  Plaintiffs responded with its own additional authorities. Doc. 63.  However, the cases cited by Plaintiffs are either readily distinguishable or present the same attempted distinctions they urged in their opposition brief, which the Court has found unavailing.  Docs. 58, 63.  While one case cited by Plaintiffs thoroughly discusses many of the same issues present here, *Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins. Co.*, No. 1:20 CV 1239, 2021 WL 168422 (N.D. Ohio Jan. 19, 2021), the Court finds it distinguishable because that case involved governmental orders that forced businesses to shut down, and no such orders exist here.  Additionally, the Court declines to follow that court's finding that the government

shutdown orders did not "indirectly cause" the restaurants' losses, as such a ruling admits of no limiting principle.

## V.    Conclusion

The Court grants Defendants' motion for judgment on the pleadings and dismisses all counts against the Defendants.

So Ordered this 16th day of February 2021.

_SL R. CR_

_____

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**